**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OFI RISK ARBITRAGES, OFI RISK ARB ABSOLU and TIMBER HILL LLC, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>    v.<br><br>COOPER TIRE & RUBBER COMPANY, ROY ARMES and BRADLEY HUGHES,<br><br>             Defendants. | Civ. A. No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

Plaintiffs OFI Risk Arbitrages, OFI Risk Arb Absolu and Timber Hill LLC (collectively, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Cooper Tire & Rubber Company ("Cooper" or the "Company") with the United States Securities and Exchange Commission ("SEC") as well as reports issued by Apollo Tyres Ltd. ("Apollo"); (b) press releases and media reports issued by and disseminated by the Company and Apollo; (c) analyst reports concerning Cooper and Apollo; (d) pleadings, evidence and trial testimony in *Cooper Tire Rubber Company v. Apollo (Mauritius) Holdings Pvt. Ltd., et al.,* C.A. No. 8980-VCG (Del. Ch.); and (e) other public information regarding the Company and Apollo.

<u>**INTRODUCTION**</u>

1.    This is a federal securities class action brought on behalf of purchasers of Cooper's publicly traded common stock between June 12, 2013 and November 8, 2013, inclusive (the "Class Period"), as well as the Cooper stockholders of record as of the close of business on

August 30, 2013 (the "Record Date") entitled to vote on the proposed merger between Cooper and Apollo (as set forth below), and were damaged thereby (the "Class").  The claims asserted herein are alleged against Cooper, Cooper's Chairman and Chief Executive Officer, Roy Armes, and Cooper's Chief Financial Officer, Bradley Hughes (collectively, "Defendants"), and arise under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and rules promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5 and Rule 14a-9, 17 C.F.R. §240.14a-9.

2.     This action arises out of the failed acquisition of Cooper—a leading tire manufacturer incorporated in Delaware—in a deal that was described by one of the Company's former executives as an example of classic "corporate greed."  As set forth below, Cooper and its most senior executives, enticed by an enormous payout that would make them all multi-millionaires, went to great lengths to push through a sale of the Company to India-based Apollo. In the hopes of closing that transaction and enriching themselves, Defendants concealed from investors the extraordinary risks that ultimately doomed the transaction and which have caused permanent damage to Cooper's business. Investors, including Plaintiffs herein, who were damaged when their investment in Cooper stock declined precipitously in value once the corrective disclosures at the end of the Class Period revealed the true risks of the deal, have suffered enormous financial losses as a result of the Defendants' wrongdoing.

3.     Specifically, on June 12, 2013, the start of the Class Period, Cooper announced that it had entered into an agreement to be acquired by Apollo, an Indian-based tire company, for $35 per share, putting the total deal at $2.5 billion in cash.  The merger would create the seventh-largest tire manufacturer in the world by revenue, and Cooper touted the deal to the Company's shareholders as an unbeatable offer.  Indeed, the $35 per share price Cooper told investors they

would receive upon the consummation of the acquisition represented a 40% premium to Cooper's 30-day volume-weighted average price.

4.     Although Cooper executives presented the deal to investors as a "compelling" transaction that was "in the best interests of shareholders," Defendants concealed known, material risks that made it highly unlikely, if not impossible, that the deal would close at $35 per share.  Indeed, Cooper executives knew that the joint venture partner in the Company's most important subsidiary—Cooper Chengshan Tire Company, Ltd. ("CCT")—vigorously opposed the transaction, had the ability to thwart the deal, and demanded extraordinary compensation in return for any agreement that it would not do so.  The fact that Cooper's joint venture partner, Chengshan Group ("Chengshan"), opposed the Apollo merger was obvious to Defendants, as Chenghsan <u>itself</u> had sought to acquire Cooper prior to the announcement of the deal—a crucial fact that Cooper concealed from investors and Apollo throughout the Class Period.

5.     As noted by Apollo in its recent claims against Cooper in Delaware Chancery Court:

> Cooper is not in compliance with the Merger Agreement, <u>in part because its representations and warranties are not true</u> and because it has failed to perform its covenants. This state of affairs can be traced to two sets of events. First, Cooper does not have control over its most significant subsidiary, a majority-owned and consolidated joint venture in China called Cooper Chengshan (Shandong) Tire Company, Ltd. ("CCT"). <u>Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.</u>

6.     In fact, prior to the announcement of the Apollo merger, Cooper senior executives, including Defendant Armes, held numerous meetings with Chengshan representatives concerning a proposed acquisition of Cooper.  Moreover, internal documents show that Cooper had anticipated a higher bid from Chengshan than what had been proposed by Apollo.  But instead of engaging in further negotiations with Chengshan to seek a better deal for

Cooper's shareholders—or even disclose to Apollo or Cooper shareholders the fact that Cooper's joint venture partner had sought to acquire the Company for itself—Cooper spurned Chengshan, and promptly moved to lock in an agreement with Apollo.

7.     Despite knowing that Chengshan's opposition to the Apollo merger posed a massive risk to the transaction, Cooper touted CCT and the Company's Chinese operations as the central factor in favor of the deal, and featured them prominently in its announcement.  For example, on June 12, 2013, in a press release announcing the acquisition, Cooper described the merger as bringing "together two companies with highly complementary brands, geographic presence, and technological expertise to create a global leader in tire manufacturing and distribution" with "strong presence in high-growth end-markets," including China.  That press release highlighted Cooper's "Chengshan" brand, and noted that "Cooper is one of the most respected names in the tire industry, with an extensive distribution network and manufacturing infrastructure, and a particularly robust presence in North America and China."  According to the press release, due to Cooper's significant presence in China, the "combined company will be uniquely positioned to address large, established markets, such as the United States and the European Union, as well as fast-growing markets of India [and] China…where there is significant potential for further growth."  Accordingly, Cooper's announcement of the deal not only failed to identify Chengshan's opposition to the transaction as a major risk that was likely to prevent Apollo's acquisition of Cooper, but falsely touted the Chengshan partnership as an asset that made the transaction more likely to close.

8.     Cooper filed numerous documents with the SEC on June 12, 2013, which provided additional details to investors concerning the merger. The filings continued to highlight Cooper's China operations and its Chengshan brand.  For example, Cooper claimed that the

combined company would have "a strong presence in the largest tire market of North America as well as the fastest-growing geographies such as China and India, among others."

9.     The Company also represented in its SEC filings that it had exclusive possession and control over all of its business operations, including CCT; had effective internal controls over its financial reporting; and had policies and procedures in place to ensure its subsidiaries' compliance with all regulatory and other legal requirements—representations that falsely reassured investors and concealed the true risks of the transaction.  Specifically, the Company filed the Agreement and Plan of Merger dated June 12, 2013 for the Cooper and Apollo transaction (the "Merger Agreement") as an exhibit to a Form 8-K.  In that document, Cooper represented, among other things, that:

- "[T]he Company or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property," including the CCT facilities;

- that Cooper "maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, and provided reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements;"

- That Cooper and its "Subsidiaries were in compliance with applicable Laws, and have policies and procedures providing reasonable assurance of continued compliance with such Laws;" and that

- "Since December 31, 2012…its Subsidiaries and, to the Knowledge of the Company, its Joint Ventures have conducted their respective businesses only in the ordinary course of business consistent with past practice in all material respects."

