## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OFI RISK ARBITRAGES, OFI RISK ARB ABSOLU and TIMBER HILL LLC, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>COOPER TIRE & RUBBER COMPANY, ROY ARMES and BRADLEY HUGHES,<br><br>    Defendants. | C.A. No. 1:14-CV-00068-LPS<br><br>CLASS ACTION |

**MEMORANDUM IN FURTHER SUPPORT OF THE MOTION OF ZHI SUN AND XIAOYAN JIA TO BE APPOINTED LEAD PLAINTIFFS AND TO APPROVE PROPOSED LEAD PLAINTIFFS' CHOICE OF COUNSEL AND IN OPPOSITION TO THE MOTION OF OFI ASSET MANAGEMENT AND TIMBER HILL LLC FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF THEIR SELECTION OF LEAD COUNSEL**

**FARUQI & FARUQI, LLP**
James R. Banko (#4518)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Telephone: (302) 482-3182
Fax:  (302) 482-3612
jbanko@faruqilaw.com

*Proposed Liaison Counsel*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (admitted *pro hac vice*)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone:   (212) 696-3730
Facsimile:   (504) 455-1498
kim.miller@ksfcounsel.com

*Counsel for the Sun Family and Proposed
Lead Counsel for the Class*

April 4, 2014

# **Table of Contents**

TABLE OF AUTHORITIES……………………………………………………………………………………..ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

    I. The Sun Family Should Be Appointed Lead Plaintiff............................................................. 2

        A)     The PSLRA Requires The Court Appoint The "Most Adequate Plaintiff" ................ 2

        B)     The Sun Family Is Entitled To The Statutory Presumption As The Most Adequate
             Plaintiff ........................................................................................................................ 3

    II. OFI Asset Management Cannot Serve As Lead Plaintiff Because It Lacks Standing, Has
        Zero Losses and Is Subject to Unique Defenses ................................................................. 5

        A)     OFI Asset Management Has Failed to Demonstrate Standing To Bring This Case
             Much Less Serve as Lead Plaintiff .............................................................................. 5

        B)     OFI Asset Management Is Subject To a Unique *Res Judicata* Defense ..................... 7

    III. Timber Hill Has Materially Overstated Its Losses and Failed to Include Accurate Trade
        Data .................................................................................................................................. 10

        A)     The Purported Loss and Transaction Data of Timber Hill Erroneously Includes non-
             *Dura* losses and relies on the Disfavored FIFO method ............................................ 10

    IV. Timber Hill Is Atypical and Inadequate To Serve as a Lead Plaintiff.............................. 15

        A)     Timber Hill is a Market Maker and Is Therefore Atypical and Inadequate ............... 15

        B)     Timber Hill is an Atypical Day Trader...................................................................... 18

    V. The Court Should Approve The Sun Family's Selection of Counsel.................................. 19

CONCLUSION........................................................................................................................... 20

i

# **Table of Authorities**

**Page #**

## Cases

*Anwar v. Fairfield Greenwich*,
    289 F.R.D. 105 (S.D.N.Y. 2013) ........................................................................ 9, 10
*Applestein v. Medivation, Inc.*,
    10-998, 2010 U.S. Dist. LEXIS 98255 (N.D. Cal. Sep. 20, 2010) .......................... 18
*Arenson v. Broadcom Corp.*,
    2004 U.S. Dist. LEXIS 27522 (C.D. Cal. Dec. 6, 2004) ....................................... 13
*Beckman v. Ener1, Inc.*,
    2012 U.S. Dist. LEXIS 19972 (S.D.N.Y. Feb. 15, 2012) ....................................... 12
*Birsch v. Drexel Firestone, Inc.*,
    519 F.2d 974 (2d. Cir. 1975) ............................................................................. 8
*Bo Young Cha v. Kinross Gold Corp.*,
    2012 U.S. Dist. LEXIS 79288 (S.D.N.Y. May 31, 2012) ................................... 12, 13
*Borochoff v. Glaxosmithkline PLC*,
    246 F.R.D. 201 (S.D.N.Y. 2007). ..................................................................... 7, 10
*Brown v. China Integrated Energy, Inc.*,
    CV 11-02559, 2011 U.S. Dist. LEXIS 151131 (C.D. Cal. Aug. 29, 2011) ............... 4
*Buettgen v. Harless*,
    263 F.R.D. 378 (N.D. Tex. 2009) .................................................................. 5, 7, 8
*Cornelissen v. Societe Avianca Inc., et autres*, Appeal No. 05-14.082, *Cour de cassation*, First
    Civil Chamber (Feb. 20, 2007) ......................................................................... 9
*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ........................................................................................ 11
*Eichenholtz v. Verifone Holdings, Inc.*,
    No. 07-6140, 2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug, 22, 2008) ................. 19
*Hunt v. Enzo Biochem, Inc.*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008) ................................................................ 12
*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................ 9
*In re Bank One Shareholders Class Actions*,
    96 F.Supp.2d 780 (N.D. Ill. 2000) .................................................................... 19
*In re Cable & Wireless, PLC Sec. Litig.*,
    217 F.R.D. 372 (E.D.Va. 2003) ........................................................................ 13
*In re Cendant Corp. Litig.*,
    264 F. 3d 201 (3d. Cir. 2001) ............................................................................. 3
*In re CMED Sec. Litig.*,
    2012 U.S. Dist. LEXIS 47785 (S.D.N.Y. Apr. 2, 2012) ........................................ 12
*In re Comdisco Sec. Litig.*,
    150 F. Supp. 2d 943 (N.D. Ill. 2001) ................................................................. 13

*In re Comverse Tech., Inc. Sec. Litig.*,
2007 U.S. Dist. LEXIS 14878 (E.D.N.Y. Mar. 2, 2007) ........................................ 11