10.     Cooper continued to promote the transaction and the justification for the $35-per-share price by touting Cooper's projected financial results and presenting Cooper's business as stable and growing.  For example, in the proxy statement seeking shareholder approval of the

deal filed on August 30, 2013 (the "Proxy"), Cooper provided financial projections showing that Cooper expected net sales of $4.2 billion and earnings of $528 million for 2013.

11.     In response to Cooper's statements touting the $2.5 billion merger and the $35-per-share that investors would receive once that merger closed, the Company's representations concerning its Chinese operations and CCT subsidiary, and the numerous assurances concerning the Company's control over its subsidiaries, their business operations, and the Company's internal controls over financial reporting, the price of Cooper shares rose from a close of $24.56 per share on June 11, 2013 to close at $34.66 per share on June 12, 2013.   Moreover, the announcement of the merger and the price Cooper shareholders would receive prompted massive investments in Cooper stock, with trading volume during the week of June 12 reaching the highest in the Company's history, with over 50 million shares trading hands.

12.     These representations were false, and misled investors concerning the true risks of the transaction.  In truth, Defendants knew that the merger was fraught with risk, and that it was highly unlikely to be consummated on the terms disclosed in Defendants' proxy materials because, as Defendants knew, Chengshan vigorously opposed the transaction.  Defendants also knew that CCT was one of primary factors motivating Apollo to agree to the deal, as Cooper had specifically touted CCT as providing Apollo with a window to the Chinese market.   But Defendants knew that Cooper had no effective control over CCT, and that Chengshan, which has a massive presence in China where CCT operates, had the unilateral ability to direct operations at the CCT facility and could, at whim, shut down one of the most significant components of Cooper's business. Indeed, Chengshan had previously denied Cooper executives access to the CCT facility.  Defendants also knew that Cooper did not even have access to CCT financial information, except as permitted by Chengshan.

13.     Cooper failed to disclose these crucial facts to Apollo (and Cooper investors) even though Apollo was intently focused on Chengshan's reaction to the transaction during the pre-merger due diligence process.  In fact, in response to Apollo's requests for more information, Defendant Armes told Apollo that Chengshan's chairman, Che Hongzhi, who goes by "Chairman Che," could respond in one of three ways:  "One, he could go along with the acquisition and really support it and transition it.  Second, he could possibly offer up his shares. He has a 35% in the joint venture.  He could possibly be looking for selling those.  And then, thirdly, he could – he could disrupt it or try to undermine it."   Accordingly, in order to prevent a negative reaction, Apollo requested to meet personally with Chairman Che.  At that May 15, 2013 meeting, which was attended by Apollo and Cooper representatives, Chairman Che explained that he was opposed to any transaction with Apollo and, at the very least, demanded compensation in return for any approval of the deal, saying "My father is changing to my stepfather – what am I getting?" Cooper executives understood that this meant Chairman Che demanded compensation for his approval, and that the failure to provide for such compensation as part of the transaction would present tremendous risks to closing on the deal.  Indeed, on June 11, 2013, the day before the merger was announced to Cooper's shareholders, Defendant Armes met again with Chairman Che, who reiterated that "he would really not like to [sic] us sell the company and his interest was in keeping Cooper and keep things going the way that we were."

14.     Unlike Apollo, Cooper's investors and the public at large knew nothing about Che's extortionate demand, but was kept in the dark by the Defendants.  Even Apollo was denied the full story.  While it was aware of Che's diffident reaction, it was denied information crucial to understanding the magnitude of the risk – the fact that Che had previously expressed an interest in buying Cooper himself.  Thus, Apollo (and the public) could not rationally evaluate

the likelihood that Che would do his utmost to obstruct an acquisition by Apollo absent a massive payment.

15.   After the Merger Agreement was signed, a number of challenges to the deal materialized.  First, two grievance were filed by the United Steelworkers, Local Union 725L and 207L ("USW"), challenging the merger on the grounds that it violated Cooper's Memoranda of Agreement for its plants in Texarkana, Arkansas and Findlay, Ohio.

16.   The grievances were filed on August 1, 2013, and arbitration was held in Washington D.C. at the end of the month. On September 13, 2013 the arbitrator issued its decision, ruling against Cooper and finding that the "Company is ordered to refrain from selling or transferring the Texarkana and Findlay plants pursuant to the Agreement and Plan of Merger unless and until the Union has entered into agreements with the buyer, Apollo Tyres B.V., prior to the closing recognizing the Union as the bargaining agent."

17.   Second, following the announcement of the transaction, workers at the CCT facility went on strike demanding termination of the merger.  CCT employees stopped producing Cooper tires, and denied Cooper all access to the facility and to any information concerning CCT.  While CCT employees temporarily returned to work on June 28, 2013, the strike resumed on July 13, 2013, and CCT workers began barring Cooper-affiliated managers from the CCT facility.  For example, on July 17 and 18, employees at the CCT facility prevented Cooper representatives from removing Cooper's own tire molds from the facility.  CCT employees have since refused to produce any Cooper-branded tires, and have physically barred Cooper-appointed managers from accessing the CCT facility, obtaining CCT's financial books and records, and have even prevented CCT from entering certain operating and financial data into CCT's computer systems that Cooper can access remotely.  Cooper itself has admitted that it had no

physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, and did not have any such control or access for months.

18.     Despite evidence to the contrary, Cooper continued to downplay the impact the CCT strike had on the viability of the deal. For example, in its Proxy, Cooper stated, "Neither the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

19.     Apollo was stunned by the CCT shut-down, and immediately engaged Cooper to determine its impact on the transaction.  However, Cooper knew that its inability to obtain basic information from CCT and generate financial results for its most important subsidiary was a fundamental roadblock preventing Cooper from closing on the deal.  Cooper knew that its lack of control over CCT contradicted its representations to Apollo and, under the terms of the Merger Agreement, enabled Apollo to simply walk away from the deal.  Recognizing that it was unable to complete the transaction at the $35-per-share price that Cooper touted to investors, Cooper filed a lawsuit on October 4, 2013 preemptively seeking to force Apollo to close on the merger. On, October 7, 2013, before the market opened, Cooper filed a Form 8-K with the SEC which included a press release revealing that the deal was unraveling, as well as a copy of the complaint Cooper filed against Apollo on October 4.

20.     In response to these disclosures, and the market's realization that the merger was in dire jeopardy and would not be consummated at the $35 per-share price that Cooper announced on June 12, 2013 (and which shareholders, without complete and accurate information, had approved just days before), Cooper's common shares plunged.  Specifically, Cooper stock fell from $31.27 per share on October 3, 2013 to close at $25.72 per share on October 7, 2013, wiping out over $300 million in shareholder value.