*In re DaimlerChrysler AG Sec. Litig.*,
216 F.R.D. 291 (D. Del. 2003) ............................................................... 8

*In re LightInTheBox Holding Co., Sec. Litig.*,
2013 U.S. Dist. LEXIS 165842 (S.D.N.Y. Nov. 21, 2013) ................................. 11, 12

*In re McKesson HBOC, Inc. Sec. Litig.*,
97 F. Supp. 2d 993 (N.D. Cal. 1999) .......................................................... 13

*In re Mills Corp. Sec. Litig.*,
2006 U.S. Dist. LEXIS 50485 (E.D.Va. May 30, 2006) ...................................... 13

*In re Olsten Corp. Sec. Litig.*,
3 F. Supp. 2d 286 (E.D.N.Y. 1998) ............................................................ 13

*In re Parmalat Sec. Litig.*,
2008 U.S. Dist. LEXIS 64296 (S.D.N.Y. Aug. 21, 2008) ...................................... 8

*In re Pfizer Sec. Litig.*,
233 F.R.D. 334 (S.D.N.Y 2005) ................................................................ 13

*In re Royal Ahold N.V. Securities and ERISA Litig.*,
219 F.R.D. 343 (D. Md. 2003) ................................................................. 7

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003) ............................................................... 19

*Johnson v. Dana Corp.*,
236 F.R.D. 349 (N.D.Ohio 2006) ............................................................... 13

*Lax v. First Merchants Acceptance Corp.*,
1997 WL 461036 (N.D. Ill. Aug. 11, 1997) .................................................... 4

*Marcus v. J.C. Penney Co., Inc.*,
6:13-cv-736 (E.D. Tex. Feb. 28, 2014) ..................................................... 6, 7

*McCabe v. Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) .................................................................. 11

*McNichols v. Loeb Rhoades & Co.*,
97 F.R.D. 331 (N.D. Ill. 1982) ............................................................... 16

*Morrison v. National Australia Bank*,
130 S.Ct. 2869 (2010) ...................................................................... 2, 8

*Richardson v. TVIA, Inc.*,
2007 WL 1129344 (N.D. Cal. Apr. 16, 2007) .................................................. 13

*Richman v. Goldman Sachs Grp., Inc.*,
274 F.R.D. 473 (S.D.N.Y. 2011) ............................................................... 4

*Seamans v. Aid Auto Stores, Inc.*,
2000 U.S. Dist. LEXIS 1749 (E.D.N.Y. Feb. 15, 2000) ........................................ 16

*Steinberg v. Ericsson LM Tel. Co.*,
2008 U.S. Dist. LEXIS 29836 (S.D.N.Y. Apr. 11, 2008) ..................................... 7, 8

*Tice v. Novastar Fin., Inc.*,
No 04-0330, 2004 U.S. Dist. LEXIS 16800 (W.D. Mo. Aug. 23, 2004) ....................... 16, 17

*Tsirekidze v. Syntax-Brillian Corp.*,
No. 07-2204, 2008 WL 942273 (D. Ariz. Apr. 7, 2008) ........................................ 19

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
454 U.S. 464 (1982) .......................................................................... 5

*Vladamir v. Bioenvision*, Inc.,
    2007 WL 4526532 (S.D.N.Y. Dec. 21, 2007) .......................................................... 13
*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)......................................................................................... 5, 6

**Statutes**

§78u-4(a)(3)(B)(iii)(I)(aa)-(cc) ............................................................................................. 3
15 U.S.C. § 4(a)(3)(A)(I) ...................................................................................................... 6
15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa) ............................................................................... 20
15 U.S.C. § 78u-4(a)(3)(B)(v) ............................................................................................ 20
15 U.S.C. § 78u-4(a)(3)(B). .................................................................................................. 5

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................................. 3
Fed. R. Civ. P. 23(a)(4).......................................................................................................... 3

## INTRODUCTION

Zhi Sun and Xiaoyan Jia ("Sun Family"), a married couple who reside in San Jose, California, respectfully submit this memorandum in further support of their motion for appointment of the Sun Family as Lead Plaintiff, for approval of their selection of Kahn Swick & Foti, LLC ("KSF") as Lead Counsel, and in opposition to the competing Lead Plaintiff motion filed by OFI Asset Management and Timber Hill LLC (collectively, "OFI Asset Manager/Timber Hill Group"). The Sun Family, with *Dura* losses of $93,089.00, is the presumptive lead plaintiff who suffered the largest losses of all competing movants who otherwise meet the requirements of Rule 23 and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Competing movants OFI Asset Management ("OFI") – a French asset manager with no standing to sue, *zero* losses, and subject to a fatal unique defense — and Timber Hill LLC ("Timber Hill") – a market maker, day trader, and net seller whose losses are erroneously inflated by *hundreds of thousands of dollars* – claim losses of "$498,687.65."  Unfortunately for the OFI Asset Management/Timber Hill Group, even a cursory review shows their losses are in fact collectively less than $23,000, far below those suffered by the Sun Family. *See* OFI and Timber Hill Brief – Dkt. # 12, at p. 2; Exhibit 2 to the Margules Declaration ("Margules Decl."), Dkt. # 13-2 at pp. 2, 98.

Putting aside the fact that the OFI Asset Management/Timber Hill Group has no demonstrated pre-litigation relationship and appears to have been cobbled together by counsel solely to claim a larger total loss figure than the individual group members moving alone, OFI is a French asset manager with no standing to sue based on the transactions of its French arbitrage fund clients.  OFI purchased no shares of Cooper tire during the Class Period and lost no money;

1

it suffered no damages whatsoever in this case.  Further, even if OFI did have standing and a loss, it is inadequate to serve as lead plaintiff because it suffers from the fatal unique defense that the Republic of France will not recognize a judgment of the United States in an opt-out class action.  *See* Declaration of Kim E. Miller ("Miller Decl.") at Ex. A (attaching *Amicus Curie* Brief of Republic of France Filed in *Morrison v. National Australia Bank*, 130 S.Ct. 2869, 2884 (2010).