21.     On October 14, 2013, Apollo filed its Answer to Cooper's Complaint in the Delaware Chancery Court.   Apollo counterclaimed, stating that under the Merger Agreement "Cooper promised to do a number of things that it had not done." Apollo further noted that Cooper was not in compliance with the Merger Agreement,

> "in part because its representations and warranties are not true and because it has failed to perform its covenants . . . .  [] Cooper does not have control over its most significant subsidiary, [CCT]. Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

22.     Additionally, Apollo noted that Cooper, as a result of its arbitration with USW, had been enjoined from consummating transactions contemplated by the Merger Agreement until a labor agreement had been reached with USW.

23.     Significant testimony and evidence from the November trial in the Delaware Chancery Court confirms that Cooper executives knew all along that Chengshan posed a material risk to the transaction, which was never disclosed to investors.  Specifically, Cooper executives, including Defendant CEO Roy Armes, repeatedly testified that, prior to the beginning of the Class Period and the announcement of the merger, Cooper was informed that Chengshan vehemently opposed the merger and required that it be compensated in any Apollo transaction. Indeed, according to that testimony, formal negotiations beginning in March 2013 revealed that the Chengshan objected to the deal, and that CCT had in fact demanded $400 million for its stake in the venture—or nearly one-sixth of the cost of the entire deal.

24.     Moreover, evidence produced in that litigation confirms that numerous other statements in Cooper's Proxy were materially false and misleading.  For example, while Cooper reported projected net sales of $4.2 billion for 2013 in its Proxy, Cooper produced internal reports weeks earlier that showed 2013 revenues were projected to be $3.9 billion—a $300

million difference—and that sales had continued to drop in the weeks leading up to and through the August 30, 2013 proxy filing and September 30, 2013 vote.  Indeed, even though Cooper had shared its increasingly dire financial projections with Apollo—further distressing its potential suitor by reporting that 2013 projected profits had been nearly cut in half over the course of just two months—Cooper's shareholders were kept in the dark.

25.     On November 8, 2013, the Delaware Chancery Court denied Cooper's request for an order requiring Apollo to close on the merger, holding that Apollo had not breached the agreement.  In so ruling, the Delaware Chancery Court made clear that, based on the information disclosed for the first time at trial, it was highly doubtful Cooper could ever have been able to satisfy its obligations under the Merger Agreement because Cooper was unable to produce its third-quarter financial results:

> [T]he reason for the extreme expedition of this action . . . is that Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013. Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose third-quarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013. Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture.

26.     In response to disclosures revealing that Cooper was not entitled to force Apollo to close, Cooper stock fell again, from $26.90 per share on November 7, 2013 to close at $23.82 per share on November 8, 2013, wiping out another $175 million in shareholder wealth.

27.     Then, on November 12, 2013, Cooper filed a Notification of Late Filing with the SEC, disclosing that it would be unable to timely file its Form 10-Q for the quarter ended September 30, 2013 because it had no access to any business and financial information relating to CCT.  Further, the Company disclosed that it expected a "significant change" in its results of operations and that its operating profit will be "significantly lower" than Cooper reported for the

same period a year before, partly as a result of the effects from the strike at CCT.  According to the Company, given that the Company does not have sufficient information regarding its most important and profitable subsidiary, "a reasonable estimate of the results cannot be made."

28.     Following these disclosures, additional developments in the Delaware Chancery Court litigation confirmed that Cooper's claims against Apollo were without merit, and that the merger and the shut-down at the CCT subsidiary had in fact put Cooper's long-term business prospects in jeopardy.  Specifically, on December 16, 2013, the Delaware Supreme Court denied Cooper's appeal of the Delaware Chancery Court's November 8, 2013 ruling, holding that the appeal had been "improvidently accepted."  Then, on December 30, 2013, Cooper announced that it was formally terminating the merger.  On a webcast with investors that day, Defendant Armes acknowledged that "the financing for the transaction [was] no longer available" and that it was "a reality that the agreement both companies signed on June 12 will not be consummated by Apollo."  On that same conference call, Defendant Hughes admitted that Cooper still did not have any control over its CCT subsidiary or access to the information needed to generate the Company's financial results, and could not provide any estimate of "when the situation will be resolved or when we will resume normal [financial] reporting."

29.     Following Cooper's cancellation of the merger, in a December 30, 2013 press release, Apollo stated "Cooper's actions leave Apollo no choice but to pursue legal remedies for Cooper's detrimental conduct."

## JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.P.R. §240.10b-5 and SEC Rule 14a-9, 17 C.F.R.

§240.14a-9.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Cooper is incorporated in this District and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

32.     The OFI Funds are described as follows:

    a.  Plaintiff OFI Risk Arbitrages is a trust organized under the laws of France, with a principal place of business located at 22 rue Vernier, 75017 Paris. OFI Risk Arbitrages purchased shares of Cooper stock on the New York Stock Exchange during the Class Period through its investment manager OFI Asset Management, and suffered damages as a result of the violations of the federal securities laws alleged herein.

    b.  Plaintiff OFI Risk Arb Absolu is a trust organized under the laws of France, with a principal place of business located at 22 rue Vernier, 75017 Paris.  OFI Risk Arb Absolu purchased shares of Cooper stock on the New York Stock Exchange during the Class Period through its investment manager OFI Asset Management, and suffered damages as a result of the violations of the federal securities laws alleged herein.

33.     Plaintiff Timber Hill, LLC ("Timber Hill") is a Connecticut limited liability company with its principal place of business at One Pickwick Plaza, Greenwich, Connecticut 06830.  Timber Hill purchased shares of Cooper stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

34.     Defendant Cooper, a Delaware Corporation based in Findlay, Ohio, is the fourth largest tire manufacturer in North America, and the eleventh-largest tire manufacturer in the world by revenue.  The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "CTB."  Cooper currently has almost 65 million shares of stock outstanding.

35.     Defendant Roy Armes ("Armes") was, at all relevant times, Cooper's Chairman and Chief Executive Officer.

36.     Defendant Bradley Hughes ("Hughes") was, at all relevant times, Cooper's Chief Financial Officer.

37.     Defendants Armes and Hughes are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Cooper, possessed the power and authority to control the contents of Cooper's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and

were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

38.     Non-party Apollo Tyres Ltd. ("Apollo") is a publicly traded Indian company that manufactures, among other things, tires and tubes for cars, trucks, farm equipment, and light commercial vehicles.  Apollo was founded in 1972, and has since grown to be one of the largest tire manufacturing companies in the world, employing over 16,000 people with annual revenue of approximately $2.34 billion in 2012.  Apollo trades on the Bombay Stock Exchange.

## BACKGROUND

### History and Organization of Cooper

39.     Cooper, founded in 1914, is the fourth largest tire manufacturer in North America, and the eleventh-largest tire manufacturer in the world by revenue.  Based in Findlay, Ohio, Cooper and its family of companies currently operate 9 manufacturing facilities and 38 distribution centers in 11 countries.  As of December 31, 2012, Cooper employed 13,550 people worldwide.  The Company is organized into two reportable business segments:  North American Tire Operations, which manufactures and markets passenger car and light truck tires for sale in the U.S., and International Tire Operations, which includes the Company's manufacturing operations in the United Kingdom, the Republic of Serbia and the People's Republic of China.