Timber Hill's losses are materially inflated because its loss calculation failed to exclude in-and-out trades made prior to the first alleged partial disclosure as required by controlling Supreme Court precedent *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 342-43 (2005). Further, rather than using only the widely favored LIFO methodology, Timber Hill also uses a simplified FIFO calculation that has been widely rejected by courts in favor of LIFO because FIFO fails to accurately reflect Timber Hill's losses, particularly in light of its extensive pre-Class Period purchases.  As a result, Timber Hill's maximum loss properly calculated based on the evidence provided by them is $22,715.00 – *approximately $374,000 less than its claimed loss*.  *See* Exhibit 2 to the Margules Decl., Dkt. # 13-2 at p. 51.  Timber Hill is also inadequate and atypical as a market maker and day trader in the stock.  Timber Hill also sold more stock during the Class Period than it purchased, rendering it a net seller.

For these reasons, discussed below, the Court should appoint the Sun Family as Lead Plaintiff in the Action and approve their selection of KSF as Lead Counsel for the Class.

## ARGUMENT

## I. The Sun Family Should Be Appointed Lead Plaintiff

### A)      The PSLRA Requires The Court Appoint The "Most Adequate Plaintiff"

The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff":

is the person or group of persons that: (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i); (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id*. §78u-4(a)(3)(B)(iii)(I)(aa)-(cc). The presumption may be rebutted if the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* §78u-4(a)(3)(B)(iii)(II)(aa)-(bb). In determining the proper party to serve as Lead Plaintiff, courts have clarified that the PSLRA's focus of the inquiry under this provision is on the typicality and the adequacy requirements of Fed. R. Civ. P. 23(a)(3)-(4). *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F. 3d 201, 263-65 (3d Cir. 2001).

### B)    The Sun Family Is Entitled To The Statutory Presumption As The Most Adequate Plaintiff

The Sun Family, a husband and wife residing in San Jose, California, suffered substantial losses of $93,089 as a result of their purchases of shares of Cooper Tire during the Class Period. *See* Certifications of Zhi Sun and Xiaoyan Jia, Dkt. # 10-1.  Movants are well suited for the role as Lead Plaintiff in this matter.  They have demonstrated their commitment to this litigation, having timely filed their Motion for appointment as Lead Plaintiff approval of their selection of Lead Counsel. Moreover, Movants also satisfy all of the requirements for appointment as Lead Plaintiff under the PSLRA and Rule 23 of the Federal Rules of Civil Procedure.

The Sun Family have interests in common with the Class members, have clear motivation and the ability to vigorously pursue this action, and have competent counsel.  Since the Sun Family meet both the typicality and adequacy requirements of Fed. R. Civ. P. 23(a), and have sustained the largest losses of all movants otherwise adequate to serve as Lead Plaintiff as a result of the alleged illegal and improper acts of Defendants, they are presumptively the most

3

adequate plaintiff to lead this action in accordance with 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  *See*

*Brown v. China Integrated Energy, Inc.*, CV 11-02559, 2011 U.S. Dist. LEXIS 151131, at *25

(C.D. Cal. Aug. 29, 2011) ("It follows that [movant] has the largest stake unless its asserted

losses are incorrect, either because LIFO or FIFO are not appropriate methods of calculating

losses or because [movant] has applied these methods in a way that is questionable.").  The

presumption cannot be rebutted and the Sun Family should be appointed Lead Plaintiffs.

> **1.   Under an analysis of the Lax factors, the Sun Family Have the Largest Interest In the Relief Sought and Is the Presumptive Plaintiff**

In determining which putative lead plaintiff or lead plaintiff group has the largest

financial interest, courts examine the four *Lax* factors: (1) the number of shares purchased; (2)

the number of net shares purchased; (3) total net funds expended by the plaintiffs during the class

period; and (4) the approximate losses suffered by the plaintiffs. *See Richman v. Goldman Sachs*

*Grp., Inc.*, 274 F.R.D. 473, 475 (S.D.N.Y. 2011), citing *Lax v. First Merchants Acceptance*

*Corp.*, 1997 WL 461036 (N.D. Ill. Aug. 11, 1997).

As shown in the table below, the Sun Family had more net shares purchased, more net

funds expended and, most importantly, more approximate losses than Timber Hill and OFI Asset

Management.

|  | Number of Shares Purchased | Number of Net Shares Purchased | Net Funds Expended | Approximate Losses |
|---|---|---|---|---|
| Sun Family | 19,100 | 19,100 | $556,305.00 | $93,089.00 |
| Timber Hill | 307,447 | - 4,279 | $104,799.70 | Maximum of $22,715.00 |
| OFI Asset Management | 0[1] | 0 | $0 | $0 |

[1] Due to the fact that OFI Asset Management did not purchase any shares of Cooper Tire during the Class Period, OFI Asset Management lacks Article III standing, and therefore has zero losses upon which to base its lead plaintiff application and its claimed losses of "$247,893.94" are simply not credible or correct.  *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 111 (2d Cir. 2008).

## II. OFI Asset Management Cannot Serve As Lead Plaintiff Because It Lacks Standing, Has Zero Losses and Is Subject to Unique Defenses

While OFI Asset Management claims a larger financial interest[2] than the Sun Family, as a French investment manager, it actually has no loss at all.  It did not purchase any shares of Cooper Tire during the Class Period, suffered zero losses and is not even a Class member.  Even if OFI did not lack Article III standing, it is also subject to a unique defense that is fatal under the *res judicata* doctrine. *See Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009) (*res judicata* unique defense renders movant "'incapable of representing the class.'").