40.     Cooper has two significant manufacturing facilities in China.  The Company's Cooper Kunshan entity, located in Kunshan, China, manufactures light vehicle tires largely for sale in markets outside China.  Under Cooper's agreement with the government of China, beginning in 2013, tires produced at this facility were permitted to be sold in the domestic Chinese market.

41.     CCT, located in Rongcheng, in eastern Shandong province, is Cooper's other Chinese business, its most important subsidiary, and operates Cooper's most profitable manufacturing facility.   CCT employs 5,000 workers, or nearly 40% of Cooper's entire workforce, and is responsible for approximately one-quarter of all of Cooper's revenues and profits.   CCT is 65% owned by Cooper, and 35% owned by Chengshan.   A chart demonstrating Cooper's ownership structure of CCT is set forth below:



42.     Cooper's Chinese operations were one of the primary reasons that Apollo was interested in acquiring Cooper.   According to Apollo managing director Neeraj Kanwar's testimony, "China was very, very important for the transaction and still is very important for the transaction. It is the fastest growing economy of the world."

43.     Beginning in January 2013, Apollo and Cooper began "serious" discussions about a potential merger, and began identifying the major negotiating points in the transaction. As early as March 7, 2013, Cooper and Apollo identified potential risks to the deal as including the contracts with Cooper's domestic unions as well as the attitude of Chengshan.

44.     Defendant Armes, Cooper's Chairman and CEO, testified that on March 7, 2013, Apollo expressed concern about how Chengshan Group head Chairman Che would react to this acquisition.  Mr. Armes informed Apollo that one possibility with regards to the venture was that Chairman Che "could disrupt it or try to undermine it."

45.     Indeed, Chenghsan's opposition to any potential transaction was conveyed to Cooper at a May 15, 2013 meeting with Chengshan, which was attended by Apollo managing director Neeraj Kanwar and Cooper representatives.  According to Kanwar's testimony, during that meeting, Chairman Che explained that he was opposed to any transaction with Apollo and, at the very least, demanded compensation in return for any approval of the deal, saying "My father is changing to my stepfather – what am I getting?"

46.     Despite this warning, Cooper concealed Chengshan's opposition to Apollo from investors, and maintained that CCT was not an obstacle to completing the merger.  In fact, Cooper withheld Chengshan's threat to the deal from investors and, rather than disclose this significant risk, Cooper touted CCT as a valuable asset that would motivate Apollo to close the deal.  In fact, Cooper also concealed this very risk from Apollo.  For example, as was only revealed in the November trial at the end of the Class Period, during Cooper and Apollo's negotiations, Cooper represented to Apollo that its Chinese platform, including CCT, was a "very low risk way to launch Apollo as a player in the China market," and that the Chengshan

"was a very good partner." According to Cooper, Chengshan had no veto or put rights, and told Apollo that the Chengshan's approval for the merger would <u>not</u> be required.

47.    As was revealed in trial testimony at the end of the Class Period, Cooper executives knew the opposite was true—that Chengshan vigorously opposed the deal—because Chengshan had <u>itself</u> sought to acquire Cooper. Internal Cooper documents produced at trial showed that, prior to the announcement of the merger, Cooper had been in negotiations with Chengshan concerning a proposed acquisition and that Cooper had in fact anticipated a higher bid from Chengshan than what had been proposed by Apollo.  As Defendant Armes testified, he knew that Chengshan was preparing a proposal to acquire Cooper but that Chengshan was apparently not able to arrange financing before the Apollo acquisition was announced.  Rather than giving Chengshan time to arrange financing for a competing bid and seek to maximize the value for Cooper's shareholders, Defendants moved quickly to lock in the offer from Apollo, despite the obvious risk posed by Chengshan.  Accordingly, Defendants knew that its joint venture partner vigorously opposed the deal with Apollo because Cooper had spurned Chengshan's attempts to acquire Cooper, and, at minimum, Chengshan required compensation in return for any approval of the transaction.  At trial, Defendant Armes revealed that on June 11, 2013, prior to Apollo's signing of the Merger Agreement and the day before the deal was announced to shareholders, Chairmen Che reiterated to Defendant Armes "that he would really not like to [sic] us to sell the company and his interest was keeping Cooper and keep things going the way that we were."

48.    Cooper's knowledge of the true risks of the transaction is also demonstrated by the fact that Cooper specifically sought to insulate itself from the risk that Chengshan would thwart the transaction in negotiating the terms of the Merger Agreement. Specifically, Cooper

sought to include a Material Adverse Event clause in the Merger Agreement that Cooper believed would allow it to argue that a negative reaction by Chengshan would not constitute an event that would permit Apollo to walk away from the deal.  However, as revealed at the trial at the end of the Class Period, throughout the extensive negotiations regarding this very term, Cooper never disclosed to Apollo that Cooper was specifically contemplating the risk of an adverse reaction by Chengshan.  In fact, rather than negotiate in good faith, Cooper falsely told Apollo that Chengshan and Chairman Che were not a threat because Cooper had control over CCT, appointed the key operational personnel at the subsidiary, and that "Cooper was the industrial partner running this operation, and that Chairman Che was kind of the local partner who was…there" and only "necessary for local reasons."

**CCT Workers' Strike**

49.     Almost immediately after the merger was announced, CCT workers went on strike and, by June 21, CCT operations were completely shut down.  By July 12, Cooper had lost all access to the CCT facility.  Indeed, Cooper was unable to remove its own tire molds from the CCT facility because security forces prevented Cooper representatives from entering the facility. While the CCT plant resumed production on August 17, Chengshan ordered that the CCT plant stop producing Cooper-branded tires.  Further, CCT workers physically blocked Cooper-appointed managers from accessing the plant, and denied Cooper the ability to obtain CCT's business and financial records, going so far as to prevent CCT workers from inputting financial data into computer systems to which Cooper has remote access.  As a result, Cooper has been unable to produce financial results for nearly a quarter of its business.

50.     As Defendant Armes admitted, Cooper knew that Chairman Che controlled the shut-down, and that the strike was not the result of any employee-initiated action.  Indeed,

Cooper was specifically advised that the protest at CCT was orchestrated by Chairman Che and organized by Chengshan Group shareholder Liu Shengli, and that middle management warned workers at the CCT facility that "anyone that does not take part in the protest will be fired."

51.     On July 10, 2013, Cooper executives met with Chairman Che to try and resolve the CCT strikes.  According to Defendant Armes' notes of the meeting, "[i]t was clear that Che only wanted to hear that we were stopping the acquisition by Apollo."

**The Company's Financial Condition Declines Rapidly**

52.     In addition to physically barring Cooper from accessing the CCT facility and obtaining basic information concerning its most important subsidiary, Chengshan has also filed formal legal action in China to dissolve the joint venture.  In that lawsuit, Chengshan claimed that the merger has caused the CCT labor union to implement a work stoppage because the merger agreement does not adequately provide for CCT's employees, and has asked the court to dissolve the partnership.