### A) OFI Asset Management Has Failed to Demonstrate Standing To Bring This Case Much Less Serve as Lead Plaintiff

In order to serve as lead plaintiff, the movant must not only be a class member, but also have standing to assert the claims on behalf of the putative class.  15 U.S.C. § 78u-4(a)(3)(B). "At an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he *personally* has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982).  To establish standing in private securities litigation, "the PSLRA requires all proposed lead plaintiffs to submit a sworn declaration stating that the proposed plaintiff has suffered financial harm."  *See* Lead Plaintiff

---

[2] Counsel for OFI Asset Management concedes that the certified schedule of transactions submitted with the complaint contained an error.  *See* Exhibit 1 to the Margules Decl. - Dkt. No. 13-1.  Despite correcting and revising the schedule of OFI Asset Management's submitted as part of the certification provided at the lead plaintiff stage, counsel for OFI Asset Management, incredibly, submitted the identical certification from the complaint with identical date and signature – with new attachments plainly corrected and changed at a later time.  This raises serious questions about the validity of the second certification, whether the signatory even knew the certification was being refiled with new data, or if OFI Asset Management ever reviewed the attachments for either certification much less understands what it signed and that the certification purports to vouch for the accuracy of the attached trade data as required under the PSLRA.  Presumably, the corrected data was not available as of the date of the certification, or the incorrect data would never have been submitted.

Order in *Marcus v. J.C. Penney Co., Inc.*, 6:13-cv-736 (E.D. Tex. Feb. 28, 2014) ("*J.C. Penney*

Order") attached as Ex. B to the Miller Decl., at p. 10 (citing 15 U.S.C. § 4(a)(3)(A)(I)).

When the movant is an investment advisor, its "status as both an attorney-in-fact for

litigation purposes and as an investment advisor with unfettered discretion over its clients'

investment decisions does not confer on [the investment advisor] Article III standing to sue in a

representative capacity." *W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 111 (holding that

investment advisor "lack[ed] constitutional standing" because it "has not demonstrated an

'injury-in-fact'").  Because OFI Asset Management has not provided evidence that it, rather than

other distinct entities, suffered an injury, OFI Asset Management has not established under

Article III and the PSLRA.

In *J.C. Penney*, the Eastern District of Texas concluded that a foreign investment

manager did not establish standing in a nearly identical circumstance.  *J.C. Penney* Order, Ex. B

to the Miller Decl. at p. 10.  There, the movant was an Italian investment manager, whose

certification stated that two different Italian entities—the two mutual funds it managed—

acquired the securities during the class period.  *Id.*  The court found that because the investment

manager did not provide any supporting evidence that it was the entity harmed rather than the

two funds it managed, the investment manager did not establish its standing to sue.  *Id.* at 11.

Similarly here, OFI Asset Management is a French investment manager that submitted a

certification "in its capacity as investment manager on behalf of and for the accounts of" two

separate and distinct legal entities: OFI Risk Arbitrages and OFI Risk ARB Absolu ("OFI Risk

Arb Funds").  *See* Exh. 1 to the Margules Decl. – Dkt. No. 13-1.  Nowhere in the certification,

nor in the attached schedule of transactions does OFI Asset Management indicate that it, rather

than the OFI Risk Arb Funds, owned the Cooper Tire securities traded during the Class Period,

or if the securities were owned by the entities' individual investors.  Without this supporting evidence, OFI Asset Management cannot establish its standing and has no losses and no damages.  OFI Asset Management is not even a class member, much less an adequate lead plaintiff movant.

### B)  OFI Asset Management Is Subject To a Unique *Res Judicata* Defense

OFI Asset Management, a French limited company (société anonyme) headquartered in Paris, France, is further subject to a unique defense, because its home country of France will not recognize or enforce an opt-out class action judgment.  OFI Asset Management is uniquely vulnerable because Defendants could argue that even if they prevailed on the merits, OFI Asset Management could turn around and file an identical case in France, and French courts would not recognize the U.S. court judgment.  Non-recognition of a judgment in OFI Asset Management's home country of France would therefore give Defendants a unique *res judicata* argument against OFI Asset Management and would "jeopardize[] the interests of the entire class if Defendants *res judicata* arguments prevail."  *Buettgen*, 263 F.R.D at 383.  Thus, "[t]he problem boils down to the fact that if this Court's judgment on the merits does not protect a prevailing Defendant against relitigation in [France], nor grants a prevailing [French] Plaintiff an enforceable damage judgment, then for those litigants a class action is not 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Id.* at 382 (quoting Fed. R. Civ. P. 23(b)(3))**.**

As a result of potential *res judicata* issues, courts have refused to appoint foreign-based company movants as lead plaintiffs. *See, e.g.*, *Id.*; *J.C. Penney* Order Ex. B to the Miller Decl. at p. 10; *Steinberg v. Ericsson LM Tel. Co.*, 2008 U.S. Dist. LEXIS 29836, at *1 (S.D.N.Y. Apr. 11, 2008); *In re Royal Ahold N.V. Securities and ERISA Litig.*, 219 F.R.D. 343, 352-53 (D. Md. 2003); *Borochoff v. Glaxosmithkline PLC*, 246 F.R.D. 201, 205 (S.D.N.Y. 2007).  Courts have