53.     While Chengshan had overtaken the CCT facility and initiated litigation, the Company's business outside China was suffering as well, and its sales had begun to decline at an alarming rate.  For example, on July 21, 2013, Cooper provided Apollo an initial forecast that included projections of $4.3 billion in revenues and $380 million in operating profit for 2013. Just weeks later, however, on August 9, 2013, Cooper provided Apollo with a revised 2013 forecast, showing $3.9 billion in revenues and $363 million in operating profit.  By September 9, 2013, Cooper revised its business plan again, showing further substantial reductions: $3.6 billion in revenues and $315 million in operating profit for 2013.  According to correspondence that was produced in connection with the Delaware litigation, Cooper repeatedly told Apollo that the declining financial results were attributable largely to deferred pricing actions in the second

quarter that impacted sales volumes and would, in fact, be compensated by over-performance later in the third quarter.

54.     However, on September 17, 2013, with two weeks left to go in the third quarter, Cooper provided new forecasts that had been revised downward yet again, projecting $3.4 billion in revenues and $257 million in operating profit for 2013.  In other words, Cooper had suffered a staggering shortfall from the revenues and operating profit Cooper projected in July, which were 25% and 48% higher than the figures provided just two months later.  Moreover, as of the beginning of October 2013, Cooper's projections reflected a 25% decline in projected operating profit for September alone, showing that Cooper's assurances of "catch-up" performance in the third quarter were wrong, and the Company's actual profitability was close to half of what Cooper projected just weeks earlier.

55.     Cooper kept its declining financial position, and its impact on the Company's merger prospects, a secret.  Indeed, the Company publicly misrepresented Cooper's financial projections in the proxy the Company issued to obtain shareholder approval of the merger.  In the proxy, which was filed on August 30, 2013, Cooper presented two sets of figures representing its sales projections for 2013—one set of figures that Cooper had originally provided to Apollo and other potential purchasers during their merger negotiations and another set of "revised" expected results that reflected the sales figures after the close of the first quarter, which ended on March 30, 2013.  Specifically, Cooper represented that it had originally projected net sales of $4.445 billion and EBITDA, or "Earnings Before Interest, Taxes, Depreciation and Amortization," of $525 million for 2013.[1]  However, "[f]ollowing the completion of the first quarter of 2013, Cooper Tire updated its financial projections to include

_____
[1] EBITDA would generally be considered a more conservative figure than operating profit, which is often expressed as Earnings Before Interest & Tax ("EBIT"), as EBITDA removes two non-cash expense items (depreciation and amortization) from the equation.

actual results from the first quarter of 2013 and revised expected results for the remainder of fiscal year 2013. The revised projections included (in millions)":

|  | 2013 |
|---|---|
| **Net Sales** | $ 4,218 |
| **EBITDA** | $ 538 |

56.     Cooper also provided "sensitivity case" projections that took into account the "cyclicality of the global tire industry, and high margins that the industry had been experiencing."  According to Cooper, the sensitivity case projections included assumptions to reflect the effects of a cyclical downturn, followed by a cyclical recovery, on revenue and EBITDA, including "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions." According to Cooper, even in the pessimistic "sensitivity case," Cooper projected revenues as follows (in millions):

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Net Sales** | $  4,188 | $  4,349 | $ 4,516 | $ 4,690 | $ 4,870 |
| **EBITDA** | $  521 | $  457 | $  384 | $  446 | $  511 |

57.     Defendants knew that these projections were materially false and misleading when they issued the proxy.  Indeed, three weeks earlier, on August 9, 2013, Cooper provided Apollo with projections showing $3.9 billion in revenues for 2013—or nearly $300 million less than the forecasted $4.188 billion net sales in Cooper's pessimistic "sensitivity case" projections.

58.     Cooper never updated its proxy or these financial projections before the shareholder vote on September 30, 2013, or otherwise provided Cooper investors the true facts

concerning its rapidly deteriorating financial condition.  By the time of the shareholder vote, Cooper was internally projecting $3.4 billion in revenues and $257 million in operating profit for 2013—or 20% and 50% lower than $4.188 billion in net sales and $521 million EBITDA for 2013 that it reported to shareholders as the pessimistic "sensitivity case" figures in the proxy.

59.     As Cooper's financial performance was floundering, it resorted to desperate measures in an attempt to reassert control over CCT.  As Defendant Hughes later testified, Cooper cut off payments to CCT's raw material suppliers in an effort to force CCT to cave and agree to the merger.  According to Hughes, "We thought that might encourage them to be more cooperative."  According to Apollo, another tactic proposed by Cooper to reassert its control over its own subsidiary was such "a drastic course of action" that it "was likely to result in a physical clash between the two security firms and place the personal safety of the CCT workers at risk."

60.     Indeed, in attempting to complete the merger and appease Chengshan, Apollo executives met directly with executives from Chengshan to seek to buy out its stake in CCT. According to trial testimony, Apollo's offer of $150-$200 million for Chengshan's stake was rejected out-of-hand by Chairman Che, who instead demanded $400 million for his stake—or nearly one-sixth of Apollo's $2.5 billion purchase price for all of Cooper.

61.     As Cooper was taking these increasingly desperate measures, Cooper affirmatively misrepresented the true impact of the CCT strike in soliciting shareholder proxies to approve the troubled transaction.  While the proxy noted that, due to the CCT strike, the CCT facility was not producing any Cooper-branded tires and that CCT employees had taken "disruptive actions, including denying access to certain representatives of the Company and withholding certain business and financial information," Cooper reiterated its confidence that the

facility would return "to full, normal operation again as soon as possible."  According to Cooper, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."  Moreover, the proxy included the Merger Agreement which set forth Cooper's representations that, among other things, Cooper had "exclusive possession" of its CCT subsidiary, had effective internal controls over its financial reporting and that it had policies and procedures in place to ensure the Company's subsidiaries' compliance with the law.

62.    The situation at CCT, and the fact that Cooper had been entirely cut-off from its primary subsidiary, was described internally by Cooper's auditors at Ernst & Young as virtually unprecedented, and called into question the Company's financial results.  In fact, as revealed in the Delaware litigation, in an email to his co-workers, one E&Y accountant questioned whether the Company could reliably provide any accurate information to investors:

> I'm looking for some examples or thoughts on a situation at Cooper Tire where a material Chinese sub is currently striking (including office workers) and have refused to produce, ship or perform any accounting functions (among other activities). Cooper's CCT sub is protesting the announced acquisition of Cooper Tire by Apollo Tyres, an Indian listed company. The sub typically represents 25% of revenue and earnings on a consolidated basis and has been striking since around the 1st of July. They were able to close June and July as the finance department was permitted to work in the building, however for the August close, they will be estimating results of the sub (not yet sure on what basis) and are not sure what they will do for September if the issue is not resolved.

> I'm obviously concerned about the situation and given the size of the entity, whether they will even be able to ensure materially accurate results. I'm just trying to get some thoughts together on considerations they and we should be making regarding their ability to report and our ability to review/audit, perform S404 testing and complete the required accounting for the Apollo acquisition. Also keeping in mind that Cooper is also in the midst of a $2 billion debt offering so we will have to report August results in the context of the comfort letter.