7

also "eliminate[d] from the class action all purchasers other than persons who were residents or citizens of the United States".  *Birsch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996-96 (2d Cir. 1975).  *See also In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 301 (D. Del. 2003) ("[I]n the Court's view, the appropriate way in which to address the concerns related to foreign investors is . . . to certify a class comprising only domestic investors."); *In re Parmalat Sec. Litig.*, 2008 U.S. Dist. LEXIS 64296, at *11 (S.D.N.Y. Aug. 21, 2008) (modifying class to exclude foreign purchasers to address "concerns over the lack of *res judicata* effect any judgment might have in other countries.").  Indeed, the mere "risk that foreign courts would not give the Court's judgment *res judicata* effect," is enough to deny a movant lead plaintiff status.  *Buettgen*, 263 F.R.D at 382 (quoting *Steinberg*, 2008 U.S. Dist. LEXIS 29836, at *1; *see also Steinberg v. Ericcson LM Tel. Co.*, No. 07-cv-9615 (S.D.N.Y. Feb. 15, 2008) (motion for lead plaintiff hearing transcript at p. 61, attached as Ex. C) (rejecting movant's application for lead plaintiff, noting "the down side is that he may well be excluded when the motion comes from defendants that according to Belgian law there weren't [sic] be res judicata on Belgian law.  I don't know if that motion is coming or not, but it could.").

Here, the unique defense is especially strong where French courts are almost certain to refuse to recognize the judgment.  In an *amicus curiae* brief submitted in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010), the Republic of France itself states that "French courts would almost certainly refuse to enforce a court judgment in a U.S. 'opt-out' class action because it . . . violates French constitutional principles and public policy." *See* Brief of Republic of France, Miller Decl. Ex. A, at p. 26.  According to the *Cour de Cassation* (France's highest court), a French judge shall only recognize and enforce a foreign judgment if the following three conditions are satisfied: "1) there is a sufficient link between the dispute and the chosen forum;

2) the decision does not violate French public policy; and 3) the party seeking enforcement did not evade French law in obtaining the foreign judgment." *Id*. (citing *Cornelissen v. Societe Avianca Inc., et autres*, Appeal No. 05-14.082, *Cour de cassation*, First Civil Chamber (Feb. 20, 2007).  Citing a decision from the *Conseil Constitutionnel* (France's only court to determine legislative constitutional issues) and French legal scholars commenting on the case, France's brief explains that French constitutional law "precludes the 'opt-out' method of binding class members" because the "choice to initiate and terminate a legal action is an important [French] individual right".  *Id*. at p. 27 (citations omitted).

Indeed, France's *amicus curiae* brief also cites approvingly *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 287 (S.D.N.Y. 2008), a Southern District of New York case in which the court modified the proposed class definition to eliminate French persons or entities on the basis that French courts would not likely recognize the judgment.   *Id*. at 29.  Because the United States and France are not party to any bilateral or multilateral agreements regarding judgment recognition or enforcement, the *Alstom* court determined that it was required to look to French law regarding recognition of judgments, and undertook a lengthy analysis of the framework set forth in *Munzer v. Munzer*, issued by France's highest court.  After finding that the French court would 1) likely have exclusive jurisdiction over French investors' claims; and 2) that the opt-out class action system would violate French constitutional principles and public policy, the court held that it would not certify a class that included absent French class members.  *Alstom*, 253 F.R.D. 285, 287.

Another recent Southern District of New York case came to the same conclusion.  In *Anwar v. Fairfield Greenwich*, 289 F.R.D. 105, 118 (S.D.N.Y. 2013), the court again determined that a French Court would not recognize a United States opt-out class judgment.   The court

found that, in the wake of *Alstom*, the amicus brief submitted by the Republic of France in *Morrison* "only served to confirm this conclusion." *Id*. As a result, the court in *Anwar* also held that it "will not certify a class which includes absent class members from France." *Id*.

Because French courts would not likely recognize or enforce a judgment rendered in this case, OFI Asset Management—as an entity organized under French law—is subject to the unique defense in that the judgment would not protect Defendants against relitigation in France, nor grant a prevailing [French] Plaintiff an enforceable damage judgment. *See Borochoff*, 246 F.R.D. at 203. "Rather, it is a waste, and their presence in the class . . . may inflict burdens on the administration of the action." *Id*. OFI Asset Management is therefore an inadequate and atypical lead plaintiff movant.

### III. <u>Timber Hill Has Materially Overstated Its Losses and Failed to Include Accurate Trade Data</u>

#### A) **The Purported Loss and Transaction Data of Timber Hill Erroneously Includes non-*Dura* losses and relies on the Disfavored FIFO method**

Timber Hill represents that it suffered losses of approximately $398,000 under a First-In-First-Out ("FIFO") methodology and approximately $250,000 in losses based on the Last-In-Last-Out ("LIFO") methodology, during the Class Period. Timber Hill provided 74 pages of trade data with its certification and an additional 96 pages of loss calculations with its loss chart. *See* Dkt. No. 13-1 at 5-78, 13-2 at 3-98. An analysis of its own data reveals these loss figures are materially wrong, resulting in losses inflated by hundreds of thousands of dollars. After excluding from Timber Hill's claimed losses in-and-out trades that suffered no damages and after calculating its losses based on the widely favored LIFO methodology, Timber Hill's losses are at most $22,715.00.

### 1. The Purported Loss of Timber Hill LLC Erroneously includes non-*Dura* losses in Direct Violation of Controlling Supreme Court Precedent

The first material error in Timber Hill's loss calculation is the inclusion of ins-and-outs losses.  This violates the tenets of controlling Supreme Court precedent by including losses arising from thousands of purchases and sales before a corrective disclosure had been made, which must be excluded under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).  In determining a movant's losses, losses that are incurred on sales prior to a corrective disclosure "are not recoverable in a securities fraud action because the losses are not proximately caused by the defendant's misstatements." *See In re LightInTheBox Holding Co., Sec. Litig.*, 2013 U.S. Dist. LEXIS 165842, at *10 (S.D.N.Y. Nov. 21, 2013) (citing *Dura,* 544 U.S. at 342-43).  In this case, the first corrective disclosure occurred on October 4, 2013 and full disclosure of the truth occurred on November 7, 2013.  Therefore, the losses from any shares purchased after June 12, 2013 and sold on or before October 4, 2013 must be excluded.  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 433 (3d Cir. 2007) ("[I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.") (quoting *Dura*, 544 U.S. at 342).