63.     Accounting experts who testified at Cooper's trial expressed the same concern. For example, Robert Cepielik, a forensic accountant at Deloitte Financial Advisory Services LLP, testified that having a unit withhold financial information from a parent trying to put out consolidated financial results is a "highly unusual situation. I've never seen anything like it."

64.     But while such a situation is unprecedented, it was not unexpected by Cooper. Indeed, Apollo was told by Cooper of at least one instance in the past few years in which Chengshan denied Cooper management access to the facility to review manufacturing processes, demonstrating that Cooper never had exclusive possession or the actual ability to control its primary subsidiary.

65.     In addition, as revealed in trial testimony, contrary to the statements in its proxy solicitation, the situation at CCT was "a big problem" for Cooper.  Defendant Armes testified that the disruption "caused a lot of things that is causing us problems with being able to get in, being able to get the financial information, and it was brought on by this acquisition."  Moreover in an e-mail dated August 27, 2013, Apollo managing director Neeraj Kanwar wrote to Defendant Armes, stating "I am writing in reference to the deteriorating situation with your joint venture in China. We and increasingly, our financing banks are growing more and more anxious regarding the issues [here], the lack of demonstrable progress and the impact this is all having on your financial results and our ability to complete this transaction."

**The Defendants Gamble on Forcing the Merger to Close**

66.     Even though Cooper executives knew that the Chengshan opposed the deal and had before denied Cooper access to the CCT plant, Cooper executives proceeded with the transaction because they were highly motivated to gamble that they could close the transaction at the $35-per share price.  For example, Defendant Armes was expected to reap about $21 million

if the sale went through.  Specifically, Armes would reap $7 million from the appreciated value of the stock he owns outright, and restricted and performance-based shares and change-in-control provisions in his compensation agreement entitled him to another $14 million if, after the merger, he leaves the Company or his compensation or terms of employment are significantly altered, as is common in transactions of this kind.  When counting his personal shares, Defendant Armes was eligible to receive more than $21 million if they deal went through.

67.     Enticed by these extraordinary incentives, Defendants were more than willing to disregard the risks posed by Chengshan and mislead investors to ensure shareholder approval of the deal—while they had no personal downside risk if the deal eventually fell apart, they needed shareholders' approval in order to cash in on their gamble.  As Dick Stephens, a former president of Cooper's North American Tire Operations who retired in 2006 after 28 years with the Company, explained, "[e]ssentially, this is corporate greed."  According to Stephens, "You've got key executives who have no tie, no concern about anything other than themselves…and 'If I can walk out of there with $10 million, $20 million, $30 million or more, and screw everybody else, or potentially screw everybody else, I don't care.'"

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

### Announcement of the Transaction and Merger Agreement

68.     The Class Period begins on June 12, 2013, when Cooper announced that it had agreed to be acquired by Apollo for approximately $2.5 billion, or a price of $35 per share, representing a 40% premium over Cooper's 30-day volume-weighted average price.

69.     In announcing the transaction before the opening of the market, Cooper highlighted its Chinese operations as critical to the deal.  For example, Cooper described the merger as bringing "together two companies with highly complementary brands, geographic

presence, and technological expertise to create a global leader in tire manufacturing and distribution" with "strong presence in high-growth end-markets," including China. That press release highlighted Cooper's "Chengshan" brand, and noted that "Cooper is one of the most respected names in the tire industry, with an extensive distribution network and manufacturing infrastructure, and a particularly robust presence in North America and China." According to the press release, due to Cooper's significant presence in China, the "combined company will be uniquely positioned to address large, established markets, such as the United States and the European Union, as well as fast-growing markets of India [and] China…where there is significant potential for further growth."

70.     Cooper also filed numerous documents with the SEC on June 12, 2013 that provided additional details about the merger to investors, and which highlighted Cooper's China operations. For example, Cooper claimed that the combined company would have "a strong presence in the largest tire market of North America as well as the fastest-growing geographies such as China and India, among others."

71.     In addition, on June 12, 2013, the Company filed the Merger Agreement in which Cooper represented that:

- "[T]he Company or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property," including the CCT facilities;

- that Cooper "maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, and provided reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements;"

- That Cooper and its "Subsidiaries were in compliance with applicable Laws, and have policies and procedures providing reasonable assurance of continued compliance with such Laws;" and that

27

- "Since December 31, 2012…its Subsidiaries and, to the Knowledge of the Company, <u>its Joint Ventures have conducted their respective businesses only in the ordinary course of business consistent with past practice in all material respects</u>."

72.    The above statements were materially false and misleading because, contrary to Cooper's assurances concerning the importance of and its control over its Chinese operations and CCT subsidiary, in particular, the Company had no effective control over this business. Moreover, the above statements were materially false and misleading in that they failed to disclose the true risks posed by the $2.5 billion transaction given that Cooper's joint venture partner opposed the transaction, had demanded compensation, and had the ability to thwart the deal by asserting its control over the CCT facility.

**<u>Quarterly Report on the Form 10-Q for the Second Quarter of 2013</u>**

73.    On August 9, 2013, Cooper filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2013.  In that filing, the Company represented that it "maintain[ed] disclosure controls and procedures designed to ensure that information required to be disclosed" in SEC filings.  Further, Cooper represented that, other than changes associated with its implementation of an Enterprise Resource Planning ("ERP") software program, "[t]here have been no other changes in the Company's internal controls over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting."  In addition, Cooper represented that, based on a review of the effectiveness of Cooper's internal controls, "the Company's CEO and CFO concluded that its disclosure controls and procedures were effective."

74.    The above statements were materially false and misleading because the Company in fact lacked effective internal controls over its financial reporting.  Indeed, Cooper had been denied access to its primary subsidiary responsible for a quarter of its profits and revenues as

early as June 21, and had been fully barred from accessing the facility since at least mid-July, and could therefore not reliably provide any financial results on a consolidated basis.

**Proxy Solicitation Seeking Approval of the Merger**

75.     On August 30, 2013, Cooper filed its Proxy solicitation seeking shareholder approval of the merger.  While the Proxy noted that, due to the CCT strike, the CCT facility was not producing any Cooper-branded tires and that CCT employees had taken "disruptive actions, including denying access to certain representatives of the Company and withholding certain business and financial information," Cooper reiterated its confidence that the facility would return "to full, normal operation again as soon as possible."  According to Cooper, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

76.     In fact, as Defendants knew, the opposite was true:  the transaction had been placed in dire jeopardy by the CCT strike.  Indeed, on August 27, 2013, three days before the proxy was issued, Apollo bankers' expressed to Apollo that they were "very concerned" about the transaction given the issues at CCT, prompting Apollo managing director Neeraj Kunwar to email Defendant Armes to ask that Cooper "delay the mailing of its proxy by a few weeks." Further, Kunwar explained through his counsel that the parties should focus on resolving the CCT strike first given the impact that the lack of access to financial records had on Apollo's ability to market the debt it needed to raise  in order to complete the merger.  As Apollo told Cooper, the "completion of the Cooper-Apollo transaction may be in jeopardy."