Timber Hill erroneously included *Dura*  losses by simply subtracting the total cost of the shares purchased during the Class Period from the total cost of the proceeds of Class Period sales – a methodology specifically rejected by the Courts after *Dura*.  *See In re Comverse Tech., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 14878, at *23 (E.D.N.Y. Mar. 2, 2007).  This is not a proper or accurate method as it includes losses incurred on sales of shares that were sold before the truth was revealed and the shares were damaged. *See id.*  Instead, a movant must separate the in-and-out trades and include the losses from only those shares that are damaged.  *See id.*

11

>   **2.   The proper method of calculating a *Dura* loss is the Strongly Preferred Last-In-First-Out ("LIFO") method because the Disfavored First-In-First-Out ("FIFO") method inflates losses**

In excluding such non-*Dura* losses from measuring the "largest financial interest" under the PSLRA, courts generally apply one of two accounting techniques: LIFO or FIFO. *LightInTheBox*, 2013 U.S. Dist. LEXIS, at *10. Courts in this District and elsewhere "have a very strong preference for the LIFO method in calculating loss." *See Richman v. Goldman Sachs Group, Inc.*, 274 F.R.D. 473, 475 (S.D.N.Y. 2011); *Beckman v. Ener1, Inc.*, 2012 U.S. Dist. LEXIS 19972, *8 (S.D.N.Y. Feb. 15, 2012); *In re CMED Sec. Litig.*, 2012 U.S. Dist. LEXIS 47785, *11 (S.D.N.Y. Apr. 2, 2012). Courts prefer the [LIFO] method of accounting and have generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases. *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 590 n.70 (S.D.N.Y. 2008). "The overwhelming trend both in this district and nationwide has been to use LIFO to calculate such losses." *See Bo Young Cha v. Kinross Gold Corp.*, 2012 U.S. Dist. LEXIS 79288, *10 (S.D.N.Y. May 31, 2012).

In adopting LIFO over FIFO as the preferred methodology, courts have given several reasons for doing so:

> First, FIFO has the potential to exaggerate losses, by failing to take into account gains that an investor might have made on the stock that were attributable to its artificial inflation as a result of the alleged fraud; LIFO, on the other hand, takes into account such gains. Second, **LIFO excludes "in-and-out" transactions, purchases and sales that occur during the class period, i.e., after the stock price was fraudulently inflated and before it dropped due to a corrective disclosure.  Any gain or loss due to such transactions is reasonably read to reflect price fluctuations attributable to factors other than the fraud, and thus should be excluded from the PSLRA loss calculus.**

*See Id.* at *10 – 13   (internal citations omitted) (emphasis added).  FIFO "has fallen out of favor…because of its tendency to overstate the losses of institutional investors and to understate

gains made from stock during the class period." *In re Pfizer Sec. Litig.*, 233 F.R.D. 334, 338 n.3 (S.D.N.Y. 2005). *See also Vladamir v. Bioenvision*, Inc., 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21, 2007); *Richardson v. TVIA, Inc.*, 2007 WL 1129344, at *4 (N.D. Cal. Apr. 16, 2007); *Johnson v. Dana Corp.*, 236 F.R.D. 349, 352-53 (N.D. Ohio 2006); *In re Mills Corp.*, 2006 WL 2035391, at *3 n.1 (E.D. Va. May 30, 2006); *Arenson v. Broadcom Corp.*, 2004 U.S. Dist. LEXIS 27522, at *7-8 (C.D. Cal. Dec. 6, 2004); *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378-79 (E.D. Va. 2003).

The underlying rationale for the preference for LIFO is readily apparent in this case. According to Timber Hill's loss charts, it owned 22,909 shares of Cooper prior to the Class Period, when the Cooper stock price was allegedly without inflation. Under a FIFO analysis, the first shares sold during the Class Period (which were allegedly inflated in price) would be applied to the pre-CP shares (which were allegedly not inflated in price), which means that Timber Hill benefited from the Defendant's misrepresentation by being able to sell its pre-Class Period shares at inflated prices. The FIFO method does not therefore accurately reflect its financial interest in this litigation. Indeed:

> There are a host of cases…that reject the kind of artificial "loss" that is manufactured by [the] FIFO construct in favor of a calculation that properly nets out purchases and sales during the class period and determines gains and losses in those terms. That is all of a piece with the concept of "actual damages" recovery that is uniformly embraced.

*In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001), *citing In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996 n.2 (N.D. Cal. 1999) ("The court favors the [net/net] approach…because the [FIFO] approach can mask significant class period receipts if there were extensive pre-class period holdings").

A LIFO analysis is vastly more correct, especially in this case, because Timber Hill was repeatedly selling its shares on a daily basis and therefore incurring losses or gains from small movements in price throughout the day. As shown on pages 1-2 of Exhibit F to the Miller Decl., Timber Hill regularly bought and sold similar amounts of shares on each day to profit from the bid-offer spread and minor price movements, rather than holding shares for extended periods of time to make profits from the stock's price growth over an extended period of time. Given this, the most logical method is to match the trades that were nearest in time to one another (*i.e.*, on the same day) under LIFO, instead of matching trades that were days apart under a FIFO analysis.