77.     Moreover, Cooper's misleading disclosure in the proxy downplaying the severity of the CCT strike also omitted the material facts that the CCT "disruption" was in fact controlled by Cooper's joint venture partner and that the strike had been specifically organized because

29

Cooper had rejected its joint venture partner's attempt to acquire Cooper for itself.  Nor did Cooper disclose that Chairman Che had demanded nearly $400 million—or nearly one-sixth of the entire $2.5 billion deal amount—in exchange for putting an end to the strike.

78.     Indeed, as was only disclosed at the end of the Class Period, Cooper woefully misrepresented the severity of the CCT strike on the completion of the merger, and in fact only disclosed the limited information it provided to investors about the CCT facility work stoppage in the August 30, 2013 proxy because of Apollo's insistence that Cooper disclose it.  As Vishal Mittal, Apollo's CFO, explained in an October 4, 2013 letter to Stephen Zumasky, Cooper's general counsel:

> In closing, we again remind you of your disclosure obligations under the Merger Agreement and U.S. securities laws. The disclosures regarding CCT that were included in the Proxy Statement, limited though they may be, were included there only on our insistence. The circumstances at CCT, combined with the frankly staggering deterioration in the Company's financial performance for the third quarter disclosed to us today, are circumstances that we have difficulty concluding are not required to be disclosed promptly under U.S. securities laws and stock exchange listing rules. We urge you to seek appropriate advice in these matters on which you, your board and we, as the ultimate successor following the Merger, can rely.

79.     Further, in the August 30, 2013 Proxy, Cooper provided materially false and misleading financial projections that directly contradicted the financial projections that Cooper had previously provided to Apollo.  Specifically, Cooper represented that it had originally projected net sales of $4.445 billion and EBITDA of $525 million for 2013, and that "[f]ollowing the completion of the first quarter of 2013, Cooper Tire updated its financial projections to include actual results from the first quarter of 2013 and revised expected results for the remainder of fiscal year 2013."  The revised projections included (in millions):

|  | 2013 |
|---|---|
| Net Sales | $   4,218 |
| EBITDA | $    538 |

80.     Cooper also provided more pessimistic "sensitivity case" projections that Cooper claimed considered "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions."   According to Cooper, even in the pessimistic "sensitivity case," Cooper projected revenues were as follows (in millions):

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Net Sales** | $  4,188 | $  4,349 | $ 4,516 | $ 4,690 | $ 4,870 |
| **EBITDA** | $   521 | $   457 | $  384 | $ 446 | $  511 |

81.     As set forth above, the financial projections Cooper reported were materially false and misleading and, in fact, directly contradicted the financial projections that Cooper had provided to Apollo weeks before.  The true projections, as Cooper knew, showed that revenues for 2013 were $300 million less than the $4.188 billion net sales Cooper projected in its publicly-reported pessimistic "sensitivity case," and that the Company's projected operating profits were $200 million less than the $521 million in EBITDA the Company disclosed to investors in the proxy.

82.     Moreover, the Proxy included in the Merger Agreement set forth Cooper's representations that, among other things, Cooper had "exclusive possession" of its CCT subsidiary, had effective internal controls over its financial reporting and that it had policies and procedures in place to ensure the Company's subsidiaries' compliance with the law.  As set forth above, those statements were materially false and misleading because the Company had no effective control over its most important subsidiary or access to the CCT facility and, in fact, never did.

83.     Indeed, Defendants continued to publicly deny the true impact of CCT's shutdown throughout the Class Period. For example, at the November trial, Defendant Hughes testified that, even though Cooper had no effective access to any information at CCT and was barred from retrieving necessary financial statements, Cooper was "still working on delivering financial results for the third quarter" and suggested that the Company would still be able to file its Form 10-Q for the third quarter, which was due to be filed in a week.

84.     In sum, the true facts, which Defendants knew but misrepresented or concealed from investors, were that:  (i) the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price announced on June 12, 2013; (ii) Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control;  (iii) Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable; (iv) Cooper's operating results had grown increasingly dire in the weeks leading up to and through the August 30, 2013 proxy filing and the September 30, 2013 shareholder vote, and the projections Cooper disclosed to investors provided a materially false and misleading picture of Cooper's financial performance and the true risk of the transaction; (v) Cooper lacked effective internal controls over its financial reporting; and (vi) rather than serve as a value-enhancing transaction, the Merger posed serious, long-term risks and harm to Cooper's business.

**The Truth Is Revealed Through a Series of Partial Disclosures**

85.     Recognizing that Cooper lacked any control over its most important subsidiary, which was a fundamental roadblock to completing the transaction at the $35-per-share price touted to investors, Cooper preemptively filed a lawsuit on October 4, 2013 in an attempt to force Apollo to close on the merger.  On October 7, 2013, before the markets opened, Cooper

filed a Form 8-K with the SEC which included a press release revealing that the deal was unraveling, as well as a copy of the complaint Cooper filed in the Delaware Chancery Court against Apollo on October 4, alerting investors that the deal was in dire jeopardy.  In response to these disclosures, and the market's realization that the merger would not be consummated at the $35-per-share price or on the terms that shareholders had approved just days before, Cooper's common shares plunged.  Specifically, Cooper stock fell from $31.27 per share on October 3, 2013 to close at $25.72 per share on October 7, 2013, wiping out over $300 million in shareholder value.

86.     On October 14, 2013, Apollo filed its Answer to Cooper's Complaint in the Delaware Chancery Court.  Apollo counterclaimed, stating that under the Merger Agreement "Cooper promised to do a number of things that it had not done." Apollo further noted that Cooper was not in compliance with the Merger Agreement,

> "in part because its representations and warranties are not true and because it has failed to perform its covenants . . . .  [] Cooper does not have control over its most significant subsidiary, [CCT]. Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

87.     Additionally, Apollo noted that Cooper, as a result of its arbitration with USW, had been enjoined from consummating transactions contemplated by the Merger Agreement until a labor agreement was reached with USW.

88.     As was made clear during the trial, Cooper had in fact exploited the inability of the parties to reach a deal with USW as pretext for its lawsuit, and its last-ditch effort to force Apollo to close.  For example, as revealed in trial testimony, contrary to Cooper's claim that Apollo had failed to use "reasonable best efforts" in reaching a resolution with the USW by allegedly excluding Cooper from the negotiation process, the truth was that Cooper had a

tumultuous relationship with the USW and that Apollo's direct negotiations with USW were the only way to reach an agreement. Louis P. DiLorenzo, Apollo's expert concerning the use of "reasonable best efforts" in the USW negotiations, testified that he was "shocked" by Cooper's arguments, given the extraordinarily antagonistic relationship between USW and Cooper. According to DiLorenzo, excluding Cooper made perfect sense because "[i]f you don't want to reach an agreement, you're definitely bringing people they don't like." Indeed, it is simply not plausible that the failure to reach an agreement with the USW had prevented the transaction from closing given that the concessions sought by the USW were a mere fraction of the $400 million in compensation that Chairman Che had demanded.

89.     On November 8, 2013, Vice Chancellor Glasscock of the Delaware Chancery Court held that Apollo did not breach the merger agreement, and denied Cooper's request for an order requiring Apollo to close on the merger. In the ruling, the court further elucidated that, based on the information disclosed for the first time at trial, it was highly unlikely Cooper could ever have been able to satisfy its obligations under the Merger Agreement because Cooper was unable to produce its third-quarter financial results:

> [T]he reason for the extreme expedition of this action…is that Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013. Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose third-quarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013. Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture.