Therefore, the FIFO losses claimed by Timber Hill are invalid because a FIFO analysis inflates Timber Hill's losses by $147,629.83. *See* Miller Decl. at ¶ 8. The LIFO losses are likewise invalid and improper because the failure to exclude ins and outs inflates Timber Hill's losses by $250,793.71.  *See* Miller Decl. at ¶ 9.  In reality, Timber Hill only suffered losses on 2,065 shares of Cooper stock and incurred less than $22,715.00 in damages. *Id.*

### 3.   Timber Hill suffered *Dura* losses no greater than $22,715.00

Based on the information provided by Timber Hill's counsel, it is not possible to calculate a completely accurate LIFO-*Dura* loss total for Timber Hill because so many trades occurred on the same day and the specific timing of the sales and purchases would affect which shares might end up being damaged.  However, accepting as true Timber Hill's representation that an accurate LIFO analysis leaves them with 2,065 shares held on October 4, 2013, due to the sale of 6,244 pre-Class Period shares, Timber Hill suffered a *maximum* loss of $22,715.00, based on two additional assumptions made in its favor: 1) that Timber Hill held its shares through

February 5, 2014; and 2) the shares it held were the shares purchased at the maximum price of $34.66.

### 4. Timber Hill's Trade Data Appears Incomplete

A review of the trading data of Timber Hill raises concerns regarding the completeness of the data provided. From June 12, 2013 to October 4, 2013, Timber Hill made over 3,200 trades in Cooper stock. However, there are no trades listed after October 4, 2013, despite the requirements of the PLSRA that (1) any shares purchased or sold up to November 8, 2013 (the last day of the Class Period) must be included in Timber Hill's certification and loss chart, and (2) any additional shares sold during the 90 day look-back period (November 8, 2013 to February 6, 2013) should be noted in the loss chart to determine whether Timber Hill should use the holding value or the actual sales price for its allegedly damaged shares. Given its trading history, and given the fact that Timber Hill is a market maker for a trading company, it seems highly unlikely that Timber Hill did not continue trading its 18,630 shares of Cooper Tire stock after October 4, 2013.

### IV. Timber Hill Is Atypical and Inadequate To Serve as a Lead Plaintiff

### A) Timber Hill is a Market Maker and Is Therefore Atypical and Inadequate

Timber Hill is a market maker as repeatedly noted by third parties, including Yahoo! Finance (*see* Miller Decl. at Ex. C), and by its own Parent company, Interactive Brokers Group, Inc. ("Interactive Brokers") ("[o]ur U.S. market making activities are conducted through Timber Hill LLC ("TH LLC"), a SEC-registered securities broker-dealer that conducts market making in equity derivative products, equity index derivative products and equity securities.") *See* Interactive Brokers 10-K for the year ended December 31, 2013, attached to Miller Decl. at Ex. E at p. 9. A market maker is defined in the Exchange Act as a broker-dealer who holds himself

out in the inter-dealer market as being ready to **purchase and sell a security for his own account, on a regular and continuous basis**. *See* USC § 78c(a)(38). A market maker "regularly publishes bid and ask quotations in an inter-dealer system or furnishes such quotation on request,… and  is "ready willing and able" to trade reasonable quantities of the security in which he is making a market to other dealers at his quoted prices." *McNichols v. Loeb Rhoades & Co.,* 97 F.R.D. 331, 344 (N.D. Ill. 1982).

Timber Hill's status as a market maker renders it inadequate to serve as Lead Plaintiff for at least the following reasons: 1) market makers are subject to a number of unusual requirements applicable only to market makers that render Timber Hill atypical; 2) Timber Hill, as a market maker, has unique tools not available to other class members, including proprietary technology, that enable Timber Hill to access information that it uses to seek to get an edge over the market by processing price and risk just ahead of the market. Market makers, such as Timber Hill, are subject to unique defenses that should prevent the court from appointing them as Lead Plaintiff. *See Tice v. Novastar Fin., Inc.*, No 04-0330, 2004 U.S. Dist. LEXIS 16800, at *24 (W.D. Mo. Aug. 23, 2004) (market maker would be subject to unique defenses and therefore selecting a plaintiff with lower losses as lead plaintiff); *see also Seamans v. Aid Auto Stores, Inc.*, 2000 U.S. Dist. LEXIS 1749, at *13-14 (E.D.N.Y. Feb. 15, 2000) (holding that a market maker "may not be one of the lead plaintiffs" because "'the issues of both reliance and materiality would be different for a market maker; he would rely on different factors than an investor would and facts that would be material to an investors' decision might not matter to him.'") (quoting *McNichols*, 97 F.R.D. at 344).

First, Timber Hill, as a registered market maker is subject to numerous unique requirements that render it atypical of the class, as discussed in Interactive Broker's 10-K:

*Rules governing specialists and designated market makers may require us to make unprofitable trades or prevent us from making profitable trades.*

Specialists and designated market makers are granted certain rights and have certain obligations to "make a market" in a particular security. They agree to specific obligations to maintain a fair and orderly market. In acting as a specialist or designated market maker, we are subjected to a high degree of risk by having to support an orderly market. In this role, we may at times be required to make trades that adversely affect our profitability. In addition, we may at times be unable to trade for our own account in circumstances in which it may be to our advantage to trade, and we may be obligated to act as a principal when buyers or sellers outnumber each other. In those instances, we may take a position counter to the market, buying or selling securities to support an orderly market.

*See* Miller Decl., Ex. E at p. 30 (emphasis added).   These unusual and unique requirements render Timber Hill atypical and inadequate to represent the Class as Lead Plaintiff.   *See Novastar*, *supra*.

Second, Timber Hill has unique tools, information, and other resources that a typical investors does not have and that render Timber Hill atypical and inadequate to represent that Class. With regard to proprietary technology, Interactive Brokers notes as follows:

Our proprietary technology is the key to our success. We built our business on the belief that a fully computerized market making system that could integrate pricing and risk exposure information quickly and continuously would enable us to make markets profitably in many different financial instruments simultaneously.

*See* Miller Decl. at Ex. E, Interactive Broker 10-K at p. 10.