90.     In response to these disclosures, Cooper stock plummeted, falling from $26.90 per share on November 7, 2013 to $23.82 per share on November 8, 2013, wiping out another $175 million in shareholder wealth.

91.     On November 12, 2013, Cooper filed a Notification of Late Filing with the SEC, disclosing that it would be unable to timely file its Form 10-Q for the quarter ended September 30, 2013 because it had no access to any business and financial information relating to CCT. Further, the Company disclosed that it expected a "significant change" in its results of operations and that its operating profit will be "significantly lower" than Cooper reported for the same period a year before, in part as a result of the effects from the strike at CCT. According to the Company, given that the Company does not have sufficient information regarding its most important and profitable subsidiary, "a reasonable estimate of the results cannot be made."

92.     Following these disclosures, additional developments in the Delaware Chancery Court litigation confirmed that Cooper's claims against Apollo were without merit, and that the merger and the shut-down of the CCT subsidiary had in fact put Cooper's long-term business prospects in jeopardy. Specifically, on December 16, the Delaware Supreme Court denied Cooper's appeal of the Delaware Chancery Court's November 8, 2013 ruling, holding that the appeal had been "improvidently accepted."

93.     On December 30, 2013, Cooper announced that it was formally terminating the merger. On a webcast with investors that day, Defendant Armes acknowledged that "the financing for the transaction [was] no longer available" and that it was "a reality that the agreement both companies signed on June 12 will not be consummated by Apollo." On that same webcast, Defendant CFO Bradley Hughes admitted that Cooper still did not have any control over its CCT subsidiary or access to the information needed to generate the Company's financial results, and could not provide any estimate of "when the situation will be resolved or when we will resume normal [financial] reporting."

94.     In a press release published later that day, Apollo stated that "Cooper has been unwilling to work constructively to complete a transaction that would have created value for both companies and their shareholders. Cooper's actions leave Apollo no choice but to pursue legal remedies for Cooper's detrimental conduct."

## LOSS CAUSATION

95.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially inflated the price of Cooper common stock and operated as a fraud or deceit on the Class.  Later, when the risks concealed by Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 4, 5, 7, and November 8,  2013, the price of Cooper common stock fell precipitously, as the prior artificial inflation came out of the price over this time.  As a result of their purchases of Cooper common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

96.     A chart setting forth some of the significant events relevant to the claims asserted herein, together with the Company's stock price, is set forth below:



## CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Cooper during the Class Period, as well as Cooper stockholders of record as of the close of business August 30, 2013 (the "Record Date") who were entitled to vote on the Merger, and were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Cooper and their families and affiliates.

98.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court.  Cooper has over 63 million shares of common stock outstanding, owned by hundreds or thousands of investors.

99.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       (a)     Whether Defendants violated the Exchange Act;

       (b)     Whether Defendants omitted and/or misrepresented material facts;

       (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

       (d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

       (e)     Whether the price of Cooper common stock was artificially inflated;

       (f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

       (g)     The extent of damage sustained by Class members and the appropriate measure of damages.

100.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

101.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

102.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

103.    Cooper's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

104.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Cooper who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

105.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

106.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Cooper securities was open, efficient, and well-developed for the following reasons, among others:

(a)     Cooper stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, Cooper filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     Cooper regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Cooper was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

107.    As a result of the foregoing, the market for Cooper securities promptly digested current information regarding Cooper from all publicly available sources and reflected such information in the price of Cooper stock.  Under these circumstances, all purchasers of Cooper common stock during the Class Period suffered similar injury through their purchase of Cooper common stock at artificially inflated prices and the presumption of reliance applies.

108.    Accordingly, Plaintiffs and the other members of the Class did rely and are entitled to have relied upon the integrity of the market price for Cooper securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

109.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Cooper common stock at artificially inflated prices.

111.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Cooper common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

112.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects, including that the Company lacked control over its primary subsidiary, that its joint venture partner opposed and could derail the merger, and that its financial statements were not reliable.

113.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth from the investing public and to support the artificially inflated prices of the Company's common stock.

115.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cooper common stock.  Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Cooper common stock had been artificially inflated by Defendants' fraudulent course of conduct.

116.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

117.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants In Connection with the Section 10(b) Claims

118.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

119.    The Individual Defendants acted as controlling persons of Cooper within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-

day operations of the Company, and/or intimate knowledge of the Company's actual performance, business operations and condition, and their power to control public statements about Cooper, the Individual Defendants had the power and ability to control the actions of Cooper and its employees.

120.    As set forth above, Cooper violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Cooper, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Cooper is liable under Section 10(b) of the Exchange Act, to Plaintiffs and the other members of the Class.

## COUNT III

### For Violation of Section 14(a) of the Exchange Act Against All Defendants

121.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.  The claims in Counts III and IV are brought under Sections 14(a) and Section 20(a) of the Exchange Act (the "Proxy Claims"). The Proxy Claims are brought on behalf of investors who held Cooper common stock on the Record Date of August 30, 2013 and were entitled to vote on the merger between Cooper and Apollo.  The Proxy Claims are based solely on negligence. They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

122.    The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the merger, including the Proxy and the other materials and statements used to solicit Cooper shareholders' approval of the merger as set forth above in paragraphs 68

through 83, contained misstatements and/or omissions of material facts. Further, Cooper's disclosures to investors following the issuance of the Proxy did not, as required by law, update and correct Defendants' previous misstatements, and themselves contained material misstatements and/or omissions.

123.    Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage Cooper shareholders to vote in favor of the merger.  As set forth above, the Defendants' proxy solicitations misled investors concerning the true risks of the merger and its impact on Cooper's business.  Further, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning the transaction.

124.    The false statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures, causing Cooper stock to fall significantly, as set forth above.

## COUNT IV

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants In Connection with the Proxy Claims

125.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

126.    The Individual Defendants acted as controlling persons of Cooper within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual

performance, business operations and condition, and their power to control public statements about Cooper, the Individual Defendants had the power and ability to control the actions of Cooper and its employees.

127.    As set forth above, Cooper violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Cooper, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Cooper is liable under Section 14(a) of the Exchange Act, to Plaintiffs and the other members of the Class.

128.    Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in

this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem

just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: January 17, 2014

/s/ *David J. Margules*
David J. Margules (Bar No. 2254)
Albert J. Carroll (Bar No. 5316)
**BOUCHARD MARGULES**
  **& FRIEDLANDER, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 573-3500
dmargules@bmf-law.com
acarroll@bmf-law.com

*Plaintiffs' Liaison Counsel*

Vincent R. Cappucci
Andrew J Entwistle
Robert N. Cappucci
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor
New York, New York 10017
Telephone:  (212) 894-7200

Gerald H. Silk
Avi Josefson
Michael Blatchley
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554 1400
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiffs OFI Risk Arbitrages, OFI Risk Arb*
*Absolu and Timber Hill LLC*