Timber Hill's proprietary technology makes it atypical and inadequate to serve as a Lead Plaintiff in this case.  Rather than being similarly situated to other class members purchasing the stock during the Class Period, Timber Hill was instead in the unique position of using its technology to seek to get an edge over the market by processing price and risk just ahead of the market.  Timber Hill further admits that it makes markets by "offering competitively tight bid/offer spreads over a broad base of over 804,000 tradable, exchange-listed products" (*see*

Miller Decl., Ex. E at p. 50) giving it access to information and tools in the market that is unique and atypical.  For this reason alone, Timber Hill is inadequate to serve as Lead Plaintiff.

### B)  Timber Hill is an Atypical Day Trader

Timber Hill's trading activity shows that it is also a frenetic day trader, atypical of the Class and therefore inadequate to serve as Lead Plaintiff. The volume and frequency of Timber Hill's trading activity indicates that its strategy involved profiting from short-term fluctuations in the price of Cooper stock and by offering to buy and sell Cooper Tire stock simultaneously at different prices in hopes of making a profit on the bid-offer spread.

Courts have found that day traders are subject to unique defenses and are atypical. For example, in *Applestein v. Medivation, Inc.*, 10-998, 2010 U.S. Dist. LEXIS 98255, at *10 (N.D. Cal. Sept. 20, 2010), the court declined to appoint as lead plaintiff a day trader because to do so would raise concerns about his typicality. In that case, the lead plaintiff movant engaged in 407 trades of the company stock over a 644 day period, traded as many as 44 times in a single day, and bought and sold the company's stock in a single day on nine different occasions. *Id.* (noting also that day traders "typically focus on technical price movements rather than price, and therefore are subject to a defense that they would have purchased the stock at issue regardless of the misstatement/omission.") (citations and internal quotation marks omitted).  In the main, "[i]t is sufficient [] to raise serious concerns about his typicality and about his susceptibility to the defense *that he was trading in response to information other than the alleged misstatements and omissions* made by [the Company]." *Id.* (emphasis added).

Here, Timber Hill is the perfect example of a frenetic day trader because its trading records show that it made 1,612 purchases and 1,547 sales during the class period (a Class Period which consisted of 150 calendar days and 106 days that the markets were open).  In other words,

18

Timber Hill was buying and selling shares, on average, almost 30 times per trading day (and potentially more if Timber Hill made additional trades from October 4, 2013 to November 8, 2013 that it failed to report in its Motion for Lead Plaintiff papers).  On one day, June 19, 2013, it made 92 purchases and 82 sales of Cooper stock.

By itself, a day-trading strategy – especially in this case, where unusual volume and frenetic activity are evident – renders movant Timber Hill inadequate as a class representative. *See In re Bank One S'holders Class Actions,* 96 F. Supp. 2d 780, 784 (N.D. Ill. 2000) (declining to appoint as lead plaintiff a candidate that engaged in "extensive day-trading"); *see also In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 733 (S.D. Ind. 2000) (noting that one movant had previously been rejected as a lead plaintiff in a securities case, in part "because its arbitrage trading strategy rendered the fund inadequate"); *Eichenholtz v. Verifone Holdings, Inc.*, No. 07-6140, 2008 U.S. Dist. LEXIS 64633, at *36 (N.D. Cal. Aug, 22, 2008) (rejecting application of lead plaintiff movant consisting of a group because one member of the group was a day trader that had an average of over eight trades a day during the class period); *Tsirekidze v. Syntax-Brillian Corp.*, No. 07-2204, 2008 WL 942273 (D. Ariz. Apr. 7, 2008) (declining to appoint lead plaintiff movant who made as many as 80 trades in a single day and concluding that '[s]uch a high-volume day trader might be subject to the unique defense that frantic trading belies any true reliance on company reports or even on the integrity of the stock price itself."); *In re Safeguard Scientifics,* 216 F.R.D. 577, 582 (E.D. Pa. 2003) (noting that day traders often focus on technical price movements rather than price).  Timber Hill is inadequate to serve as Lead Plaintiff.

## V. **The Court Should Approve The Suns Family's Selection of Counsel**

The PSLRA vests authority in the Lead Plaintiff to select and retain counsel to represent the Class, subject to the Court's approval.  *See* 15 U.S.C. § 78u-4(a)(3)(B)(v).  Courts will

generally not disturb the Lead Plaintiff's choice of counsel unless necessary to "protect the interests of the class."   15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).   The Sun Family have selected KSF to serve as Lead Counsel for the Class.

KSF has not only prosecuted complex securities fraud actions, but it has also successfully prosecuted many other types of complex class actions.   This Court may be assured that in the event the Sun Family's motion is granted, KSF will provide the members of the Class with the highest caliber of legal representation.

## CONCLUSION

For all of the foregoing reasons, the Sun Family respectfully requests that this Court: (i) appoint the Sun Family to serve as Lead Plaintiff in this Action; (ii) approve the Sun Family's selection of KSF as Lead Counsel for the Class; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated: April 4, 2014                                         Respectfully submitted,

                                                             **FARUQI & FARUQI, LLP**
                                                             _/s/ James R. Banko_____
                                                             James R. Banko (#4518)
                                                             20 Montchanin Road, Suite 145
                                                             Wilmington, DE 19807
                                                             Telephone: (302) 482-3182
                                                             Fax: (302) 482-3612
                                                             jbanko@faruqilaw.com

                                                             *Proposed Liaison Counsel*

20

Kim E. Miller (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone:   (212) 696-3730
Facsimile:   (504) 455-1498

-and-

Lewis S. Kahn
**KAHN SWICK & FOTI, LLC**
206 Covington St.
Madisonville, LA 70447
Telephone (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for the Sun Family and Proposed*
*Lead Counsel for the Class*