# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| OFI RISK ARBITRAGES, OFI RISK ARB ABSOLU and TIMBER HILL LLC, individually and on behalf of all others similarly situated, | Civ. A. No. 1:14-cv-00068-LPS |
| Plaintiffs, | |
| v. | <u>JURY TRIAL DEMANDED</u> |
| COOPER TIRE & RUBBER COMPANY, ROY ARMES and BRADLEY HUGHES, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
Benjamin P. Chapple (Bar No. 5871)
**FRIEDLANDER & GORRIS, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Plaintiffs' Liason Counsel*

Vincent R. Cappucci
Andrew J. Entwistle
Robert N. Cappucci
Jordan A. Cortez
Evan T. Raciti
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor
New York, New York 10017
(212) 894-7200

Gerald H. Silk
James A. Harrod
Lauren McMillen Ormsbee
Evan Berkow
Laura Asserfea
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Lead Counsel and Counsel for Lead Plaintiffs*
*OFI Asset Management and Timber Hill LLC*

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ........................................................................................................ 2

II.   CLAIMS ASSERTED ............................................................................................... 11

III.  JURISDICTION AND VENUE ............................................................................... 11

IV.  PARTIES .................................................................................................................. 12

    A.    Lead Plaintiffs ............................................................................................... 12

    B.    Defendants ..................................................................................................... 13

    C.    Non-Party Apollo Tyres Ltd. ......................................................................... 14

V.    BACKGROUND ...................................................................................................... 14

    A.    Cooper's Business Strategy ........................................................................... 14

    B.    CCT Is Cooper's Most Important Subsidiary ................................................ 17

VI.  DEFENDANTS' FRAUDULENT SCHEME ........................................................... 17

    A.    Apollo And Cooper Discuss A Possible Merger ........................................... 17

    B.    Cooper And Apollo Agree To A Merger ...................................................... 19

    C.    Defendants Knew That Chengshan Would Resist And Prevent The Merger
        With Apollo ................................................................................................... 21

    D.    Cooper Lacked Control Over CCT ................................................................ 26

    E.    Defendants Conceal Cooper's Lack Of Control Over CCT ........................... 28

    F.    Apollo And Cooper Recognized That The Merger Would Be Challenged
        By The USW ................................................................................................. 29

    G.    Defendants Armes And Hughes Were Motivated To Complete The
        Merger So They Could Reap Tens Of Millions of Dollars ............................ 31

    H.    CCT Workers Strike While Cooper Assures Investors That It Will Not
        Impact The Merger ........................................................................................ 32

    I.    Cooper Downplays The Problems At CCT To Investors In Its Second
        Quarter 10-Q ................................................................................................. 36

J.   While The Prospects For The Merger And Cooper's Financial Condition Decline Rapidly, Defendants File The Proxy Statement With Misleading Financial Data ................................................................................................ 36

K.   Cooper Publishes Its Proxy As Conditions Surrounding The Merger And Control Of CCT Continue to Deteriorate ............................................................ 39

L.   The Ongoing Problems With CCT Block Cooper From Moving Forward With The Merger ................................................................................................ 43

M.   The USW Successfully Challenges The Merger ................................................... 44

N.   Apollo Demands A Price Reduction From Cooper Because Of The Problems Impacting The Merger ......................................................................... 45

O.   Cooper Shareholders Vote On The Merger Without Knowing The True Facts .................................................................................................................... 46

VII.   THE TRUTH IS REVEALED THROUGH A SERIES OF PARTIAL DISCLOSURES .............................................................................................................. 47

A.   Cooper Files a Lawsuit to Force the Merger ....................................................... 47

B.   The Merger Further Unravels As Cooper's Financial Results Suffer .................. 52

C.   The Full Impact Of The CCT Strike Is Finally Revealed In Cooper's Third Quarter 2013 Results ................................................................................... 54

D.   Post-Class Period Events: Chengshan Buys Cooper's Stake In CCT ................. 55

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER ........................................................... 56

IX.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 63

A.   Announcement Of The Transaction And Merger Agreement .............................. 63

B.   Quarterly Report On Form 10-Q For The Second Quarter of 2013 .................... 67

C.   Proxy Solicitation Seeking Approval Of The Merger ......................................... 68

D.   The September 30, 2013 Press Release ............................................................... 73

X.   LOSS CAUSATION ......................................................................................................... 74

XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 77

XII.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND AFFILIATED UTE ........................................................................................................... 77

{FG-W0378817.}

XIII.   CLASS ACTION ALLEGATIONS ................................................................. 79

XIV.   CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE
        EXCHANGE ACT.......................................................................................... 81

COUNT I  VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE
        10B-5 AGAINST ALL DEFENDANTS ......................................................... 81

COUNT II  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST
        THE INDIVIDUAL DEFENDANTS IN CONNECTION WITH THE SECTION
        10(B) CLAIMS ............................................................................................. 82

XV.    CLAIMS BROUGHT PURSUANT TO SECTIONS 14(a) AND 20(a) OF THE
        EXCHANGE ACT.......................................................................................... 83

COUNT III  VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AGAINST
        ALL DEFENDANTS...................................................................................... 85

COUNT IV  VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST
        THE INDIVIDUAL DEFENDANTS IN CONNECTION WITH THE PROXY
        CLAIMS ........................................................................................................ 87

XVI.   PRAYER FOR RELIEF ................................................................................. 89

XVII.  JURY DEMAND ............................................................................................ 89

{FG-W0378817.}

# COMPLAINT

1.     Lead Plaintiffs (defined below), by their undersigned counsel, hereby bring this federal securities class action on behalf of purchasers of publicly traded common stock of Cooper Tire & Rubber Company ("Cooper" or the "Company") between June 12, 2013 and February 28, 2014, inclusive (the "Class Period"), as well as the Cooper stockholders of record as of the close of business on August 30, 2013 (the "Record Date") entitled to vote on the proposed merger between Cooper and Apollo (as set forth below), and were damaged thereby (the "Class").  The claims asserted herein are alleged against Cooper, Cooper's Chairman and Chief Executive Officer, Roy Armes ("Armes"), and Cooper's Chief Financial Officer, Bradley Hughes ("Hughes") (collectively, "Defendants"), and arise under Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and rules promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5, and Rule 14a-9, 17 C.F.R. §240.14a-9. Excluded from the Class are Defendants, present or former executive officers of Cooper, and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

2.     Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of: (a) regulatory filings made by Cooper with the United States Securities and Exchange Commission ("SEC") as well as reports issued by Apollo Tyres Ltd. ("Apollo"); (b) press releases and media reports issued and disseminated by the Company and Apollo; (c) analyst reports concerning Cooper and Apollo; (d) pleadings, evidence and trial testimony in *Cooper Tire Rubber Company v. Apollo (Mauritius) Holdings Pvt. Ltd., et al.,* C.A. No. 8980-

1

VCG (Del. Ch.) (the "Cooper-Apollo Trial" or the ); (e) data reflecting the pricing of Cooper common stock; (f) information obtained from former Cooper employees and other individuals with knowledge of the facts alleged, throughout the course of counsel's investigation; and (g) other publicly available material and data, including as identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.     <u>INTRODUCTION</u>

3.     On June 12, 2013, Cooper announced that competitor Apollo would acquire the Company for $2.5 billion (the "Merger"), a merger that would create the seventh-largest tire manufacturer in the world by revenue.  This news thrilled the market and caused Cooper's stock to increase by over $10 per share, or 41%, on the Company's highest historical trading volume. While Cooper executives presented the deal to investors as a "compelling" transaction, their statements concerning the Merger were materially false and failed to disclose that Cooper's Chinese joint venture partner had put in a competing bid to acquire the Company, would not cooperate in the Merger and had the ability to seize control of the Company's major China-based operations.  As Defendants were aware, Cooper's lack of control over its Chinese subsidiary also precluded Cooper from providing the "Required Information" (defined below) concerning the Company's financial results that were a precondition to the Merger.

4.     Less than four months later, the deal had collapsed, the Company's largest and most profitable subsidiary was in revolt, Apollo and Cooper were embroiled in a litigation over the failed Merger, and, as a result, Cooper's Class Period investors suffered hundreds of millions

2

of dollars in losses.  Ultimately, the proposed Merger would result in the unraveling of Cooper's Chinese joint venture and the loss of tens of millions of dollars to the Company.

5.      From the outset, in their disclosures related to the Merger, Defendants misrepresented and concealed Cooper's lack of control over its most profitable subsidiary.  Since 2006, Cooper held a majority stake in Chinese subsidiary Cooper Chengshan Tire Company, Ltd. ("CCT").  Cooper's 65% stake in CCT provided up to 25% of Cooper's revenue and "was very, very important" for the Cooper-Apollo Merger, according to Apollo Managing Director Neeraj Kanwar.  Cooper's majority stake in CCT gave the Company valued access to the Chinese markets – "the fastest growing economy of the world" – something that Apollo deeply coveted.

6.      The China-based Chengshan Group ("Chengshan"), led by "Chairman Che," owns the remaining 35% stake in CCT yet exercised a disproportionate amount of control over the key joint venture.  Chengshan "closely controlled CCT" from within China, providing most of CCT's management personnel.  Chengshan and Chairman Che, referred to as the "local" partner, were "highly influential" in the region and had embedded relationships with both the Chinese government and the workers at the CCT plant.  Chengshan would leverage these relationships and influence to exercise complete control over the CCT facilities, finances and operations to effectively veto the Merger, an event that Defendants predicted would occur prior to the Merger announcement.

7.      Defendants knew that Cooper did not have control over CCT.  Former Cooper employees confirm Chengshan's control over CCT.  They have indicated that Cooper "didn't have a . . . lot of authority" over CCT and had no "ability to go get the financial information" or "see the data" for CCT without Chengshan's cooperation.  Indeed, it was later revealed during the November 2013 Cooper-Apollo Trial concerning the Merger (discussed below) that

3

Chengshan had denied Cooper's management access to CCT's facilities to review manufacturing processes at least once in the years preceding the Class Period.  Thus, it was clear to Defendants that a sale of Cooper and its stake in CCT required the acquiescence of Chengshan.

8.      It was equally clear to Defendants that Chengshan and Che were opposed to the Merger from the start.  Indeed, during negotiations, Defendant Armes told Apollo executives that Cooper did not know how Chairman Che would react to the Merger, noting equivocally that Che "could go along with the acquisition and really support it and transition it," could be looking to sell his 35% stake, or "he could disrupt [the acquisition] or try to undermine [the acquisition]." For Apollo, the acquisition of CCT was a vital part of the deal with Cooper, and because Cooper's response was not satisfactory, Apollo requested a personal meeting with Che in China. However, at this May 15, 2013 meeting between Che and executives from both Apollo and Cooper, Che voiced his opposition to the Merger and desire to "keep things going the way that [they] were."  Che told Apollo and Cooper that, at the very least, he demanded some compensation for his approval, stating "*[m]y father is changing to my stepfather – what am I getting?*"[1]

9.      Cooper realized that Chairman Che's reaction to the Merger could deter Apollo, and immediately took steps to convince Apollo that not only did Cooper control CCT such that Chengshan had no veto, put or approval rights over the Merger, but that "there was no issue on the relationship with Chairman Che" and "that there was absolutely no concern as far as China or CCT was concerned."

10.     Defendants knew at all relevant times, however, that Chengshan not only strongly opposed the Cooper-Apollo Merger, but that Chairman Che was himself "interested in putting in a bid" for the Company, further pitting him against the Merger.  In fact, in advance of the June

---

[1] Unless otherwise indicated, all emphasis has been added.

4

12, 2013, Merger announcement, Cooper engaged in multiple secret discussions with Chairman Che culminating in Che making a $38 per share offer to acquire Cooper.  These negotiations and Chengshan's offer were not disclosed to investors (or to Apollo).  In fact, while negotiations with Chengshan were described in the Proxy seeking approval for the Merger, Chengshan was identified anonymously as "Party C," an omission of the most critical fact about these negotiations.  Apollo did not learn of Che's interest in Cooper until the deal had all but fallen apart.  Upon learning that information, Apollo managing director Neeraj Kanwar stated that such information was material to anyone involved in the Merger (including investors), and that it cast light on the reasons for Chairman Che's opposition to the Merger and could have informed how Apollo dealt with Chengshan and Chairman Che from the outset.

11.     Defendants' knowledge of Chengshan's opposition and ability to veto the Cooper-Apollo Merger is reflected in Cooper's inclusion of protective language in the Agreement and Plan of Merger, dated as of June 12, 2013 (the "Merger Agreement").  Cooper negotiated a Material Adverse Effect clause in the Merger Agreement that it believed would not preclude consummation of the deal even if Chengshan attempted to block the transaction.

12.     Despite clear evidence that Chengshan had the desire and ability to block the Merger, Cooper finalized the terms of the Merger Agreement with Apollo.  On June 12, 2013, Cooper announced the Merger to its shareholders, highlighting its Chinese operations as critical to the deal.  Cooper shares immediately appreciated by $10.10, or 41%, closing on June 12, 2013 at $34.66 per share.  This massive increase indicated investors' view, based on Defendants' misrepresentations and omissions, that the Merger was very likely to be consummated and that there were few obstacles to closing.

13.     Upon the Merger announcement, Chairman Che traveled to the United States and made a final and failed attempt to convince Cooper to accept his bid for the Company.  Once that bid was rejected, Chengshan and CCT acted quickly, first striking and then blocking Cooper from access to any aspect of CCT's operations.  In the first ten days after the Merger was announced, Chengshan orchestrated a strike by CCT's labor force and the complete shutdown of CCT operations, barring Cooper representatives and employees from the facilities through the use of hired security guards.  By July 12, Cooper had lost all access to the CCT facility, unable to even remove its own property from the space or remotely access financial data.  Then, on July 29, Chengshan filed a formal legal action in a local Chinese court seeking approval to dissolve the Cooper-Chenshan joint venture.

14.     Cooper's inability to access CCT's financial information, results and accounting records posed a clear, practical impediment to the Merger.  Even under Cooper's own interpretation of the Merger Agreement that allowed the Merger to close without Chengshan's cooperation, Cooper would still be required to provide certain "Required Information" (defined below) to Apollo, including financial information and a business plan for CCT.  Chengshan's ability to preclude Cooper's access to CCT made providing the Required Information, and the closing of the Merger, an impossibility.

15.     This was borne out in the later trial and pleadings in Delaware Chancery Court.  As summarized by Apollo in the Cooper-Apollo Trial, the Merger Agreement contained "representations and warranties [that] are not true" because "Cooper does not have control over [CCT]," a fact that became evident "following the announcement of the Merger Agreement [when] . . . Cooper [] lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records."

6

16.     All of these actions by Chengshan were orchestrated by Chairman Che to increase Chengshan's bargaining power and ability to wrench substantial monetary consideration from Cooper and/or Apollo in exchange for its acquiescence to the Merger.   However, despite Apollo's offer of $150 to $200 million for Chengshan's stake in CCT, Chairman Che demanded double that amount, a figure that neither Apollo nor Cooper were willing to pay.   Other ploys by Cooper to gain access to CCT – such as cutting off payments to CCT's suppliers – also failed to force the Chinese subsidiary and joint venture partner to cooperate.

17.     By August 2013, it was clear to Cooper and Apollo that the Merger was in dire jeopardy, but Cooper did not share this information with its shareholders.   Cooper failed to reveal the severity of the CCT lockout and work stoppage, and their effect on the Merger in the Company's August 9, 2013 Form 10-Q for the second quarter of 2013.   Then, just a few weeks later, the August 30, 2013 Form Def. 14-A Proxy Statement (the "Proxy") acknowledged certain problems at CCT (information that was only included at Apollo's insistence), but was otherwise filled with false statements, and omitted material facts regarding the situation at CCT and its effect on the Merger.   For example, Defendants falsely represented in the Proxy that CCT would return "to full, normal operation again as soon as possible" and that "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

18.     Defendants described Cooper's effective internal controls over its financial reporting in the Merger-related disclosures.   In reality, Cooper lacked such controls as it did not have control or direct access to CCT's financial and accounting records.   Cooper was unable to even ascertain CCT's financial situation at the time the Proxy was issued.   Defendant Armes admitted that the CCT disruption was "brought on by this acquisition" and had "caused . . . problems with being able to get in, being able to get the financial information."   Cooper's

inability to access CCT's financials was not only "concern[ing]" to the Company's auditors at Ernst & Young LLP, but was causing Apollo and the banks financing the acquisition to "grow[] more and more anxious regarding the issues, the lack of demonstrable progress and the impact this is having on [Cooper's] financial results and [Apollo's] ability to complete this transaction."

19.     Indeed, at the end of the Class Period, Cooper revealed its internal control failures.  On February 28, 2014, Cooper disclosed in its belated Form 10-Q for the third quarter of 2013, that the Company's operating profit had declined by $102 million – nearly one-third of which was directly attributable to the labor issues at CCT and costs associated with the aborted Merger.  Cooper also admitted that "its disclosure controls and procedures were not effective."

20.     Cooper's financial projections included in the Proxy were also knowingly false. The Proxy provided both optimistic and pessimistic versions of Cooper's sales projections, both of which were misstated by hundreds of millions of dollars.  For example, the "pessimistic" case study in the Proxy projected $4.188 billion in net sales and $521 million EBITDA for 2013.  In contrast, three weeks before the Proxy was issued, Cooper provided Apollo with projections of nearly $300 million less than the Proxy's pessimistic scenario.  By the time the vote on the Merger occurred on September 30, 2013, Cooper's internal projections had worsened considerably.

21.     In addition to false statements and omissions concerning Cooper's control over CCT, CCT's ability to thwart the Merger, Cooper's ineffective internal controls, and Cooper's materially false financial projections, Defendants also concealed labor problems it faced in the United States due to the Merger.  Notwithstanding Cooper's representations on June 12, 2013 that there was no "pending or, to the Knowledge of the Company, threatened … labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving the Company

8

or any of its Subsidiaries," Cooper and Apollo actively anticipated, and planned for, a material dispute with a Local Union of the United Steelworkers ("USW") arising out of the Merger. Indeed, Cooper and Apollo were preparing for litigation with the USW over the terms of the Merger since April 2013, a material fact withheld from shareholders.

22.    In September 2013, following the issuance of the Proxy, but well before the September 30 vote, the chances of the Merger going through weakened even further, all unbeknownst to investors, but well-known to Defendants.  As Armes testified in the Cooper-Apollo Trial, by late September 2013 "[t]he biggest risk at that time was clearly with China" and "I had a lot of reservations about whether [Apollo] would close or not."  Indeed, Apollo made it clear to Defendants that a downward modification of the deal price presented the only chance that Apollo would consummate the Merger.

23.    Cooper refused to acquiesce to a request from Apollo to push back the vote or to consider a price decrease.  Without providing any updated information to shareholders concerning the ongoing problems with CCT and the USW, or Apollo's demands for a price reduction, Cooper went ahead with the shareholder vote on September 30, 2013.  The Merger was approved by Cooper's shareholders, after which Defendant Armes boasted in a press release that the "compelling transaction" would create a combined company "with a strong global footprint that includes a presence in … the fastest growing geographies of India and China."

24.    Shortly after Cooper shareholders voted to go forward with the Merger, the true state of affairs started to become known.  On October 4, 2013, Cooper preemptively filed a lawsuit in the Delaware Chancery Court in an attempt to force Apollo to close on the Merger. Before the markets opened the following business day, Cooper issued a press release attaching a copy of its complaint against Apollo, and Apollo issued a competing statement that blamed the

9

lawsuit on Cooper's "misrepresentations" concerning its control over CCT.  All told, Cooper's shares declined by a total of $5.55, or 18%, on Friday, October 4, 2013 and the following trading day, Monday, October 7, 2013 as the bad news concerning the Merger and the CCT situation were revealed to the market.  Apollo responded to Cooper's complaint with its own counterclaims on October 14, 2013, arguing that Cooper was not in compliance with the Merger Agreement due to its lack of control over CCT.

25.     On November 8, 2013, the Chancery Court determined that Apollo did not breach the Merger Agreement, and denied Cooper's request for an order requiring Apollo to close on the Merger.  The Court specifically found that it was highly unlikely Cooper could ever have been able to satisfy its obligations under the Merger Agreement because Cooper was unable to produce its financial results "due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture."  In response to the Court's opinion, Cooper stock plummeted, falling from $26.90 per share on November 7, 2013 to $23.82 per share on November 8, 2013.

26.     By the end of 2013, the Merger had completely unraveled beyond the point of repair – a fact that, by that time, came as no surprise to investors.  Apollo and Cooper acknowledged on December 30, 2013, that the Merger had been formally terminated.

27.     Cooper did not gain back even a modicum of control over CCT until mid-January 2014.  At that time, the Company was finally provided access to the financial and operational data at CCT that was necessary to prepare its quarterly report on Form 10-Q for the third quarter of 2013 (ended September 30, 2013).  That Form 10-Q was filed with the SEC on February 28, 2014, and revealed for the first time just how severely the problems associated with the Merger had impacted Cooper's business – a loss of $29 million was blamed directly on CCT – in

addition to revealing Cooper's admittedly ineffective internal controls over the third quarter financial results. Upon this news, Cooper's common stock dropped nearly 8%.

## II.   CLAIMS ASSERTED

28.    Based on the facts alleged herein, Lead Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Cooper and the Individual Defendants on behalf of purchasers of Cooper's common stock during the Class Period, June 12, 2013 through February 28, 2014, inclusive. Lead Plaintiffs also assert Section 14(a) and 20(a) claims on behalf of investors who held Cooper common stock on the Record Date of August 30, 2013, and were entitled to vote on the Merger between Cooper and Apollo.

## III.   JURISDICTION AND VENUE

29.    The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.P.R. §240.10b-5 and SEC Rule 14a-9, 17 C.F.R. §240.14a-9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

30.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Cooper is incorporated in this District and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## IV.   PARTIES

### A.   Lead Plaintiffs

31.     OFI Asset Management ("OFI"), a subsidiary of OFI Group, is a France-based asset manager, with a principal place of business located at 22 rue Vernier, 75017 Paris.  As reflected in the certification attached hereto as Exhibit A, OFI Asset Management purchased shares of Cooper stock on the New York Stock Exchange during the Class Period through the OFI Risk Arbitrages Fund and the OFI Risk Arb Absolu Fund (the "OFI Funds"), and suffered substantial losses as a result of the violations of the federal securities laws alleged herein.  The OFI Funds are structured as "Fonds Commun de Placement,'' or "FCPs," and are organized under the laws of France.  As such, under French law, the OFI Funds do not have a legal personality and cannot act on their own.  Accordingly, OFI Asset Management, as asset manager for the OFI Funds, has the exclusive right to manage the OFI Funds and engage in litigation in their names.  OFI Asset Management, through the OFI Funds, held shares of Cooper common stock as of August 30, 2013, the Record Date for voting on the Merger, which were eligible to vote.

32.     Plaintiff Timber Hill, LLC ("Timber Hill") is a Connecticut limited liability company with its principal place of business at One Pickwick Plaza, Greenwich, Connecticut 06830.  As reflected in the certification attached hereto as Exhibit B, Timber Hill purchased shares of Cooper stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  Timber Hill held shares of Cooper common stock as of August 30, 2013, the Record Date for voting on the Merger, which were eligible to vote.

{FG-W0378817.}

B. **Defendants**

33.     Defendant Cooper, a Delaware corporation based in Findlay, Ohio, is the fourth largest tire manufacturer in North America, and the eleventh-largest tire manufacturer in the world by revenue.  The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "CTB."  Cooper currently has approximately 63.5 million shares of stock outstanding.

34.     Defendant Roy Armes ("Armes") was, at all relevant times, Cooper's Chairman and Chief Executive Officer.  Armes signed the Definitive Proxy Statement and the Sarbanes-Oxley certifications contained in each of Cooper's Form 10-Qs that are discussed below.

35.     Defendant Bradley Hughes ("Hughes") was, at all relevant times, Cooper's Chief Financial Officer.  Hughes signed each of Cooper's Form 10-Qs that are discussed below, as well as the Sarbanes-Oxley certifications contained in each of those Form 10-Qs.

36.     Defendants Armes and Hughes are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Cooper, possessed the power and authority to control the contents of Cooper's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

13

C.      **Non-Party Apollo Tyres Ltd.**

37.      Non-party Apollo is a publicly-traded Indian company that manufactures, among other things, tires and tubes for cars, trucks, farm equipment, and light commercial vehicles. Apollo was founded in 1972, and has since grown to be one of the largest tire manufacturing companies in the world, employing over 16,000 people with annual revenue of approximately $2.34 billion in 2012.  Apollo trades on the Bombay Stock Exchange.  Apollo is led by Onkar Kanwar, who serves as its Chairman and Managing Director.  Onkar Kanwar's son, Neeraj Kanwar, serves as Vice Chairman and Managing Director and Sunam Sarkar serves as President and CFO.

## V.      BACKGROUND

A.      **Cooper's Business Strategy**

38.      Cooper, founded in 1914, is the fourth largest tire manufacturer in North America, and the eleventh-largest tire manufacturer in the world by revenue.  Based in Findlay, Ohio, Cooper and its family of companies currently operate 9 manufacturing facilities and 38 distribution centers in 11 countries.  As of December 31, 2012, Cooper employed 13,550 people worldwide.  The Company is organized into two reportable business segments:  North American Tire Operations, which manufactures and markets passenger car and light truck tires for sale in the U.S., and International Tire Operations, which includes the Company's manufacturing operations in the United Kingdom, the Republic of Serbia and the People's Republic of China.

39.      Cooper has significant manufacturing operations in China.  Cooper Chengshan Tire, or CCT ("CCT"), located in Rongcheng, in eastern Shandong province, is Cooper's principal Chinese business.[2]  The CCT joint venture was founded in February 2006, when

---

[2]  The Company also operates Cooper Kunshan, located in Kunshan, China, which manufactures light vehicle tires largely for sale in markets outside China.

Cooper acquired a 51% ownership position in Cooper Chengshan (Shandong) Passenger Tire company, Ltd. and Cooper Chengshan (Shandong) Tire Company, Ltd.  As Cooper explained in its Annual Report on Form 10-K for 2007, this acquisition was part of its Asian strategy, which "calls for [Cooper] to align with strategic partners the Company believes will provide access to the local market and position it to take advantage of the significant anticipated growth within Asia over the next five to ten years."

40.     The other 49% stake was held by the Chengshan Group ("Chengshan"), which is led by Chairman Che Hongzhi, who is referred to as "Chairman Che."  In its complaint filed in in connection with the Delaware Litigation (the "Delaware Complaint"), Cooper admitted that Chairman Che was "highly influential."  Chengshan, through its subsidiaries, is engaged in tire manufacturing, steel cord, rubber planting and processing, ocean biology engineering, real estate development, ecological tourism, technological research and hotel operation among other things. As was revealed during the Cooper-Apollo Trial testimony, Chairman Che and the Chengshan Group were the "local partner[s]" who were "necessary for local reasons."  Indeed, the Chengshan Group has significant ties with the Chinese government.  According to the Chengshan Group's English-language website, since 1997 "in order to bring the advantages of state-owned large and medium-sized enterprises into full play and seek greater development space" the Chengshan Group has made efforts in the "enrollment of 512 key state-owned large and medium-sized enterprises which would receive the support of Chinese government." Moreover, before becoming employed with the Chengshan Group, Chairman Che served as the Chief of Investment Promotion Bureau of Rongcheng City – the city in which CCT's facilities are located.

41.     Three years after the CCT joint venture was formed in March 2010, Cooper decided to increase its 51% stake in CCT, paying Chengshan $18 million to raise its ownership of CCT to 65%.   At the time, Allen Tsaur, General Manager of Cooper's Asian Pacific operations, commented that "CCT is a critical part of Cooper's strategy and has performed exceptionally well.  We are excited about the opportunity to increase our ownership in these operations."   However, Chairman Che later expressed his disappointment with that sale.  As reported in *Forbes India*, Chairman Che told Onkar and Neeraj Kanwar during a November 2013 meeting that "he had been taken for a ride by Cooper" and that "he had sold his 15 percent stake in the joint venture to Cooper, and all he got was $18 million."

42.     As it currently stands, CCT is 65% owned by Cooper, and 35% owned by Chengshan.  Because Cooper accounts for any venture in which it has a majority interest under the "equity" method of accounting, Cooper accounts for and reports its share of CCT's assets, liabilities, revenue, and profits, on a consolidated basis in its financial statements.

43.     A chart demonstrating Cooper's ownership structure of CCT is set forth below:



### B.     CCT Is Cooper's Most Important Subsidiary

44.     CCT is Cooper's most important subsidiary, and operates Cooper's most profitable manufacturing facility.   CCT employs 5,000 workers, or nearly 40% of Cooper's entire workforce.   In addition, as Defendant Hughes admitted in his Cooper-Apollo Trial testimony, CCT is responsible for approximately one-quarter of Cooper's revenues and profits.

45.     CCT's revenue and location in the key emerging Chinese market made Cooper an attractive partner and investment opportunity for Apollo.  Cooper's ownership of CCT allowed the Company to tout that it was among the top eight truck and bus radial tire manufacturers in China.   As reported by Marketline in December 2012, Cooper's "strong market position enhances the brand image of Cooper Tire in the market place and provide[s] an edge over its peers."  Moreover, a May 10, 2013, Standard & Poor's report on Cooper specifically noted that higher production at CCT "will aid [Cooper's] margins."

46.     According to Apollo managing director Neeraj Kanwar's Cooper-Apollo Trial testimony, "China was very, very important for the transaction and still is very important for the transaction. It is the fastest growing economy of the world."  Indeed, as Kanwar wrote to Armes in an August 27, 2013, email that was used at trial, "CCT is a very significant part of Cooper's global operations and, as one of the key value drivers for Cooper, was and remains at the core of our strategic plans and projected earnings."

## VI.    DEFENDANTS' FRAUDULENT SCHEME

### A.     Apollo And Cooper Discuss A Possible Merger

47.     As early as October 2012, news outlets leaked news of a potential merger between Apollo and Cooper.  An unconfirmed report on Bloomberg on October 11, 2012 estimated that Apollo could acquire a controlling stake in Cooper for a price between $600 million and $800

17

million, although rating agencies such as Standard & Poor's quickly stated that they were "skeptical" that such a bid would occur.

48.     Beginning in January 2013, Apollo and Cooper began "serious" discussions about a potential merger, and began identifying the major negotiating points in the transaction.  A key motivation for Apollo was to acquire CCT and to gain better access and entry into China.  As Neeraj Kanwar explained in his trial testimony, while Apollo is a leader in the Indian tire industry and has a presence in Europe and South Africa, acquiring Cooper would give Apollo "an opportunity in China.  So together, when you combine these two entities, you get a geography which looks after the entire world" including the "two fastest growing economies of the world, which is China and India."  As Kanwar testified, "China was very, very important for the transaction."

49.     However, unbeknownst to Apollo, Cooper was also negotiating with Chairman Che about a potential sale of the entire Company to Chengshan.  Defendant Armes testified at the Cooper-Apollo Trial that, as early as January 2013, Chairman Che let Cooper know that "he would be interested in putting in a bid" and that he "had indicated that he was interested" in purchasing Cooper.  Cooper withheld from Apollo (and its own investors) any information concerning Chengshan's interest in and potential bid for the Company.

50.     On March 7, 2013, management from Cooper and Apollo had their first face-to-face meeting regarding a potential merger.  During that meeting, Cooper and Apollo identified potential risks to the deal as including the contracts with Cooper's domestic unions as well as the attitude of Chengshan.  Defendant Armes, Cooper's Chairman and CEO, testified that during the March 7 meeting, Apollo expressed concern about how Chairman Che would react to this

acquisition.   Armes informed Apollo that one possibility with regards to the venture was that Chairman Che "could disrupt it or try to undermine it."

> **B.**     **Cooper And Apollo Agree To A Merger**

51.     On June 12, 2013 Cooper and Apollo announced that they had entered into the Merger Agreement whereby Cooper would be acquired by Apollo for approximately $2.5 billion, or a price of $35 per share, representing a 40% premium over Cooper's 30-day volume-weighted average price.   The market reacted favorably to news of this Merger and Cooper shares immediately increased by $10.10, or 41%, closing on June 12, 2013 at $34.66 per share.

52.     In the Merger Agreement, Cooper made numerous representations regarding its control over CCT, internal controls and its relationships with its unions.   Specifically, Cooper represented that:

- "[T]he Company or one of its Subsidiaries *has exclusive possession of each Owned Real Property and Leased Real Property*," including the CCT facilities;

- There were no "pending or, to the Knowledge of the Company, *threatened*, nor has there been for the past five years, *any labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving the Company or any of its Subsidiaries*"; and

- Cooper maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, "*and provide[d] reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements.*"

53.     As discussed herein, Defendants' statements concerning the Merger falsely represented that: (i) Cooper had exclusive possession of the CCT facilities; (ii) it maintained effective internal controls and provided "reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements"; and (iii) that there were no pending or threatened

19

labor strikes, lock-outs, material disputes, walk-outs, work stoppages or slow-downs involving Cooper or any of its subsidiaries.  Contrary to Cooper's assurances concerning its control over its Chinese operations and CCT, in particular, the Company had no effective control over this business.  Moreover, the above statements were materially false and misleading in that they failed to disclose that Cooper's joint venture partner opposed the transaction, had demanded compensation, and had the ability to thwart the deal by asserting its control over the CCT facility and the unionized workforce at CCT.  Defendants similarly misrepresented and failed to disclose their knowledge and belief concerning the challenges to be made by Cooper's domestic unions to the transactions, which they not only considered, but specifically planned a strategy to address.

54.     Apollo's offer to acquire Cooper was financed by over $2.5 billion in debt.  As Apollo explained in its pre-trial briefing, the financing needed for the transaction was intended to be accomplished through a $1.875 billion bridge-to-bond facility and $500 million revolving credit facility provided by a group of investment banks led by Morgan Stanley documented in a Commitment Letter, and a $450 million secured credit facility through Standard Chartered Bank to be contributed as equity to the purchase.  Under the Commitment Letter, the financing banks contemplated that they would underwrite the debt and it would be offered into the market through a private placement by way of an Offering Memorandum and a "high-yield road show."

55.     Critically, prior to marketing the debt, and in order to obtain a rating, the financing banks would need financial information and business plans, including then-current financial statements and data for all of Cooper's subsidiaries (the "Required Information"). In order to accomplish this, the Merger Agreement provided a 20-day "Marketing Period" that would begin when all necessary financial information and business plans and projections were provided, and that information was, among other things, materially correct and accurate,

sufficiently current and supported by an auditor's "comfort letter."[3]  The transaction agreements contemplated that, among other conditions, once Apollo and the financing sources had the Required Information and prepared an offering memorandum, the 20-calendar day marketing period could begin, leading to the financing at the close of the transaction.  Cooper's portion of the Required Information required it to obtain, among other things, current financial results from CCT and a comfort letter from its audit firm.

56.    Although the closing of the Merger was not conditioned on the financing – and the Commitment Letter contemplated that the banks would still fund a bridge facility even if they were unable to sell the debt –  it was conditioned on providing the banks the ability to market the debt by requiring the provision of the Required Information.  The completion of the Marketing Period was a precondition to closing.

57.    The Merger Agreement also provided for a vote by Cooper's shareholders to be scheduled "as promptly as reasonably practicable after the date of mailing of the Proxy Statement."  The shareholder vote would ultimately be scheduled for September 30, 2013.

### C.    Defendants Knew That Chengshan Would Resist And Prevent The Merger With Apollo

58.    As Cooper admitted in the Delaware Complaint, it knew that CCT would be an issue in consummating the Merger.  Chengshan's opposition to any potential transaction was conveyed to Cooper by May 15, 2013 at the latest.  On that date, Apollo managing director Neeraj Kanwar met with Chairman Che and Chengshan.  Also in attendance at that meeting were Hal Miller ("Miller"), President of Cooper's International Tire Division, and Allen Tsaur ("Tsaur"), Cooper's Senior Vice President & General Manager of Asia Operations.  According

---

[3] Comfort letters usually accompany the audited financial statements for a company. The letter contains whatever assurances the accountant is willing to provide with respect to the reliability of the subject company's financial statements.

{FG-W0378817.}

to trial testimony, during that meeting, Chairman Che explained that he was opposed to any transaction with Apollo and, at the very least, demanded compensation in return for any approval of the deal, saying, "[m]y father is changing to my stepfather – what am I getting?"  As Sunam Sarkar, Apollo's Chief Financial Officer, testified, the parties walked away from that meeting with the understanding that Chairman Che wanted some form of compensation to acquiesce to the Merger.

59.     Despite this warning, Cooper concealed Chengshan's opposition to the Apollo acquisition from investors, and maintained that CCT was not an obstacle to completing the Merger.  In fact, rather than disclose this significant risk, Cooper touted CCT as a valuable asset that would motivate Apollo to close the deal.  As was revealed in the Cooper-Apollo Trial, during Cooper and Apollo's negotiations, Cooper sought to allay any concerns that Apollo had concerning the Merger, CCT or Chairman Che.  Specifically, Cooper, told Apollo that its Chinese platform, including CCT, was a "very low risk way to launch Apollo as a player in the China market," and that Chengshan "was a very good partner."  According to Cooper, Chengshan had no veto or put rights, and Cooper told Apollo that Chengshan's approval for the Merger would *not* be required.  Neeraj Kanwar further testified that in March or early-April 2013, Apollo had a call with Defendant Hughes and Miller in which Miller "gave us all comfort that there was no issue on the relationship with Chairman Che and things were going [on] the right path."  According to Kanwar, Miller explained that Chengshan had "a lot of investments in the plant and that there was absolutely no concern as far as China or CCT was concerned."

60.     As was only revealed months later in trial testimony, Cooper executives knew the opposite was true – that Chengshan vigorously opposed the deal – because Chengshan had *itself* sought to acquire Cooper.  Internal Cooper documents produced at trial showed that, prior to the

22

announcement of the Merger, Cooper had been in negotiations with Chengshan concerning a proposed acquisition and that Cooper had in fact anticipated a higher bid from Chengshan than what had been proposed by Apollo.  Indeed, Defendant Armes testified that on or about May 15, 2013 – the same day that Apollo was in China meeting with Chairman Che – Che's representatives were negotiating with Cooper's representatives about a potential Merger between Chengshan and Cooper.

61.     As Defendant Armes testified, during the spring of 2013 he knew that Chengshan was preparing a proposal to acquire Cooper.  Armes testified that he met with Chengshan on two occasions to "try to gauge the seriousness of their offer and if it was really going to go anywhere" but Chengshan was apparently not able to arrange financing before the Merger was announced.  Rather than giving Chengshan time to arrange financing for a competing bid and seek to maximize the value for Cooper's shareholders, Defendants moved quickly to lock in the offer from Apollo, despite the obvious risk posed by Chengshan.

62.     Concerning Chengshan's proposed offer, Armes testified that Chengshan would "wait until after some announcement with Apollo and then they would look at coming in with a topping bid."  Accordingly, Defendants knew that its joint venture partner vigorously opposed the deal with Apollo because, for among other reasons, Cooper had spurned Chengshan's attempts to acquire Cooper, and, at minimum, Chengshan required compensation in return for any approval of the transaction, which it had the ability to effectively veto by assuming control over CCT's assets, operations, financial information and labor force.

63.     Defendants' knowledge of the true risks of consummating the Merger are also demonstrated by the fact that Cooper specifically sought to insulate itself from the risk that Chengshan would thwart the transaction in negotiating the terms of the Merger Agreement.

23

Specifically, Cooper negotiated a Material Adverse Effect clause in the Merger Agreement that Cooper believed would allow it to argue that a negative reaction by Chengshan would not constitute an event that would permit Apollo to walk away from the deal.  However, as revealed during the trial, throughout the extensive negotiations regarding this very term, Cooper never disclosed to Apollo that Cooper was specifically contemplating the risk of an adverse reaction by Chengshan.   In fact, rather than negotiate in good faith, Cooper falsely told Apollo that Chengshan and Chairman Che were not a threat because Cooper had control over CCT, appointed the key operational personnel at the subsidiary, and that "Cooper was the industrial partner running this operation, and that Chairman Che was kind of the local partner who was . . . there" and only "necessary for local reasons."  However, as set forth below and demonstrated by the fact that Cooper would be effectively locked out of CCT, Cooper did not have effective control over CCT.

64.     Despite knowing that Chairman Che was attempting to put together his own bid for Cooper and would attempt to block the Merger, Cooper never disclosed this fact to its investors.   Indeed, this vital information was even kept secret from Apollo.  For example, Defendant Hughes testified in the Cooper-Apollo Trial that Apollo was never told during any meetings that he attended during Merger negotiations that it was likely there would be disruption at CCT.  Nor was Apollo informed of the fact that Cooper had little to no control over CCT, despite the fact that Chengshan had the ability and motive to thwart the deal by asserting its control over CCT.

65.     Neeraj Kanwar's testimony further confirmed that Cooper had concealed this information from its investors.  Indeed, Kanwar testified that Cooper never disclosed that it was, in fact, in talks with Chairman Che about potentially buying Cooper.  Cooper's investors only

24

learned that Cooper and Chengshan were in talks about a potential buy-out during the Cooper-Apollo Trial. There, both Defendant Armes and Neeraj Kanwar testified that Cooper never once disclosed that Chengshan was another potential bidder for the Company. Indeed, Armes testified that after the problems started in China, Neeraj Kanwar asked him about the identity of other bidders for Cooper, and Armes refused to tell him who they were.

66.     As Kanwar confirmed in his testimony, the knowledge that Chengshan was a rival bidder was materially important information for **anyone** concerned with the Merger and also represented a major risk to the transaction:

> I really wish someone had told me. … Post June 12th, if I had known this, it would be a totally different strategy on how to operate in China. I know -- I know the Asians and, obviously, if you're going against a bidder, here he is totally against you, who's shut off a plant, who's shut off access and you're not even telling us. Tomorrow we're going to be the owners of the company. **We need to know that.**
>
> And I only realized this yesterday when Mr. Roy Armes mentioned this. **And I've been all this while wondering why is this guy not liking this merger. If you put two and two together, obviously he doesn't like this merger because he was one of the bidders**.

67.     Indeed, analysts confirmed that the existence of competing bidders was important information for investors. A June 12, 2013, analyst report by KeyBanc Capital Markets analyzing the Merger announcement specifically noted that "[w]e do not foresee other competing bidders for acquiring CTB." A June 13, 2013 report by the same analyst was titled "CTB: Shareholders Get a Good Deal from Apollo; Another Bidder Seems Unlikely" and discussed the fact that their HOLD rating was predicated on the belief that "competing bids from other strategic buyers appear somewhat unlikely at this point" and that Cooper's management "did not foresee material upside from entertaining other offers." That report noted, based on the analyst's discussions with the Company, that Cooper "made it clear that it was not shopping the business to other competitors in the industry."

25

### D.   Cooper Lacked Control Over CCT

68.   Despite CCT's importance to Cooper's overall business, and its critical importance to the Merger, Defendants failed to disclose that Cooper had shockingly little control over its most important subsidiary.  This was manifest by the fact that CCT had a distinct management team dominated by employees loyal to CCT and lack of access and control over CCT's accounting, financial reporting and other systems.

69.   Defendants themselves acknowledged that Chengshan and Che had effective control over CCT as they were the "local" partner.  Chengshan's effective control was a product of its, and Che's, deep ties and embedded relationships with the Chinese government and the workers and unions at CCT.  This influence allowed Chengshan and Che to act with impunity.  Their control over CCT, known before the Merger was announced, was fully borne out by subsequent events when Chengshan orchestrated numerous acts to disrupt the Merger.  Aware of these issues, Defendants chose to obscure the true facts of Chengshan's approach to them about purchasing Cooper, the fact that CCT sought compensation to "go along" with the transaction, and the fact that Chengshan had the ability to control CCT in such a manner as to act as a veto over the Merger.

70.   This is consistent with information obtained from former employees of Cooper with knowledge.  Confidential Witness ("CW") 1, the Global Manager of Internal Audit at Cooper from 2010 through May 2013, became familiar with the CCT-Cooper relationship through CW 1's work in the global audit capacity.  For example, CW 1 visited Cooper Kunshan on several occasions and regularly interacted with individuals at CCT.  Members of CW 1's team who reported to CW 1 also visited CCT in person.  Further, CW 1 reported to Defendant Hughes for approximately six months during the second half of 2011.

26

71.     CW 1 stated that Cooper had "apparently very little" control over CCT.  CW 1 explained that Chengshan "pretty closely controlled CCT" and that it was a "very closed atmosphere there, whether it was audit, controls, financials – there was a lot of mystery around what happened out there."  Specifically, CW 1 noted that CCT had two management teams, and while only "a handful" of personnel were from Cooper, "most" personnel were from Chengshan. CW 2, a former Systems Administrator at Cooper from September 2012 through January 2014, interacted with CCT's own internal IT and systems support team.  CW 2 also came to know more about Cooper's lack of control over CCT through interactions with CW 2's supervisor, Clark Huff, who was involved with the setup of CCT and would "share thoughts and viewpoints and opinions from [CCT's] side."  CW 2 confirmed that Cooper "didn't have a whole lot of authority" over CCT, which was run as a separate business unit.

72.     Critically, CW 1 emphasized that CCT had its own financial system, with access to data being "closed off" to Cooper.  CW 1 explained that "[w]e did not have the ability to go get the financial information. We couldn't see the data."  Instead, CW 1 explained that CCT would submit financial information to Cooper on a monthly basis, and Cooper would then incorporate it into their global consolidation system. CW 3, a former operations accounting manager at Cooper from August 2012 through December 2013, confirmed that "China was on a totally different system than ours. We didn't have access to it. We didn't, as a corporate office, have visibility. They had to send us numbers on a monthly basis." CW 2 also confirmed that throughout CW 2's tenure, CCT maintained separate data systems that could not be accessed by Cooper.  According to CW 2, "It was widely known we didn't have access to [CCT's] financial data, which was making it difficult to provide numbers to close out our year."

27

73.     Moreover, as MKM Partners described in a November 2013 analyst report, Chairman Che and Chengshan had a "war-lord-like relationship" with CCT's employees that was "powerful and detrimental to the value of [Cooper's] interest."  Indeed, Chengshan had at least once before shut Cooper out of the CCT facilities.  As Apollo revealed in its Answer to Cooper's Complaint in the Delaware Chancery Court litigation, subsequent to signing the Merger Agreement, Apollo was told by Cooper of at least one instance in the past few years in which Chengshan denied Cooper management access to the facility to review manufacturing processes, demonstrating that Cooper *never* had exclusive possession or the actual ability to control its primary subsidiary.

### E.     Defendants Conceal Cooper's Lack Of Control Over CCT

74.     Defendants' conversations with Chairman Che and the CW statements about Cooper's lack of control over CCT are corroborated and confirmed by Chengshan's ability and desire to frustrate or block the Merger, none of which was disclosed by Defendants.  Defendant Armes revealed in his trial testimony that on June 11, 2013, prior to Apollo's signing of the Merger Agreement and the day before the deal was announced to shareholders, Chairmen Che reiterated to Defendant Armes "that he would really not like to [sic] us to sell the company and his interest was keeping Cooper and keep things going the way that we were."  Armes "informed him at that point in time that we had signed the agreement."

75.     When Cooper announced the Merger to its shareholders it highlighted its Chinese operations as critical to the deal.  For example, Cooper described the Merger as bringing "together two companies with highly complementary brands, geographic presence, and technological expertise to create a global leader in tire manufacturing and distribution" with a "strong presence in high-growth end-markets," including China.  Moreover, according to Cooper's press release announcing the deal, due to Cooper's significant presence in China, the

28

"combined company will be uniquely positioned to address large, established markets, such as the United States and the European Union, as well as fast-growing markets of India [and] China…where there is significant potential for further growth."  In none of its public statements and filings did Cooper disclose the truth concerning the $2.5 billion transaction; namely, that Cooper's joint venture partner opposed the transaction, had made its own offer to purchase the Company, had demanded compensation in connection with accepting the deal, and had the ability to thwart the Merger by asserting its control over the CCT facility and the union at CCT.

> **F.      Apollo And Cooper Recognized That The
>            Merger Would Be Challenged By The USW**

76.      In addition to the apparent problems posed by Chengshan's desire and ability to block the Merger, undisclosed domestic labor problems created a second obstacle to the consummation of the Merger.  Notwithstanding Cooper's representations on June 12, 2013 that there was no "***pending or, to the Knowledge of the Company, threatened … labor strike or lock-out or any material dispute***, walk-out, work stoppage or slow-down involving the Company or any of its Subsidiaries," Cooper and Apollo actively anticipated, and planned for, a material dispute with the USW arising out of the Merger.  Specifically, Cooper knew that the USW was expected to allege that Cooper had violated certain successorship provisions of the collective bargaining agreement applicable to Cooper's plants in Findlay, Ohio and Texarkana, Arkansas by entering into a Merger agreement with Apollo without Apollo having: (i) entered into an agreement with the USW recognizing the USW as the bargaining representatives for the employees within their respective bargaining units at the Findlay and Texarkana facilities; and (ii) entered into an agreement with the USW establishing the terms and conditions of employment to be effective at the two plants as of the closing of the Merger.

77.     Defendants' subjective belief that the USW would challenge the Merger is reflected in statements made by both its in-house and outside lawyers. Stanley Weiner, a Partner at Jones Day who represented Cooper in its Merger negotiations with Apollo, testified in the Cooper-Apollo Trial that the parties were aware during negotiations that "the Steelworkers would take the position" that the successorship provisions applied to the merger transaction and "we needed to craft a solution to that." In particular, Stephen Zamansky, Senior Vice President, General Counsel and Secretary of Cooper, testified that the successorship issue was "discussed with Apollo and their counsel in multiple meetings" during the Merger negotiations. Zamansky testified that Cooper had even provided Apollo with the relevant collective bargaining agreements and discussed the particular provisions that would support the USW's challenge.

78.     Moreover, Cooper and Apollo were preparing for litigation with the USW. Trial testimony revealed that by April 2013 at the latest, Cooper and Apollo were discussing the fact that the USW was expected to file grievances accusing Cooper of violating the successorship clauses in its collective bargaining agreements. Specifically, Weiner testified that in late April 2013 he had a call with the lawyers at Sullivan & Cromwell handling the Merger for Apollo to discuss grievances to be filed by the USW. James Dougherty, a Partner at Jones Day who represented Cooper in the Merger negotiations, also testified that Cooper executives believed that "we ought to work expeditiously to try to convince the Steelworkers that the provision did not apply to the proposed transaction" and that "we would ensure that we had some kind of mechanism, whether it was arbitration or other legal proceeding, to get a decision as quickly as possible" to resolve the challenge from the USW. Weiner confirmed Dougherty's testimony, testifying himself that the parties agreed during the Merger negotiations to "expedite arbitration" with regard to the USW and to "make sure that the decision of the arbitrator would be rendered

30

in sufficient time to give the parties time to negotiate a labor contract so it wouldn't interfere with the closing."

79.     Subsequent events further illustrate that Defendants' public statements regarding its relationship with USW were misleading.   Indeed, on July 8, 2013, the USW and Cooper executed an agreement setting forth the schedule for the filing and arbitration of the USW's grievances relating to the Merger – but this fact was not disclosed to investors.   On August 1, 2013, the USW filed two grievances challenging the Merger on the grounds that it violated Cooper's collective bargaining agreements for its plants in Texarkana, Arkansas and Findlay, Ohio.   The arbitration hearing was conducted on August 28, 2012.   The arbitrator agreed with the USW in his September 13, 2013, Opinion and Award, finding that Cooper had acknowledged in its pre-arbitration briefing that the Merger constituted a "change of control" and that the Company must refrain from selling or transferring the Texarkana and Findlay plants pursuant to the Merger Agreement unless and until the USW entered into agreements with Apollo establishing the terms and conditions of employment to be effective at the two plants.

### G.     Defendants Armes And Hughes Were Motivated To Complete The Merger So They Could Reap Tens Of Millions Of Dollars

80.     Despite being aware of the risks threatening the Merger, Cooper's executives were highly motivated to mislead investors about its true risks, in an attempt to secure shareholder approval and reduce the risk of a competing bid or rejection of the transaction.   For example, Defendant Armes was expected to reap over $22 million if the sale went through. Specifically, after the Merger, Armes would become entitled to receive over $8 million from his vested and unvested stock options.   Moreover, if Armes left the Company following the Merger, as is common in transactions of this kind, he would be entitled to reap almost $10 million from his restricted and performance-based shares and over $4 million in cash severance

31

payments.   Similarly, as Cooper disclosed in its Proxy Statement, Defendant Hughes would become entitled to receive over $5 million dollars in "golden parachute" compensation if the deal went through – a 900% increase over his nearly $500,000 2013 salary.

81.   Enticed by these extraordinary incentives, Defendants were more than willing to disregard the risks posed by Chengshan and mislead investors to ensure shareholder approval of the deal – while they had no personal downside risk if the deal eventually fell apart, they needed shareholders' approval in order to cash in on their gamble.   As Dick Stephens, a former president of Cooper's North American Tire Operations who retired in 2006 after 28 years with the Company, explained in a July 27, 2013, article in *The Courier*, "[e]ssentially, this is corporate greed."   According to Stephens, "You've got key executives who have no tie, no concern about anything other than themselves…and 'If I can walk out of there with $10 million, $20 million, $30 million or more, and screw everybody else, or potentially screw everybody else, I don't care.'"

### H.   CCT Workers Strike While Cooper Assures Investors That It Will Not Impact The Merger

82.   Chairman Che took immediate action to thwart Apollo's purchase of Cooper following the announcement of the Merger.   As reported in a *Forbes India* article titled "How the Apollo, Cooper Deal Was Botched," Chairman Che traveled to the United States at the invitation of Cooper on June 15, 2013 – three days after the announcement – with a bid of his own to acquire the Company.   Che's bid was $38 per share, $3 more than the $35 per share price agreed to between Apollo and Cooper, but Cooper decided to reject this higher offer and forge ahead with Apollo.   Trial testimony and exhibits confirm that Cooper and Chairman Che continued to discuss a potential topping bid following that meeting.   Indeed, on June 26, 2013, Tsaur, Cooper's General Manager of Asia Operations sent an email to Armes summarizing a meeting he

32

had that day with Chairman Che in which "[t]he following options were discussed," including "Chengshan to make topping bid."

83.     Once Che's bid was rejected, Chengshan and CCT acted quickly, first striking and then blocking Cooper from access to any aspect of CCT's operations.  On June 18, 2013, CCT's Labor Union posted "An Open Letter To All Employees of Cooper Tire & Rubber Company" on Chengshan's website in which the Union "object[ed] to [] Apollo's acquisition of Cooper," "strongly protest[ed] this transaction" and "require[d] the termination of this transaction."  Just three days later, Chengshan had orchestrated the complete shutdown of CCT operations, barring Cooper representatives and employees from the facilities through the use of hired security guards.  As Defendant Armes admitted during his trial testimony, Cooper knew that Chairman Che controlled the shut-down, and that the strike was not the result of any employee-initiated action.  Indeed, Armes testified that he was advised by Kamsky Associates, Inc., a Beijing-based advisory firm hired by Cooper to advise on Chinese government matters, that Chairman Che was behind everything that was going on at CCT, from authorizing the strike to putting guards at the door to keep Cooper out.  Specifically, Armes testified in his deposition that:

> [W]hen [Kamsky Associates] had put some people on the ground [in China] to try to understand what was going on there so we could see what actions we needed to put in place and, you know, they indicated there were security guards and things at the door, but everything they found from talking with people was that Che was behind all that was going on there, from authorizing the strike, putting guards at the door to keep us out.

84.     With the strike at CCT continuing, on July 10, 2013, Cooper executives, including Defendant Armes and Tsaur, met with Chairman Che and Che's advisor from the law firm of King & Wood to try and resolve the strikes.  According to Defendant Armes' notes of the meeting, "[i]t was clear that Che only wanted to hear that we were stopping the acquisition by Apollo," "[m]oving forward with the acquisition was not acceptable in their view," and Che

33

would "[s]upport the strike" which could "significantly impact our business depending on the length of the strike."

85.     By July 12, Cooper had lost all access to the CCT facility.  Indeed, Cooper was unable to remove its own tire molds from the CCT facility because security forces prevented Cooper representatives from entering.  While the CCT plant resumed production on August 17, Chengshan ordered that the CCT plant stop producing Cooper-branded tires.

86.     Further, CCT workers physically blocked Cooper-appointed managers from accessing the plant, and denied Cooper the ability to obtain CCT's business and financial records.  Chengshan's efforts to block the Merger went so far as to prevent CCT workers from inputting financial data into computer systems to which Cooper has remote access.  As Defendant Hughes admitted, on August 19, 2013 at the latest (but most likely in early July), Cooper could not collect information in its finance and accounting system to provide either internal or external financial reporting.  On that date, Defendant Hughes was forwarded an email from Cooper representatives in China, which explained that because of the strike, and because CCT had stopped entering operational data into the systems Cooper had access to, Cooper had no access to CCT financial information.  As Stephanie L. Yang, Cooper's CFO of Asia Pacific Operations, wrote to Hughes, "this is a big problem as we cannot collect information in the system to provide both internal and external financial reporting."  As a result, Cooper was unable to produce financial results.

87.     This put the Merger in dire jeopardy.  On August 27, 2013, Neeraj Kanwar sent an email to Defendant Armes in which he stated that Apollo's financing banks were particularly concerned that Cooper had no access to the financial records for CCT.  Kanwar wrote that "[w]ith no control over the financial records, there is little chance we can get a financing done

34

given the need for your auditors to sign off" and that "the completion of the Cooper-Apollo transaction may be jeopardized."

88.    In addition to physically barring Cooper from accessing the CCT facility and obtaining basic information concerning its most important subsidiary, Chengshan also filed formal legal action in China to dissolve the joint venture.  Specifically, Chengshan filed suit on July 29, 2013 in the Weihai Intermediate People's Court, Weihai, China.  The complaint, Case Docket No. (2013) Wei Shang Chu Zi No. 69, named CCT as a defendant and alleged that the Merger Agreement did not adequately provide for CCT's employees and therefore the proposed Merger with Apollo caused CCT's labor union to implement a work stoppage.  The complaint further alleged that the Merger would subject the joint venture (CCT) to further operational risks. The suit sought, among other matters, the dissolution of the joint venture pursuant to Chinese law.  A trial date was set for September 24, 2013, but the date was postponed.  A *Gasgoo Automotive News* report on September 16, 2013 (a certified translation of which is attached hereto at Exhibit C), noted that Chengshan's real purpose in filing the case was to increase its bargaining power in the negotiation with Cooper and Apollo.  If Chengshan won the case, they would have two years to apply for execution, or they could be regarded as giving up the right to dissolve the CCT.  Given the year-long trial time, the case could last for two to three years, making the acquisition unachievable in the short term.  However, U.S. investors did not – and still do not – have access to Chengshan's complaint or the details contained therein.

89.    None of the information concerning Chengshan's control over CCT (and Cooper's loss of control), Cooper's lack of access to the CCT facility, financial information and accounting records, and the Company's ensuing inability to produce the "Required Information" to allow the Merger to close, was disclosed to investors.

35

I.      **Cooper Downplays The Problems At CCT**
        **To Investors In Its Second Quarter 10-Q**

90.     On August 9, 2013, Cooper filed its quarterly report on Form 10-Q for the second

quarter ended June 30, 2013, and disclosed some of the problems that had arisen at CCT

following the Merger announcement.   However, Cooper made materially false and misleading

statements, concealing the truth about those issues from its investors.   For example, while

Cooper disclosed a "temporary work stoppage" at CCT, the Company kept secret the fact that the

strike was controlled by Chengshan and was organized to thwart the Merger.   Moreover, the

Company represented in the 10-Q that it had "maintain[ed] disclosure controls and procedures

designed to ensure that information required to be disclosed" in SEC filings when, in fact, it

***never*** had control over its access to CCT's financial information.   Indeed, as of the date of the

10-Q's filing, that lack of control enabled Chengshan to bar Cooper from accessing CCT, thus

ensuring that the Company could not reliably provide any financial results on a consolidated

basis, including the "Required Information" necessary to complete the Merger.

J.      **While The Prospects For The Merger And Cooper's**
        **Financial Condition Decline Rapidly, Defendants**
        **File The Proxy Statement With Misleading Financial Data**

91.     While Chengshan had taken over the CCT facility and initiated litigation, the

Company's business outside China was suffering as well, and its sales had begun to decline at an

alarming rate.   However, in an attempt to cover up the impact of the CCT strike and problems in

China from derailing the Merger and obtaining shareholder approval for same, Defendants

published knowingly false financial information in the Proxy, published on August 30, 2013,

soliciting votes for the Merger.

92.     The information disclosed in the Proxy was in direct conflict with internal Cooper

financial information.   For example, as discussed in letter from Apollo to Cooper used in the

Cooper-Apollo Trial, on July 21, 2013, Cooper provided Apollo with an initial forecast that included projections of $4.3 billion in revenues and $380 million in operating profit for 2013. Just weeks later, however, on August 9, 2013, Cooper provided Apollo with a revised 2013 forecast, showing $3.9 billion in revenues and $363 million in operating profit.

93.     By September 9, 2013, Cooper revised its business plan again, showing further substantial reductions: $3.6 billion in revenues and $315 million in operating profit for 2013. According to correspondence that was produced in connection with the Trial, Cooper repeatedly told Apollo that the declining financial results were attributable largely to deferred pricing actions in the second quarter that impacted sales volumes and would, in fact, be compensated by over-performance later in the third quarter.

94.     However, on September 17, 2013, with two weeks left to go in the third quarter, Cooper provided new forecasts that had been revised downward yet again, projecting $3.4 billion in revenues and $257 million in operating profit for 2013.  In other words, Cooper had suffered a staggering shortfall from the revenues and operating profit Cooper projected in July, which were 25% and 48% higher than the figures provided just two months later.  Moreover, as of the beginning of October 2013, Cooper's projections reflected a 25% decline in operating profit for September alone, showing that Cooper's assurances of "catch-up" performance in the third quarter were wrong, and the Company's actual profitability was close to half of what Cooper projected just weeks earlier.

95.     Cooper kept its declining financial position, and its impact on the Company's merger prospects, a secret.  Indeed, the Company publicly misrepresented Cooper's financial projections in the Proxy it issued to obtain shareholder approval of the Merger.  In that Proxy, which was filed on August 30, 2013, Cooper presented two sets of figures representing its sales

37

projections for 2013 – one set of figures that Cooper had originally provided to Apollo and other potential purchasers during their Merger negotiations and another set of "revised" expected results that reflected the sales figures after the close of the first quarter, which ended on March 30, 2013.  Specifically, Cooper represented that it had originally projected net sales of $4.445 billion and EBITDA, or "Earnings Before Interest, Taxes, Depreciation and Amortization," of $525 million for 2013.[4]  However, "[f]ollowing the completion of the first quarter of 2013, Cooper Tire updated its financial projections to include actual results from the first quarter of 2013 and revised expected results for the remainder of fiscal year 2013. The revised projections included (in millions)":

|  | 2013 |
|---|---|
| **Net Sales** | $ 4,218 |
| **EBITDA** | $ 538 |

96.     Cooper also provided "sensitivity case" projections that took into account the "cyclicality of the global tire industry, and high margins that the industry had been experiencing."  According to Cooper, the sensitivity case projections included assumptions to reflect the effects of a cyclical downturn, followed by a cyclical recovery, on revenue and EBITDA, including "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions." According to Cooper, even in the pessimistic "sensitivity case," Cooper projected revenues as follows (in millions):

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **Net Sales** | $ 4,188 | $ 4,349 | $ 4,516 | $ 4,690 | $ 4,870 |
| **EBITDA** | $ 521 | $ 457 | $ 384 | $ 446 | $ 511 |

---

[4] EBITDA would generally be considered a more conservative figure than operating profit, which is often expressed as Earnings Before Interest & Tax ("EBIT"), as EBITDA removes two non-cash expense items (depreciation and amortization) from the equation.

{FG-W0378817.}

97.     Defendants knew that these projections were materially false and misleading when they issued the Proxy.  Indeed, three weeks earlier, on August 9, 2013, Cooper provided Apollo with projections showing $3.9 billion in revenues for 2013 – or nearly $300 million less than the forecasted $4.188 billion net sales in Cooper's pessimistic "sensitivity case" projections.

98.     Moreover, Cooper never updated its Proxy or these financial projections before the shareholder vote on September 30, 2013, or otherwise provided Cooper investors the true facts concerning its rapidly deteriorating financial condition, which was significantly impacted by the ongoing problems at CCT.  By the time of the shareholder vote, Cooper was internally projecting $3.4 billion in revenues and $257 million in operating profit for 2013 – or 20% and 50% lower than $4.188 billion in net sales and $521 million EBITDA for 2013 that it reported to shareholders as the pessimistic "sensitivity case" figures in the proxy.

### K.     Cooper Publishes Its Proxy As Conditions Surrounding The Merger And Control Of CCT Continue to Deteriorate

99.     As Cooper's financial performance was floundering, it resorted to desperate measures in an attempt to reassert control over CCT.  As Defendant Hughes later testified, Cooper cut off payments to CCT's raw material suppliers in an effort to force CCT to cave and agree to the Merger.  According to Hughes, Cooper intended that act to force a shutdown of CCT, which "might encourage them [Chengshan/Che] to be more cooperative."  According to Apollo, another tactic proposed by Cooper to reassert its control over its own subsidiary was such "a drastic course of action" that it "was likely to result in a physical clash between the two security firms and place the personal safety of the CCT workers at risk."

100.    In addition, in attempting to complete the Merger and appease Chengshan, Cooper and Apollo executives, including Defendant Hughes, met directly with executives from Chengshan to facilitate a transaction where Apollo would seek to buy out Chengshan's stake in

39

CCT.  According to trial testimony from Neeraj Kanwar and Sunam Sarkar, at some point in September or October 2013, Apollo offered $150-$200 million for Chengshan's stake in CCT, but this offer was rejected by Chairman Che, who instead demanded $400 million for his stake – or nearly one-sixth of Apollo's $2.5 billion purchase price for all of Cooper.

101.    As Cooper was resorting to these increasingly desperate measures, the Company affirmatively misrepresented the true impact of the CCT strike in soliciting shareholder proxies to approve the troubled transaction.  While the Proxy noted certain problems at CCT, notably that it was not producing Cooper-branded tires and that CCT employees had taken "disruptive actions" Defendants falsely and misleading reiterated that that CCT would return "to full, normal operation again as soon as possible."  According to Cooper, "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."  Moreover, the Proxy included the Merger Agreement, which set forth Cooper's representations that, among other things, Cooper had "exclusive possession" of its CCT subsidiary, had effective internal controls over its financial reporting and that it had policies and procedures in place to ensure the Company's subsidiaries' compliance with the law.

102.    Prior to the publication of the Proxy, the situation at CCT, and the fact that Cooper had been entirely cut-off from its primary subsidiary, was described internally by Cooper's auditors at Ernst & Young as virtually unprecedented, and made it impossible for the Company's financial results to be produced and made it impossible for Ernst & Young to provide the necessary "comfort letter" as part of the Required Information to trigger the beginning of the Marketing Period.  In fact, as revealed in the Delaware litigation, in an email to co-workers, in August or September 2013, one of the Ernst & Young accountants reviewing

40

Cooper's financial statements questioned whether the Company could reliably provide any accurate information to investors:

> I'm looking for some examples or thoughts on a situation at Cooper Tire where a material Chinese sub is currently striking (including office workers) and have refused to produce, ship or perform any accounting functions (among other activities). Cooper's CCT sub is protesting the announced acquisition of Cooper Tire by Apollo Tyres, an Indian listed company. The sub typically represents 25% of revenue and earnings on a consolidated basis and has been striking since around the 1st of July. They were able to close June and July as the finance department was permitted to work in the building, however for the August close, they will be estimating results of the sub (not yet sure on what basis) and are not sure what they will do for September if the issue is not resolved.

> I'm obviously concerned about the situation and given the size of the entity, whether they will even be able to ensure materially accurate results. I'm just trying to get some thoughts together on considerations they and we should be making regarding their ability to report and our ability to review/audit, perform S404 testing and complete the required accounting for the Apollo acquisition. Also keeping in mind that Cooper is also in the midst of a $2 billion debt offering so we will have to report August results in the context of the comfort letter.

103.   Accounting experts who testified at Cooper's trial expressed the same concern. For example, Robert Cepielik, a forensic accountant at Deloitte Financial Advisory Services LLP, testified that having a unit withhold financial information from a parent trying to put out consolidated financial results is a "highly unusual situation. I've never seen anything like it."

104.   In addition, as revealed in trial testimony, contrary to the statements in its Proxy, the situation at CCT was "a big problem" for Cooper.  Defendant Armes testified that the disruption "caused a lot of things that is causing us problems with being able to get in, being able to get the financial information."  Moreover, in an e-mail dated August 27, 2013, Apollo managing director Neeraj Kanwar wrote to Defendant Armes, stating "I am writing in reference to the deteriorating situation with your joint venture in China. We and increasingly, our financing banks are growing more and more anxious regarding the issues [here], the lack of demonstrable

41

progress and the impact this is all having on your financial results and our ability to complete this transaction."

105.   Indeed, as was only disclosed at the end of the Class Period, Cooper woefully misrepresented the severity of the CCT strike on the completion of the Merger, and in fact only disclosed the limited information it provided to investors about the CCT facility work stoppage in the August 30, 2013 Proxy because of Apollo's insistence that Cooper disclose it.   Vishal Mittal, a Director of Apollo, explained in an October 4, 2013 letter to Stephen Zamansky, Cooper's general counsel:

> In closing, we again remind you of your disclosure obligations under the Merger Agreement and U.S. securities laws. ***The disclosures regarding CCT that were included in the Proxy Statement, limited though they may be, were included there only on our insistence.*** The circumstances at CCT, combined with the frankly staggering deterioration in the Company's financial performance for the third quarter disclosed to us today, are circumstances that we have difficulty concluding are not required to be disclosed promptly under U.S. securities laws and stock exchange listing rules. We urge you to seek appropriate advice in these matters on which you, your board and we, as the ultimate successor following the Merger, can rely.

106.   The Proxy further misrepresented and concealed material facts in the "Background of the Merger" section, including that one of the principal competing bidders for Cooper was Chengshan.   The Proxy described that Cooper had received several indications of interest from "Party C," later disclosed to be Chengshan.   The Proxy discussed extensive negotiations between Cooper and "Party C," including an initial offer from Chengshan to acquire Cooper at $35 per share, and revised offers on April 29, 2013 and May 6, 2013, both of which valued Cooper at $38 per share, in cash.   The Proxy further disclosed that on May 14, 2013, "Party C" and Cooper entered into a confidentiality agreement so that Chengshan could engage in due diligence.

107.     Despite the number of conversations, multiple offers and progress of these negotiations, nowhere in the Proxy did Defendants disclose the critical, material fact that Party C was Chengshan.   Given Chengshan's relationship with Cooper and ability to seize a key asset that was critical to both the Company's business and consummation of the Merger, the fact that Chengshan had offered to acquire Cooper was a material fact that should have been disclosed and the omission of which made the Proxy materially misleading.   Based on testimony and information described above, it is clear that Chengshan's consideration of acquiring, and offers to acquire Cooper, and Che's perception that he was spurned for a lower bidder, were a material fact relevant to the risks that the Merger would be consummated.

## L.     The Ongoing Problems With CCT Block Cooper From Moving Forward With The Merger

108.     By September 2013, at the latest, it was clear that the problems with CCT were preventing Cooper from meeting conditions required to effectuate the deal.   As discussed in greater detail above, the Merger Agreement provided that the Merger could only close after the completion of a 20-day Marketing Period during which Apollo's financing sources would market the debt being used to finance the Merger.   This Marketing Period could only begin once Apollo and the financing banks received certain Required Information from Cooper, including financial statements and business plans for all of Cooper's subsidiaries, including CCT.

109.     In an attempt to push the Merger forward, on September 3, 2013, Cooper declared in a letter to Apollo that it had provided all Required Information as of August 30 and that the Marketing Period had therefore started.   Apollo responded on September 5, asserting that Cooper had not delivered the Required Information and the Marketing Period had not begun. Specifically, Apollo stated that it was still awaiting "an updated business plan that addresses developments in your businesses, particularly the work stoppage at your joint venture, CCT, as

well as the issues the Company has experienced in recent months in North America which recently have come to light."

110.    Apollo elaborated on what additional Required Information was needed in a September 12, 2013 letter from Vishal Mittal to Stephen Zamansky at Cooper.  Apollo explained that "the Company does not presently have access to financial and other data at CCT. Nevertheless, you have an obligation to provide us with access, including to CCT's books and records, financial condition and operations pursuant to" the Merger Agreement.   Specifically, Apollo stated that Cooper was obligated under the Merger Agreement to provide Apollo with access to "whatever information you have available regarding sales volumes, raw material purchase volumes, inventory, marketing expenses, headcount, payroll and other operating expenses."  Apollo further stated that this information was needed "at your earliest convenience" in order to "make our Financing Sources comfortable with, these unusual circumstances."

111.    Cooper knew that it would not be able to provide this information to Apollo, and accordingly, that the parties were precluded from moving forward with the Merger.   As discussed above, by no later than August 2013 Cooper was unable to collect information from CCT for either internal or external financial reporting and, as a result, Cooper could not produce financial results.   Indeed, in a September 1, 2013 email entered as a trial exhibit, Defendant Hughes informed Defendant Armes that third quarter forecasts were "very fluid [ ] given the lack of clarity about what is going on at CCT."  Cooper's lack of control over CCT was blocking the transaction, yet none of this was disclosed to investors.

### M.    The USW Successfully Challenges The Merger

112.    While Cooper was attempting to deal with the issues in China, it was simultaneously litigating the USW's challenge to the Merger.  As discussed above, while Cooper and Apollo negotiated the Merger, they knew that the USW would challenge the transaction on

the grounds that it violated Cooper's Memoranda of Agreement for its plants in Texarkana, Arkansas and Findlay, Ohio.  The USW filed its formal grievances on August 1, 2013, and arbitration was held in Washington D.C. at the end of that month. On September 13, 2013 the arbitrator issued its decision, ruling against Cooper and finding that the "Company is ordered to refrain from selling or transferring the Texarkana and Findlay plants pursuant to the Agreement and Plan of Merger unless and until the Union has entered into agreements with the buyer, Apollo Tyres B.V., prior to the closing recognizing the Union as the bargaining agent."  This known, but undisclosed, obstacle further increased the risk of the Merger falling through.

### N.  Apollo Demands A Price Reduction From Cooper Because Of The Problems Impacting The Merger

113.    As Armes testified in the Cooper-Apollo Trial, by late September 2013 "[t]he biggest risk at that time was clearly with China" and "I had a lot of reservations about whether [Apollo] would close or not."   Indeed, facing ongoing negotiations with both CCT and USW, Apollo demanded a downward modification of the deal price beginning in September 2013. During the Cooper-Apollo Trial, Zamansky, Cooper's General Counsel, testified that on September 17, 2013, "[t]here was a small side meeting which involved myself; Roy Armes, our CEO; also Onkar and Neeraj Kanwar" during which Neeraj Kanwar indicated that he was "unhappy with certain developments that had arisen since the deal was signed."   Zamansky testified that Kanwar would require a price reduction to move forward:

> He noted Cooper's performance.  He noted the CCT issue as a big one and said, "And now we have this arbitration decision and the Steelworkers to deal with." These affect the economics.  These cost money.  *He said, "If we can fit this in the financing great, but if not, they have to come out of somewhere, and that somewhere was Cooper shareholders," indicating a price reduction*.

114.    Defendant Armes testified that he had a phone conversation with Neeraj Kanwar in September 2013 and that "it was clear that [Apollo] wanted a price reduction."   Neeraj

Kanwar confirmed Armes' story, testifying that he had demanded a price reduction from Armes in a phone call on September 25, 2013 – five days before the shareholder vote.   Armes' handwritten notes from that meeting, exhibits used in the Cooper-Apollo Trial, state that Kanwar told him "Cost are too high for current share price" and that Apollo would likely need "Estimated $75-125m or $1.50-2.00 / share."   In addition, Apollo's lawyers sent two emails to Cooper's counsel on September 28, 2013 that: (i) confirmed Neeraj Kanwar's earlier discussions with Armes regarding the price reduction; (ii) attached a formal proposal for an amendment to the Merger agreement that would reduce the price by $2.50 per share; and (iii) stated that Apollo believed the modification was necessary to see the Merger through.   Finally, as revealed at trial, Armes' handwritten notes from a September 29, 2013 call with Neeraj Kanwar indicate that Kanwar told him that without a price modification, the banks would not finance the deal and that Apollo was "pushed to [the] edge."   As indicated by an October 4, 2013 letter from Apollo to Cooper, at that time Cooper had still not delivered the Required Information to Apollo.

### O.   Cooper Shareholders Vote On The Merger Without Knowing The True Facts

115.   As revealed by trial exhibits, by September 28, 2013, Apollo was demanding both that the Merger price be reduced by $2.50 per share and that Cooper postpone its stockholders' vote for 20 days, from September 30 to October 21.   However, Cooper outright refused. Cooper's counsel stated to Apollo's counsel in a September 30, 2013 email that "[a]s Roy has indicated to Neeraj on several different occasions, we do not see a basis for a decrease from the $35 per share Merger consideration."   Defendant Armes also testified that Cooper did not reschedule the shareholder vote because "[a]t that point in time there was no reason – we had an original deal at $35 a share and there was no reason to change that, or no justification to – for a

price reduction they were calling for. And there was no reason for not moving ahead with the shareholder meeting."

116.    Despite knowing that the Merger was stalled and jeopardized by the ongoing problems with CCT and the USW as well as Apollo's demands for a price reduction, Cooper went ahead with the shareholder vote on September 30, 2013. The results of that vote were disclosed on that day, with 48,879,964 shares voting for the Merger, 1,935,087 against, and 149,580 abstaining.

117.    Commenting on Cooper's shareholders' approval of the Merger, Armes boasted in a press release that the "compelling transaction" would create a combined company "with a strong global footprint that includes a presence in … the fastest growing geographies of India and China." The press release remained silent regarding any of the numerous issues that were then threatening the deal.

## VII.    THE TRUTH IS REVEALED THROUGH A SERIES OF PARTIAL DISCLOSURES

### A.    Cooper Files a Lawsuit to Force the Merger

118.    Just four days after Cooper investors voted to approve the Merger, the true facts began to be revealed as the Merger unraveled.

119.    The market began to recognize the precarious state of the Merger in early October 2013. As disclosed in the Merger Agreement, Apollo was expected to begin marketing the debt it would use to finance the Merger shortly after Cooper's shareholders voted in favor of the transaction. As it was apparent to many people in the financial services business that such a "road show" had not commenced, combined with the reality that many people were aware of Cooper's impending lawsuit, Cooper shares began to decline on October 4, 2014. *Bloomberg News* first noted the decline in Cooper's stock price during the trading day and subsequently put

{FG-W0378817.}

out a story indicating that they had requested comment from Apollo and received no response. Rumors on stock message boards and other forums began to circulate indicating that the Merger was in trouble. The rumors likely reflected leakage of certain information concerning Cooper's lawsuit against Apollo that was filed on October 4, 2013, which many individuals, including Cooper's public relations firms, internal staff, law firms, and financial advisors, would have been aware of as of that date.

120. Recognizing that Cooper lacked any control over its most important subsidiary, which was a fundamental roadblock to completing the transaction at the $35-per-share price touted to investors, the Company announced at 6:10 p.m. and then preemptively filed a lawsuit on October 4, 2013 (at 6:53 p.m.) in an attempt to force Apollo to close on the Merger. After a decline of $1.76 during regular trading on October 4, Cooper shares declined by an additional $3.56, or 12%, to trade as low as $25.95 per share in extended trading that day.

121. On October 7, 2013, before the markets opened, Cooper filed a Form 8-K with the SEC which included a press release belatedly revealing that the Merger was unraveling. That filing attached a copy of the complaint Cooper filed in the Delaware Chancery Court against Apollo on October 4. Even so, Cooper attempted to downplay the extent to which the Merger was at risk by stating in a press release that it was confident that both Cooper and Apollo would "work effectively together" to see the Merger through since "this compelling transaction" would offer many opportunities within "the fastest growing geographies including China."

122. Cooper's complaint made clear that the Merger was in dire straits, due to problems with the USW and latent issues at CCT. This was further confirmed by a statement released by Apollo on October 6, 2013, pinning the failure for the merger to progress on Cooper's lack of control over CCT:

Apollo has asked Cooper to confirm that Cooper has sufficient control over and access to its majority-owned subsidiary in China to permit it to deliver current consolidated financial information and auditors' comfort letters and that Cooper is in compliance with covenants and representations in the merger agreement. To date, Cooper has been unable or unwilling to provide these confirmations. ***Cooper's inability to access the facilities of its Chinese subsidiary***, to determine what products this subsidiary is producing or to whom those products are being sold, ***to track or control how its funds are being spent or even to access operating or financial information, either physically or remotely, goes well beyond any typical work stoppage. Cooper has misrepresented its management and control of this asset to Apollo and to its own shareholders.*** While Apollo continues to be supportive of Cooper's efforts to establish control over its subsidiary's operations and to assert Cooper's rights against its JV partner, Apollo cannot be responsible for Cooper's failures to do so.

123.    The disclosures on October 4 through October 7, 2014 began to reveal the true risk of the Merger closing and reflected the information that there had been significant unknown impediments to that consummation.

124.    Nor was the market fully convinced by Cooper's assurances.  As a BB&T Capital Markets analyst report noted on October 7, 2013, "we believe the likelihood of the deal closing at the initially agreed upon $35 per share price is decreasing and at worst the merger between CTB and Apollo Tyres could fall through.  Notably, as union labor negotiations and the Chinese JV appear to create longer term uncertainty that may prevent final financing arrangements, we are more skeptical of the targeted Q4'13 closure."  An S&P Capital IQ report issued that same day also lowered its price target for Cooper from $35.00 to $33.00 reflecting "our view of a reduced likelihood of the sale of CTB to Apollo Tyres at the previously contracted price of $35 per share."  In response to the October 4, 6, and 7, 2013, disclosures, and the market's realization that due to Cooper's lack of control over CCT and dispute with USW the Merger may not be consummated at the $35-per-share price or on the terms that shareholders had approved just days before, Cooper's common shares fell from $31.27 per share at the close on October 3, 2013 to

close at $25.72 per share on October 7, 2013, a total decline of $5.55 per share, or 18%, wiping out over $350 million in shareholder value.

125.    On October 14, 2013, Apollo filed its Answer to Cooper's complaint in the Delaware Chancery Court.  Apollo counterclaimed, stating that under the Merger Agreement "Cooper promised to do a number of things that it had not done." Apollo further noted that Cooper was not in compliance with the Merger Agreement,

> "in part because ***its representations and warranties are not true*** and because it has failed to perform its covenants . . . .  [] Cooper does not have control over its most significant subsidiary, [CCT]. Indeed, following the announcement of the Merger Agreement, it has become clear and Cooper has admitted that Cooper has lost any physical control over, or even access to, CCT's operations, facilities, assets, and accounting books and records, assuming it ever possessed the access or control that it warranted it had in the Merger Agreement.

126.    Additionally, Apollo noted that Cooper, as a result of its arbitration with USW, had been enjoined from consummating transactions contemplated by the Merger Agreement until a labor agreement was reached with USW.

127.    As was made clear during the trial, Cooper had in fact exploited the inability of the parties to reach a deal with USW as pretext for its lawsuit, and its last-ditch effort to force Apollo to close.  For example, as revealed in trial testimony, contrary to Cooper's claim that Apollo had failed to use "reasonable best efforts" in reaching a resolution with USW by allegedly excluding Cooper from the negotiation process, the truth was that Cooper had a tumultuous relationship with USW and that Apollo's direct negotiations with USW were the only way to reach an agreement.  Louis P. DiLorenzo, Apollo's expert concerning the use of "reasonable best efforts" in the USW negotiations, testified that he was "shocked" by Cooper's arguments, given the extraordinarily antagonistic relationship between USW and Cooper. According to DiLorenzo, excluding Cooper made perfect sense because "[i]f you don't want to reach an agreement, you're definitely bringing people they don't like."  Indeed, it is simply not

50

plausible that the failure to reach an agreement with USW had prevented the transaction from closing given that the concessions sought by USW were a mere fraction of the $400 million in compensation that Chairman Che had demanded.

128.     Following a 4-day trial, on November 8, 2013, Vice Chancellor Glasscock of the Delaware Chancery Court held that Apollo did not breach the Merger Agreement, and denied Cooper's request for an order requiring Apollo to close on the Merger.  In the ruling, the court further elucidated that, based on the information disclosed for the first time at trial, it was highly unlikely Cooper could ever have been able to satisfy its obligations under the Merger Agreement because Cooper was unable to produce its third-quarter financial results:

> [T]he reason for the extreme expedition of this action…is that Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013. Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose third-quarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013. **Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture.**

129.     A November 11, 2013 analyst report from MKM Partners found it "surprising" that the decision was rendered with about 15 minutes left in the trading day and stated "[i]n our opinion, the judge's decision creates a huge burden for CTB to overcome going forward."  This report also "place[d] an extremely low probability on [Cooper's] ability to overturn Vice Chancellor Glasscock's decision."

130.     In response to these disclosures, Cooper stock plummeted, falling from $26.90 per share on November 7, 2013 to $23.82 per share on November 8, 2013, a decline of 11.5%, wiping out another $200 million in shareholder wealth.

131.     In a press release published later that day, Apollo stated that "Cooper has been unwilling to work constructively to complete a transaction that would have created value for both

companies and their shareholders.  ***Cooper's actions leave Apollo no choice but to pursue legal remedies for Cooper's detrimental conduct***."

**B.      The Merger Further Unravels As Cooper's
              Financial Results Suffer**

132.    On November 12, 2013, Cooper filed a Notification of Late Filing with the SEC, disclosing that it would be unable to timely file its Form 10-Q for the quarter ended September 30, 2013 because it had no access to any business and financial information relating to CCT. Further, the Company disclosed that it expected a "significant change" in its results of operations and that its operating profit will be "significantly lower" than Cooper reported for the same period a year before, in part as a result of the effects from the strike at CCT.  According to Cooper, given that the Company does not have sufficient information regarding its most important and profitable subsidiary, "a reasonable estimate of the results cannot be made."

133.    Following these disclosures, additional developments in the Cooper-Apollo Trial confirmed that Cooper's claims against Apollo were without merit, and that the Merger and the shut-down of the CCT subsidiary had in fact put Cooper's long-term business prospects in jeopardy.  Specifically, on the morning of December 13, 2013 *Bloomberg* reported that Cooper had appealed the Delaware Chancery Court's November 8, 2013 ruling to the Delaware Supreme Court.  In its papers, and as analyzed by *Bloomberg*, Cooper argued that Apollo had violated the Merger Agreement by insisting upon a reduction of the Merger price.  These stories further reported on Cooper's disclosure, in a letter to the Delaware Supreme Court dated December 12, 2013, that it remained unable to provide third quarter financial results due to its inability to resolve the issues at CCT and obtain necessary financial information.  On December 16, however, the Delaware Supreme Court denied Cooper's appeal, holding that the appeal had been "improvidently accepted."  The market reacted poorly to this news, which both further

52

highlighted the impossibility of the Merger being completed at the $35/share price and confirmed that the undisclosed problems at CCT and with the USW directly resulted in Apollo's unwillingness to consummate the Merger at $35.00 per share. As a result, the price of Cooper's common stock declined from $23.89 at open on December 13, 2013, to close at $21.62 on December 16, 2013 – a drop of 9.5%.

134.   On December 30, 2013, Cooper announced that it was formally terminating the Merger. On a webcast with investors that day, Defendant Armes acknowledged that "financing for the transaction [was] no longer available" and that it was "a reality that the agreement both companies signed on June 12 will not be consummated by Apollo." On that same webcast, Defendant Hughes admitted that Cooper still did not have any control over its CCT subsidiary or access to the information needed to generate the Company's financial results, and that "[a]t present, we cannot tell you when the situation will be resolved or when we will resume normal [financial] reporting." Defendant Armes echoed Hughes' statements:

> Addressing the issues at CCT joint venture in Rongcheng, China, is our top priority in the near-term. The situation there was driven by the merger agreement; and with the agreement now terminated, ***Cooper is working independently to restore normal operations at CCT. This includes obtaining the information needed for Cooper to resume regular financial reporting as soon as possible.*** Once the situation at CCT is resolved and regular financial reporting has resumed, Cooper will be in a position to address additional options for the deployment of capital targeted at returning value for our stockholders.
>
> ***As I'm sure you understand, we are legally restricted in the actions we can take with the capital of our Company until Cooper resumes regular financial reporting; therefore, the CCT situation must be fully resolved before we can address the options available to return value to our shareholders.***

135.   In a press release published later that day, Apollo stated that "Cooper has been unwilling to work constructively to complete a transaction that would have created value for both companies and their shareholders. Cooper's actions leave Apollo no choice but to pursue legal remedies for Cooper's detrimental conduct."

53

### C.    The Full Impact Of The CCT Strike Is Finally
####    Revealed In Cooper's Third Quarter 2013 Results

136.    Following the termination of the Merger, Cooper had to negotiate further with Chengshan in order to obtain the financial information necessary to file its quarterly and yearly reports.  In January 2014, the Company entered into an agreement (the "CCT Agreement") with Chengshan and the union at CCT that provided that the Union and Chengshan would provide support to return CCT to normal operations.   In addition, the CCT Agreement provided Chengshan a limited contractual right to either (i) purchase the Company's equity interest in CCT or (ii) sell its equity interest in CCT to the Company.  As Defendant Armes stated in an investor conference call on January 31, 2014, this agreement "confirms that Chengshan and the union agree to support CCT in resuming full, normal operations, including the continued production of Cooper brand products and financial data entry, which will allow Cooper to resume regular financial reporting."   Armes further assured investors that "even with the disruption to our business from the Apollo deal and the situation at CCT over the past several months, I want to reiterate that Cooper expects to be profitable for the second half of 2013, and to exit the year with a strong balance sheet."

137.    The Company was finally provided access to the financial and operational data at CCT necessary to prepare its quarterly report on Form 10-Q for the third quarter of 2013.  That Form 10-Q was filed with the SEC on February 28, 2014, and revealed for the first time just how severely the problems associated with the Merger – and, in particular, Cooper's lack of control over its most important subsidiary – impacted Cooper's business.  The Company recorded operating profit in the third quarter of 2013 of $28 million, a *decrease of $102 million* compared with the third quarter of 2012.  Cooper attributed *$29 million of that decline solely to the labor issues at CCT* and a further $5 million of that decline to costs associated with the aborted

54

Merger.  Indeed, in a Press Release issued on February 28, Defendant Armes stated that "issues surrounding the Merger had a significant negative impact on our third quarter results, and we anticipate some carry over of these negative impacts to a lesser degree in the near term."

138.   Moreover, Cooper finally admitted in the Form 10-Q that its disclosure controls were "ineffective" during the Class Period.  The Company stated that:

> As a result of circumstances that arose during the third quarter of 2013 due to labor actions relating to the merger agreement with Apollo, the Company was unable to file the third quarter 2013 Form 10-Q within the time period specified in the SEC rules and forms. This filing delay was caused by the inability to obtain certain business and financial information from CCT joint venture in a timely manner. ***As a result of this situation the Company has concluded that its disclosure controls and procedures were not effective for the third quarter of 2013.***

139.   Analysts were surprised at the extent to which the CCT strike impacted Cooper's results.  In March 3, 2014 analyst reports, KeyBanc Capital Markets stated that the third quarter was "Weaker Than Expected" and Northcoast Research noted that "revenue, operating income, and earnings per share fell well short of our outlook and consensus estimates."

140.   In response to these disclosures, Cooper's stock declined from $24.93 per share at close of market on February 28, 2014 to $23.01 per share on March 3, 2014, a drop of 7.7%, that wiped out a further $125 million in shareholder wealth.

### D.   Post-Class Period Events: Chengshan Buys Cooper's Stake In CCT

141.   The events surrounding the labor strikes in China and the failed Merger irreparably harmed the relationship between Cooper and Chengshan, and Chengshan finally sought to sever that relationship in October 2014. On October 8, 2014, Chengshan announced that it would exercise its option to acquire Cooper's 65% stake in CCT for $284.5 million.  An October 8 article in the *Wall Street Journal* noted that a Chengshan executive said Chengshan decided to buy out its U.S. partner because of last year's labor dispute.  The article quoted the

55

Chengshan executive as stating "[t]here has been no trust between the two parties since the event last summer" and "[w]e are unable to continue our cooperation."

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

142.   Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that the Company's public statements regarding its Merger with Apollo, control over its CCT subsidiary, relationship with USW, internal controls over financial reporting, and reported financial results and projections issued during the Class Period were materially false and misleading.  In particular, as detailed throughout this Complaint, Hughes and Armes were personally involved and knowledgeable about the details, events and issues that are alleged to have been misrepresented or omitted during the Class Period.  The information in this section is a summary of the allegations detailing the Individual Defendants' scienter that are set forth more fully above.

143.   *First*, Cooper and its executives knew from the outset of negotiations with Apollo that the Company did not have any effective control over CCT.  In fact, Apollo was specifically told by Cooper of at least one instance in the past few years in which Chengshan denied Cooper management access to the facility to review manufacturing processes, demonstrating that Cooper never had possession of or the actual ability to control its primary subsidiary. Knowing this information, the Individual Defendants and Cooper concealed that Cooper had no control over its most important subsidiary and that Chengshan could utilize its control over CCT to sabotage the deal.

144.   Indeed, CW 1, Global Manager, Internal Audit at Cooper from 2010 through May 2013, stated that Cooper historically had "apparently very little" control over CCT.  CW 1 explained that Chengshan "pretty closely controlled CCT" and that it was a "very closed atmosphere there, whether it was audit, controls, financials – there was a lot of mystery around

what happened out there."  CW 1 stated that access to CCT's financial data was "closed off" to Cooper, with CW 3 explaining that "China was on a totally different system than ours.  We didn't have access to it. We didn't, as a corporate office, have visibility. They had to send us numbers on a monthly basis."  Further, according to CW 2, a former Systems Administrator at Cooper from September 2012 through January 2014, "[i]t was widely known we didn't have access to [CCT's] financial data."  Cooper touted its control over CCT and misrepresented to Apollo that Chengshan was not able to interfere with the Merger.

145.  *Second*, Defendants Armes and Hughes testified in the Cooper-Apollo Trial that they knew from the outset of negotiations with Apollo that Chairman Che was a rival bidder for Cooper who would and could attempt to stop an Apollo-Cooper merger.  Defendant Armes testified that as early as January 2013, Chairman Che let Cooper know that "he would be interested in putting in a bid" and that he "had indicated that he was interested."  Defendant Armes further testified that he knew Chengshan was preparing a proposal to acquire Cooper during the spring of 2013.  Armes testified that he met with Chengshan on two occasions during that time to "try to gauge the seriousness of their offer and if it was really going to go anywhere" but Chengshan was apparently not able to arrange financing before the Apollo acquisition was announced.  Indeed, Armes testified that Cooper was having talks with Chairman Che about a potential topping bid as late as June 26, 2013 – *two weeks after the announcement of the Apollo-Cooper deal*.  However, the fact that Chengshan was a spurned, rival bidder was only revealed to Apollo and Cooper's investors during the trial itself. Armes even testified that after the problems started in China, Neeraj Kanwar asked him about the identity of other bidders for Cooper and Armes refused to tell him who they were.

146.    Moreover, trial testimony further revealed that the Individual Defendants knew that Chairman Che was vehemently opposed to the transaction and would seek to thwart the deal with Apollo.  In addition to knowing that Chengshan was a rival bidder, Armes also testified that during the first management meeting between Apollo and Cooper on March 7, 2013, he told Apollo's representatives that Chairman Che "could disrupt [the Merger] or try to undermine it." Indeed, Defendant Armes revealed that on June 11, 2013, prior to Apollo's signing of the Merger Agreement and the day before the deal was announced to shareholders, Chairmen Che reiterated to Defendant Armes "that he would really not like to [sic] us to sell the company and his interest was keeping Cooper and keep things going the way that we were."  Armes however "informed him at that point in time that we had signed the agreement."

147.    Fully aware of Che and Chengshan's connections and relationships to governmental entities in China and their control over CCT's workers, Defendants knew that Che and Chengshan would exercise control over CCT to block the Merger.  As Defendant Armes admitted during his trial testimony, once the problems in China manifested, Cooper and the Individual Defendants knew that Chairman Che controlled the shut-down and that the strike was not the result of any employee-initiated action.  Indeed, Cooper was specifically advised that the protest at CCT was orchestrated by Chairman Che.  In addition, on July 10, 2013, Cooper executives met with Chairman Che to try and resolve the CCT strikes.  According to Defendant Armes' notes of the meeting, which were entered as a trial exhibit, "[i]t was clear that Che only wanted to hear that we were stopping the acquisition by Apollo," "[m]oving forward with the acquisition was not acceptable in their view," and that Che would "[s]upport the strike" which could "significantly impact our business depending on the length of the strike."

148.     *Third*, the Individual Defendants knew very early in the Class Period that CCT's refusal to allow Cooper to access its financials would prevent Cooper from completing the Required Information that was a prerequisite to the Merger and the reporting of Cooper's third quarter financial results. As Defendant Hughes testified, by August 19, 2013 at the latest, Cooper could not collect information in the system to provide either internal or external financial reporting.  On that date, Defendant Hughes was forwarded an email from Cooper representatives in China which explained that because of the strike and because CCT had stopped entering operational data into the systems, CCT could not offer any financial information.  As Stephanie L. Yang, Cooper's CFO of Asia Pacific Operations, wrote to Hughes, "this is a big problem as we cannot collect information in the system to provide both internal and external financial reporting."  As a result, Cooper was unable to produce financial results for nearly a quarter of its business.  Indeed, in a September 1, 2013 email entered as a trial exhibit, Defendant Hughes informed Defendant Armes that third quarter forecasts were "very fluid [ ] given the lack of clarity about what is going on at CCT."

149.     The Individual Defendants also knew that Cooper's inability to access CCT's financial data put the deal in serious jeopardy.  One of the documents utilized as a trial exhibit was an August 27, 2013 email from Neeraj Kanwar to Defendant Armes in which Kanwar stated that Apollo's financing banks were particularly concerned that Cooper had no access to the financial records for CCT.  Kanwar wrote that "With no control over the financial records, there is little chance we can get a financing done given the need for your auditors to sign off" and that "the completion of the Cooper-Apollo transaction may be jeopardized."

150.     *Fourth*, the Individual Defendants, who signed the Proxy soliciting votes for the Merger, knew that the financial information included in the Proxy was inconsistent with their

most recent internal financial information.  In the Proxy, Cooper presented two sets of figures representing its sales projections for 2013 – one of which was a lower "sensitivity case" projection which included assumptions reflecting the effects of a cyclical downturn, followed by a cyclical recovery, on revenue and EBITDA.  However, a letter cited in the Delaware litigation revealed that, ***three weeks before the issuance of the Proxy***, Cooper provided Apollo with projections of nearly $300 million less than the Proxy's more pessimistic "sensitivity case" projections.  Further, by the time of the shareholder vote on September 30, 2013, Cooper was internally projecting $3.4 billion in revenues and $257 million in operating profit for 2013 – or 20% and 50% lower than $4.188 billion in net sales and $521 million EBITDA for 2013 that it reported to shareholders as the pessimistic "sensitivity case" figures in the proxy.

151.    Both Defendants Armes and Hughes testified in the Cooper-Apollo Trial that they knew of and were involved in the development of these forecasts.  As Armes testified, "[w]e continued to upgrade our forecast with new information on an ongoing basis," that "[t]he forecasts have directionally been going down," and that "[t]he information that is presented, our guys have presented the best information that they have at the time."  Hughes testified that he continued to provide information to Apollo and that "[w]e've continued the process for providing them with actual results and then following on with updated profit forecasts" and that "we develop [that information], we share that with Apollo."  However, Cooper never updated its Proxy or these financial projections before the shareholder vote, or otherwise provided Cooper investors with the true facts concerning its rapidly deteriorating financial condition.

152.    Moreover, Cooper-Apollo Trial exhibits show that Cooper's executives were actively trying to conceal the issues plaguing CCT in the Proxy.  As discussed in greater detail at ¶105, Vishal Mittal, a Director of Apollo, explained in an October 4, 2013 letter to Stephen

60

Zamansky, Cooper's general counsel, "the disclosures regarding CCT that were included in the Proxy Statement, limited though they may be, were included there only on our insistence."

153.    *Fifth*, by the time of the shareholder vote, the Individual Defendants knew that Apollo was threatening not to go through with the Merger unless it received a significant price reduction.  As discussed in greater detail above, Defendant Armes was told directly by Neeraj Kanwar that Apollo required a price reduction in order to close the deal during phone calls and meetings in September 2013 (¶¶113-14) and Apollo's lawyers sent at least two emails to Cooper's counsel on September 28, 2013 demanding a price modification and setting forth the specific terms of that reduction (¶¶114).

154.    Indeed, by September 28, 2013, not only was Apollo demanding that the Merger price be reduced by $2.50 per share, but also that Cooper postpone its stockholders' vote for 20 days, from September 30 to October 21, 2013.   However, Cooper outright refused, with Defendant Armes testifying that Cooper did not reschedule the shareholder vote because "[a]t that point in time there was no reason -- we had an original deal at $35 a share and there was no reason to change that, or no justification to -- for a price reduction they were calling for. And there was no reason for not moving ahead with the shareholder meeting."  Despite knowing that the deal was being jeopardized by the ongoing problems in China as well as by Apollo's demands for a price reduction, Cooper went ahead with the shareholder vote without disclosing any of those risks to its shareholders.

155.    *Sixth*, trial testimony also revealed that Cooper knew that the USW would challenge the Merger from the outset of the Merger negotiations during spring 2013.  Stanley Weiner, a Partner at Jones Day who represented Cooper in its Merger negotiations with Apollo, testified in the Cooper-Apollo Trial that the parties were aware during those negotiations that

61

"the Steelworkers would take the position" that certain successorship provisions in their collective bargaining agreements applied to the Merger transaction and "we needed to craft a solution to that." Indeed, Stephen Zamansky – who reported to Defendant Armes – testified that the successorship issue was "discussed with Apollo and their counsel in multiple meetings" during the Merger negotiations and that Cooper had even provided Apollo with the relevant collective bargaining agreements and "highlighted the specific provisions as a potential issue." However, this anticipated risk was not disclosed to investors until after the USW filed formal grievances challenging the Merger in August 2013.

156. *Seventh*, Defendants Armes and Hughes' extraordinary "golden parachute" compensation packages raise an additional inference of scienter. As discussed above at ¶ 80 Defendant Armes was expected to reap over $22 million and Defendant Hughes was expected to receive over $5 million dollars if the sale went through and they left the Company in the next two years, and even that would likely occur. Enticed by these extraordinary incentives, Defendants were more than willing to disregard the risks posed by Chengshan and mislead investors to ensure shareholder approval of the deal at its original $35 per share price.

157. *Eighth*, the fact that CCT was such a significant part of the Company's business and was a key component of Apollo's interest in Cooper is strong evidence of Defendants' scienter. Specifically, CCT is Cooper's most important subsidiary and operates Cooper's most profitable manufacturing facility. CCT employs 5,000 workers, or nearly 40% of Cooper's entire workforce. In addition, CCT is responsible for approximately one-quarter of all of Cooper's revenues and profits. Defendant Hughes confirmed during his testimony in the Cooper-Apollo Trial that CCT accounts for up to 25 percent of Cooper's overall revenue and that, aside from Cooper U.S., CCT is the largest Cooper unit in terms of revenue. Cooper's

62

Chinese operations were also one of the primary reasons that Apollo was interested in acquiring

Cooper.  According to Apollo managing director Neeraj Kanwar's testimony, "China was very,

very important for the transaction and still is very important for the transaction. It is the fastest

growing economy of the world."  The fact that the misstatements and omissions at issue here

related to one of Cooper's critical business operations supports a strong inference of Defendants'

scienter.

## IX.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   Announcement Of The Transaction And Merger Agreement

158.    The Class Period begins on June 12, 2013, when Cooper announced that it had

agreed to be acquired by Apollo for approximately $2.5 billion, or a price of $35 per share,

representing a 40% premium over Cooper's 30-day volume-weighted average price.

159.    In announcing the transaction before the opening of the financial markets, Cooper

highlighted the importance of its Chinese operations to the deal.  In a press release filed that day

with the SEC, Cooper described the Merger as bringing "together two companies with highly

complementary brands, geographic presence, and technological expertise to create a global

leader in tire manufacturing and distribution" with a "strong presence in high-growth end-

markets," including China.  That press release highlighted Cooper's "renowned" Chengshan

brand, and noted that "Cooper is one of the most respected names in the tire industry, with an

extensive distribution network and manufacturing infrastructure, and a particularly robust

presence in North America and China."

160.    More specifically, Defendants' June 12, 2013 press release, emphasized that due

to Cooper's significant presence in China, the "***combined company will be uniquely positioned***

***to address*** large, established markets, such as the United States and the European Union, as well

as the ***fast-growing markets of*** India [and] ***China…where there is significant potential for further growth.***"

161.    Cooper filed numerous other documents with the SEC on June 12, 2013 that provided additional details about the Merger and continued to highlight Cooper's China operations.  For example, Cooper claimed in a Media Statement filed on Form Def 14-A that the combined company would have "a strong presence" in "the fastest-growing geographies such as China and India, among others."  Defendant Armes echoed this sentiment in a transcript filed on Form 14-A, stating that "we'll have a strong presence in the world's fastest-growing tire regions of China and India, as well as in Europe and South Africa."  In another transcript filed on Form 14-A, Armes stated that "We're going to be in the fastest growing tire region in the world in China and now India" and "as we look at it, we've been very successful in the execution of our strategic plan.   Strong in North America, growing and being stronger in Asia, China specifically."   In letters to its suppliers and customers, Cooper similarly stated that "We will have a presence spanning four continents, with a significant foothold in the world's three largest automotive regions – the U.S., Europe, and China – and will be a leading player in fast-growing emerging" regions.

162.    Defendants' statements in paragraphs 159 and 161, touting the benefit of the Company's Chinese operations to Apollo (post-merger) were materially false and misleading, and failed to disclose, that: (i) Cooper's ability to include the CCT assets and operations in the sale to Apollo would at best, be frustrated, and would likely be impossible due to its lack of control over CCT; and (ii) Chengshan had made a competing offer to acquire Cooper.

163.    On June 12, 2013, the Company also filed the Merger Agreement, which was annexed to a Form 8-K, and in which Defendants represented that:

64

- "[T]he Company or one of its Subsidiaries *has exclusive possession of each Owned Real Property and Leased Real Property*," including the CCT facilities;

- That there were no "pending or, to the Knowledge of the Company, threatened, nor has there been for the past five years, *any labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving the Company or any of its Subsidiaries*"; and

- That Cooper maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and disposition of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, "*and provide[d] reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements.*"

164.    The statements in paragraph 163 were materially false and misleading because: (i) Cooper was not in exclusive possession or control of the CCT properties in China (Chengshan was)(¶¶68-73); (ii) as later admitted, Cooper did not have effective internal controls over its financial reporting or disclosure controls (¶¶53; 86-7; 138); and (iii) Cooper was aware that Chengshan and Chairman Che had refused to cooperate in the Merger and would make efforts, such as locking Cooper out, refusing access to financial and accounting records, and orchestrating labor strikes and work stoppages, to effectuate blocking the Merger (¶¶58-73). Moreover, the above statements were materially false and misleading in that they failed to disclose the true risks posed by the $2.5 billion transaction given that Cooper's joint venture partner opposed the transaction, had demanded compensation, and had the ability to thwart the Merger by asserting its control over the CCT facility and the union at CCT.

165.    Cooper made additional false and misleading statements regarding the Company's relationship with USW in its June 12, 2013 filings.  In a presentation filed on Form Def 14-A, Cooper stated on a slide titled "Continuity and Business as Usual" that Cooper would "continue to honor collective bargaining agreements" and on a slide titled "Key Takeaways – A Great

Match" that "Cooper will recognize labor unions and honor collective bargaining agreements." In a Frequently Asked Questions document filed on Form Def 14-A Cooper answered the question "What will happen with the unions currently representing Cooper employees and their existing contracts?" by stating that "Cooper will continue to recognize the labor unions and honor the terms of the collective bargaining agreements presently in effect."

166.    Further, as stated above, Cooper represented in the Merger Agreement that there was no "***pending or, to the Knowledge of the Company, threatened … labor strike or lock-out or any material dispute***, walk-out, work stoppage or slow-down involving the Company or any of its Subsidiaries."

167.    The above statements in paragraphs 165 and 166 were materially false and misleading because, contrary to Cooper's assurances that it was not subject to any pending or threatened labor disputes, the Company knew that USW was going to challenge the Merger. Indeed, Cooper and Apollo actively anticipated a material dispute with USW arising out of the Merger concerning USW's argument that Cooper had violated the collective bargaining agreement applicable to its Findlay, Ohio and Texarkana, Arkansas plants by entering into the Merger Agreement without abiding by certain successorship clauses in those collective bargaining agreements (¶¶76-8).   Moreover, trial testimony and exhibits revealed that Cooper and Apollo were preparing for this dispute to be settled through formal legal adjudication by late April 2013 at the latest (¶78).   At that time, Cooper and Apollo were discussing the fact that USW would file grievances accusing Cooper of violating the successorship clauses in its collective bargaining agreements and, according to Cooper's counsel at Jones Day, planned to "ensure that we had some kind of mechanism, whether it was arbitration or other legal proceeding, to get a decision as quickly as possible" if USW challenged the Merger (¶78).

**B.**   **Quarterly Report On Form 10-Q For The Second Quarter of 2013**

168.   On August 9, 2013, Cooper filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2013.  Defendant Hughes signed the 10-Q and Defendants Armes and Hughes certified the truth of its contents pursuant to their obligations under the Sarbanes-Oxley Act.

169.   In that filing, Cooper for the first time disclosed only some of the problems that had arisen at CCT following the Merger announcement, including the work stoppage at CCT (¶90) and the complaint filed by CCT's union (¶88).  Specifically, Cooper disclosed only a "temporary work stoppage" at CCT.

170.   Cooper's misleading disclosures misrepresented the severity of the CCT strike. The true facts, which Defendants knew but misrepresented or concealed from investors, were that the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price announced on June 12, 2013.  (¶¶47-107).  Indeed, the above statements omitted the material facts that the CCT "temporary work stoppage" was in fact controlled by Cooper's joint venture partner (Chengshan) and that the strike had been specifically organized because Cooper had rejected its joint venture partner's attempt to acquire Cooper for itself.  (¶¶83-6).

171.   The Company also represented in the 10-Q that it "maintain[ed] disclosure controls and procedures designed to ensure that information required to be disclosed" in SEC filings.  Further, Cooper represented that, other than changes associated with its implementation of an Enterprise Resource Planning ("ERP") software program, "[t]here have been no other changes in the Company's internal controls over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting."  In addition, Cooper represented that,

based on a review of the effectiveness of Cooper's internal controls, "the Company's CEO and CFO concluded that its disclosure controls and procedures were effective."

172.    The above statements in paragraph 171 were materially false and misleading because the Company in fact lacked effective internal controls over its financial reporting, as it has now admitted.  Cooper ***never*** had control over its access to CCT's financials (¶¶68-72). Cooper had been denied access to its primary subsidiary responsible for 25% of its profits and revenues as early as June 21, and had been fully barred from accessing the facility since at least mid-July, and could therefore not reliably provide any financial results on a consolidated basis (¶¶83-6).  As confirmed in an August 19, 2013 email sent to Defendant Hughes, "this is a big problem as we cannot collect information in the system to provide both internal and external financial reporting" (¶86).  Ultimately, Defendants would admit that they lacked adequate internal control over their disclosure and reporting functions (¶138).

### C.    Proxy Solicitation Seeking Approval Of The Merger

173.    On August 30, 2013, Cooper filed its Proxy seeking shareholder approval of the Merger.  Commenting on the filing of the Proxy, Defendant Armes stated in an article published that day on Business Wire that "[o]ur combined company will offer customers a comprehensive portfolio of products and brands in … the fastest growing geographies of China and India," and that "[w]e are pleased the transaction continues to move forward to closing."

174.    While the Proxy noted that, due to the CCT strike, the CCT facility was not producing any Cooper-branded tires and that CCT employees had taken "disruptive actions, including denying access to certain representatives of the Company and withholding certain business and financial information," Cooper stated that it was continuing "to work toward resolving these issues and returning the facility to full, normal operation again as soon as

possible."   According to Cooper, "*[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger.*"

175.   In fact, as Defendants knew, the opposite was true:  the CCT strike effectively precluded the Merger from being consummated due to Chengshan's barring access to CCT's facilities, financial information and demanding compensation.  (¶¶83-9; 108-11).  On August 27, 2013, three days before the Proxy was issued, Apollo bankers' expressed to Apollo that they were "very concerned" about the transaction given the issues at CCT, prompting Apollo managing director Neeraj Kanwar to email Defendant Armes to ask that Cooper "delay the mailing of its proxy by a few weeks."  Further, Kanwar explained through his counsel that the parties should focus on resolving the CCT strike first given the impact that the lack of access to financial records had on Apollo's ability to market the debt it needed to raise in order to complete the Merger.  As Apollo told Cooper, the "completion of the Cooper-Apollo transaction may be in jeopardy" (¶87).

176.   Moreover, Cooper's misleading disclosure in the Proxy downplaying the severity of the CCT strike also omitted the material facts that the CCT "disruption" was in fact controlled by Cooper's joint venture partner Chengshan and that the strike had been specifically organized because Cooper had rejected Chengshan's attempt to acquire Cooper for itself and to "block" the Merger.

177.   Cooper woefully misrepresented the severity of the CCT strike on the completion of the Merger.  Indeed, Cooper only disclosed the limited information it provided to investors about the CCT facility work stoppage in the Proxy at Apollo's insistence.  As Vishal Mittal explained in an October 4, 2013 letter to Stephen Zamansky, "[t]he disclosures regarding CCT that were included in the Proxy Statement, limited though they may be, were included there only

on our insistence" because the issues impacting CCT "are circumstances that we have difficulty concluding are not required to be disclosed promptly under U.S. securities laws" (¶105).

178.    The Proxy contained materially false and misleading and statements, and omitted to disclose material facts, in connection with the narrative contained in the "Background of the Merger."  Where, as discussed above in paragraphs 106-107, Defendants failed to disclose that the competing bidder, "Party C," was Chengshan and that Cooper had engaged in significant negotiations with Chengshan and Che, who had offered a higher price to acquire Cooper than Apollo.  Defendants failed to disclose this material fact, which made the entire discussion of the course of their negotiations with "Party C" highly misleading given that Chengshan, as a competing bidder, had the ability and motive to block consummation of the Merger.

179.    Further, in the Proxy, Cooper provided materially false and misleading financial projections that directly contradicted the financial projections that Cooper had previously provided to Apollo.  As discussed in greater detail above, the Proxy contained two sets of projections – a set of purportedly normal projections and more pessimistic "sensitivity case" projections that Cooper claimed considered "reduced net sales based on expectations for average industry volume growth, consistent pricing and Cooper Tire's geographic presence;" "reduced expected future margins based on historical margins;" and "reduced expected future capital expenditure costs in response to revised business conditions" (¶¶95-6).

180.    As set forth above, however, these financial projections Cooper reported in the Proxy were materially false and misleading and, in fact, directly contradicted the financial projections that Cooper had provided to Apollo weeks before.  (¶¶91-8).  The true projections, as Cooper knew, showed that revenues for 2013 were $300 million less than the $4.188 billion net sales Cooper projected in its publicly-reported pessimistic "sensitivity case," and the Company's

projected operating profits were $200 million less than the $521 million in EBITDA the Company disclosed to investors in the Proxy.

181.    Moreover, the Proxy included the Merger Agreement, which contained Cooper's materially false and misleading representations concerning Cooper's control over CCT and effective internal controls, as discussed above at ¶¶ 52-3; 163-4; 166-7.  As set forth above, those statements were materially false and misleading because at the time the Proxy was filed the Company was still subject to a labor strike and work stoppages at its CCT facility and had no effective control over its most important subsidiary or access to the CCT facility and, in fact, never did.

182.    In sum, the statements set forth above were materially false and misleading because the true facts, which Defendants knew but misrepresented or concealed from investors, were that: (i) the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price announced on June 12, 2013 (¶¶47-107); (ii) Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control (¶¶68-73); (iii) Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable and made it impossible to complete production of the "Required Information" that was a precondition to the Merger (¶¶68-73; 108-11); (iv) Cooper's operating results had grown increasingly dire in the weeks leading up to and through the August 30, 2013 Proxy filing and the September 30, 2013 shareholder vote, and the projections Cooper disclosed to investors provided a materially false and misleading picture of Cooper's financial performance and the true risk of the transaction (¶¶91-105; 113-17); and (v) Cooper lacked effective internal controls over its financial reporting (¶¶68-73; 85-7; 138).

71

183.   In the Proxy, Cooper also – and for the first time – disclosed its dispute with USW.  The Company stated that on August 1, 2013, USW and two of its local unions "filed grievances alleging that Cooper Tire has violated the successorship provisions of the collective bargaining agreement applicable to each plant by entering into the merger agreement" without Apollo having first entered into labor agreements USW and each local union at the Findlay and Texarkana facilities.  Cooper stated that the parties agreed to binding arbitration regarding the dispute and that the arbitration hearing took place on August 28, 2013.  The Company also warned that if USW prevailed at arbitration, Cooper or Apollo "could be required to enter into an agreement with the United Steelworkers and each local union establishing different terms and conditions of employment from those in the current agreements to be effective at Findlay, Ohio and Texarkana, Arkansas as of the closing of the merger" (¶79).

184.   As discussed in greater detail above, the arbitrator sided with USW in a September 13, 2013, Opinion and Award, and ordered the Company to refrain from selling or transferring the Texarkana and Findlay plants pursuant to the Merger Agreement unless and until USW entered into agreements with Apollo establishing the terms and conditions of employment to be effective at the two plants.  Cooper disclosed the arbitration award in a Form 8-K filed on September 19, 2013, stating that "Cooper Tire is assessing its options related to this decision" but assuring investors that "Cooper Tire and Apollo are continuing discussions with the Unions with an aim of reaching an amicable resolution quickly to minimize any impact on the original closing schedule."  Cooper also attempted to minimize any negative effects of this news by confidently asserting that "[b]oth Cooper Tire and Apollo remain firmly committed to the strategic rationale for the Merger … and are optimistic that a mutually beneficial settlement can be reached."

185.    The above statements were materially misleading because, in sharp contrast to the Company's assurances, Cooper knew by this time that the problems in China and the ongoing issues with USW in the wake of the arbitration award had put the Merger at serious risk (¶¶47-111).    Moreover, Cooper failed to disclose that by the time of this disclosure Apollo had indicated to Cooper that it would not go through with the Merger unless it received a price reduction (¶¶113-14).

###    D.    The September 30, 2013 Press Release

186.    Defendants continued to publicly deny the true impact of CCT's shutdown in connection with the shareholder vote on September 30, 2013.    Upon shareholder approval, Cooper filed a press release with the SEC in which Defendant Armes stated that the "compelling transaction" would create a combined company "with a strong global footprint that includes a presence in … the fastest growing geographies of India and China."    The press release remained silent regarding any of the many issues that were then threatening the deal.

187.    Cooper's statements stand in sharp contrast to what Defendant Armes revealed in his testimony at the Cooper-Apollo Trial.    Indeed, Defendant Armes testified that as of the date of the shareholder vote, Cooper and its top executives were aware that the work stoppage at CCT and the issues with USW were major risks threatening the completion of the Merger (¶115).

188.    Moreover, Cooper failed to disclose that by the time of the shareholder vote, Apollo had indicated to Cooper that it would not go through with the Merger unless it received a price reduction.    As trial testimony revealed, Apollo had demanded a price reduction during multiple phone calls, meetings and correspondences during September 2013 (¶¶113-14).

189.    In sum, the true facts, which Defendants knew but misrepresented or concealed from investors during the Class Period, were that: (i) the Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price

73

announced on June 12, 2013 (¶¶47-117); (ii) at the time of the shareholder vote, Apollo had already demanded a price reduction from Cooper to complete the Merger (¶¶113-14); (iii) Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control which made it impossible to complete production of the "Required Information" that was a precondition to the Merger (¶¶108-11); (iv) Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable (¶¶68-73; 85-6; 108-11); (v) Cooper's operating results had grown increasingly dire in the weeks leading up to and through the September 30, 2013 shareholder vote, and were putting the deal at risk (¶¶91-98); (vi) Cooper lacked effective internal controls over its financial reporting (¶¶68-73; 85-7; 138); and (vii) rather than serve as a value-enhancing transaction, the Merger posed serious, long-term risks and harm to Cooper's business (¶¶47-117).

## X.  <u>LOSS CAUSATION</u>

190.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially inflated the price of Cooper common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market and/or affected the price of Cooper's shares on October 4 and 7, 2013 (¶¶119-124), November 8, 2013 (¶¶128; 130), December 13 and 16, 2013 (¶¶133), and February 28, 2014 (¶¶127-40), the price of Cooper common stock fell promptly and precipitously.  These declines were proximately caused by the disclosure of the previously misrepresented, misleading or undisclosed true facts to the market, reducing the prior artificial inflation, as discussed and detailed above.  As a result of

74

their purchases of Cooper common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

191.    A chart setting forth some of the significant events relevant to the claims asserted herein, together with the Company's stock price, is set forth below:



{FG-W0378817.}

## XI.   **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

192.   Cooper's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

193.   Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Cooper who knew that the statement was false.   None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.   **PRESUMPTION OF RELIANCE: FRAUD ON**
## **THE MARKET AND *AFFILIATED UTE***

194.   Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentation and omissions pursuant to the fraud-on-the-market doctrine in that, among other things:

> A.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

> B.   The misrepresentations and omissions were material;

> C.   The Company's stock traded in an efficient market;

> D.   The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

> E.   Lead Plaintiffs and other members of the Class purchased Cooper common stock between the time defendants misrepresented or failed to

77

disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

195.   At all relevant times, the market for Cooper's common stock was an efficient market for the following reasons, among others:

     A.    Cooper stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

     B.    As a regulated issuer, Cooper filed periodic public reports with the SEC and the New York Stock Exchange;

     C.    Cooper regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

     D.    Cooper was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

196.   As a result of the foregoing, the market for Cooper securities promptly digested current information regarding Cooper from all publicly available sources and reflected such information in the price of Cooper stock.  Under these circumstances, all purchasers of Cooper common stock during the Class Period suffered similar injury through their purchase of Cooper common stock at artificially inflated prices and the presumption of reliance applies.

197.   A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute. Citizens of Utah v. United States*, 406 U.S. 128 (1972) because, as set forth above, Lead Plaintiffs' fraud claims are grounded in Defendants' material omissions.  As this action involves Defendants' failure to disclose material adverse information, including the Company's lack of control over its primary subsidiary, that its joint venture partner opposed and could derail the Merger, the Company's anticipation of

78

conflict with the USW, and that its financial statements were not reliable – information that Defendants were obligated to disclose in light of their statements on these topics – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XIII.  CLASS ACTION ALLEGATIONS

198.  Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Cooper during the Class Period, as well as Cooper stockholders of record as of the close of business August 30, 2013 who were entitled to vote on the Merger, and were damaged thereby. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Officer Defendant; (iii) any person who was an officer of director of Cooper during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; and (vi) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

199.  The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Cooper's common stock was actively traded on the New York Stock Exchange, an efficient market.  Cooper has over 63 million shares of common stock outstanding, owned by hundreds or thousands of investors.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members in the Class.

200.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.     Whether Defendants violated the Exchange Act;

B.     Whether Defendants omitted and/or misrepresented material facts;

C.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.     Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;

F.     Whether the price of Cooper common stock was artificially inflated;

G.     Whether Defendants' conduct caused the members of the Class to sustain damages; and

H.     The extent of damage sustained by Class members and the appropriate measure of damages.

201.     Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

202.     Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

203.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

80

## XIV.   CLAIMS BROUGHT PURSUANT TO SECTION 10(b) AND 20(a) OF THE EXCHANGE ACT

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

204.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

205.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Cooper common stock at artificially inflated prices.

206.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Cooper common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

207.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects, including that the Company lacked control over its primary subsidiary, that its joint venture partner opposed and could derail the Merger, and that its financial statements were not reliable.

81

208.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth from the investing public and to support the artificially inflated prices of the Company's common stock.

210.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cooper common stock.  Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Cooper common stock had been artificially inflated by Defendants' fraudulent course of conduct.

211.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.  This claim is brought within the applicable statute of limitations.

212.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants In Connection with the Section 10(b) Claims

213.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

{FG-W0378817.}

214.    As alleged herein, Cooper is liable to Lead Plaintiffs and members of the Class based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(a) of the Exchange Act.

215.    Throughout the Class Period, the Individual Defendants were controlling persons of Cooper within the meaning of Section 20(a) of the Exchange Act, and culpable participants in the fraud alleged herein.

216.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Cooper, the Individual Defendants had the power and ability to control the actions of Tower and its employees.

217.    Given their individual and collective responsibilities for managing Cooper throughout the Class Period, the Individual Defendants were regularly presented to the market as the individuals responsible for the Company's day-to-day business and operations, as well as its strategic direction.  This claim is brought within the applicable statute of limitations.

218.    Each of the Individual Defendants culpably participated in some meaningful sense in the fraud alleged herein.  By virtue of the foregoing, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XV.    CLAIMS BROUGHT PURSUANT TO SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

219.    The claims in Counts III and IV below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors – including Lead Plaintiffs – who held Cooper common stock on the Record Date of August 30, 2013, and were entitled to vote on the Merger between Cooper and Apollo.  The Proxy Claims

are based solely on negligence. They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims.

220.    The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy and the documents incorporated into the Proxy, contained misstatements and/or omissions of material facts. Further, Defendants did not, as required by law, update and correct their previously-made misstatements.

221.    Defendants' proxy solicitations included all statements which served to color the market's view of the deal and encourage Cooper shareholders to vote in favor of the Merger. These statements included the following (collectively referred to as the "Proxy Solicitations"):

(a)      Cooper's June 12, 2013 Form 8-K and attached Merger Agreement, set forth above at ¶¶159; 160; 163;

(b)      Cooper's Quarterly Report on Form 10-Q for the Quarter ended June 30, 2013, filed on August 9, 2013, set forth above at ¶¶168-69; 171; and

(c)      The Proxy and attached Merger Agreement, set forth above at ¶¶174; 178-79; 181.

222.    All of the Proxy Solicitations were materially false and misleading.

223.    Specifically, the Proxy failed to disclose and/or misrepresented the following highly material information prior to the shareholder vote on September 30, 2013:

(a)      The Merger was an incredibly high-risk transaction that had no reasonable prospects of being consummated at the $35-per-share price announced on June 12, 2013;

(b)      Cooper did not have exclusive possession over its primary subsidiary, CCT, and in fact never had such possession or control;

(c)      Cooper's lack of control over CCT, which accounted for nearly a quarter of its business, rendered Cooper's financial results unreliable and made the closing of the Merger impossible because it precluded Cooper from providing the Required Information as was its obligation under the Merger Agreement;

84

(d)        Cooper's operating results had grown increasingly dire in the weeks leading up to and through the August 30, 2013 proxy filing and the September 30, 2013 shareholder vote, and the projections Cooper disclosed to investors misrepresented Cooper's financial performance and the true risk of the transaction;

(e)        Cooper lacked effective internal controls over its financial reporting; and

(f)        Defendants made material false and misleading statements, and failed to disclose material facts, in the "Background of the Merger" section of the Proxy, specifically by failing to disclose that "Party C," who had offered to acquire Cooper for $38 per share, was in fact Chengshan, which made the entire discussion of the course of their negotiations with "Party C" highly misleading given that Chengshan, as a competing bidder, had the ability and motive to block consummation of the Merger.

224.    Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as update and/or correct any false or misleading statements they had made concerning the situation at CCT and the escalating risks that were stalling and jeopardizing the completion of the Merger. In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote.

225.    The false statements and omissions as set forth above proximately caused foreseeable losses to Lead Plaintiffs and members of the Class, as the risks concealed by these false and misleading statements and omissions materialized through a series of partial disclosures, causing Cooper stock to fall from $31.27 at the close of trading on October 3, 2013, the day preceding the first corrective disclosure, to $23.01 at the close of trading on March 3, 2014, as set forth more fully above at ¶¶118-140; 190-91.

## COUNT III

### Violation of Section 14(a) of the Exchange Act Against All Defendants

226.    Lead Plaintiffs repeat and reallege the allegations in Sections II-V, VII, IX-XIII, above, as if set forth fully herein. For purposes of this claim, Lead Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or

intentional or reckless misconduct. This claim is based solely on negligence. Defendants acted negligently in misrepresenting and failing to disclose highly material information in connection with the Proxy in advance of the September 30, 2013 Proxy vote.

227.  The Proxy, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

228.  Defendants did not update the Proxy Solicitations or the Proxy when material information arose after dissemination of these documents, but before the shareholder vote on September 30, 2013.

229.  Defendants named in this count, jointly and severally, solicited and/or permitted use of their names in the Proxy Solicitations.

230.  Cooper is the issuer of the Proxy.

231.  Defendant Armes signed the Proxy and otherwise permitted the use of his name in the Proxy.

232.  Defendant Hughes signed the Quarterly Report on Form 10-Q for the Quarter ended June 30, 2013 (filed on August 9, 2013) and other Proxy Solicitation documents incorporated by reference into the Proxy, and otherwise permitted the use of his name in the Proxy.

233.  By means of the Proxy and documents attached thereto or incorporated by reference therein, Defendants sought to secure Lead Plaintiffs' and other Class members' approval of the Merger, and solicited proxies from Lead Plaintiffs and other members of the Class.

86

234.    Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, and/or omitting material facts required to be stated in order to make the statements contained therein not misleading. Defendants were required to disclose the material facts discussed above, because Defendants were required to ensure that the Proxy fully and fairly disclosed all objective material facts to allow a reasonably prudent investor to make an informed investment decision. These Defendants also acted negligently in failing to update the Proxy, which were false at the time they were issued and were also rendered false and misleading by the omission of material information that arose after their dissemination and before the September 30, 2013 shareholder vote.

235.    The Proxy Solicitations described herein were essential links in the accomplishment of the Merger. As a result of these solicitations, the Cooper shareholders approved the Merger.

236.    Lead Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

237.    This claim is brought within the applicable statute of limitations.

238.    By reason of the foregoing, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

## COUNT IV

## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants In Connection with the Proxy Claims

239.    Lead Plaintiffs repeat and reallege the allegations in Sections II-V, VII, IX-XIII above, as if set forth fully herein.

240.     During their tenures as officers and/or directors of Cooper, each of Defendants Armes and Hughes was a controlling person of Cooper within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Cooper, these Defendants had the power and authority to cause Cooper to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the Proxy and the other solicitations described herein made by Cooper during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

241.     In their capacities as senior corporate officers of Cooper, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above. Indeed, these Defendants had access to information regarding the circumstances surrounding the Merger, including the terms of the Merger and analyses of the financial condition of Cooper. As a result of the foregoing, Armes and Hughes a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act.

242.     As set forth above, Cooper violated Section 14(a) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Cooper, and as a result of their own aforementioned conduct, Armes and Hughes are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Cooper is liable under Section 14(a) of the Exchange Act, to Lead Plaintiffs and the other members of the Class. Moreover, as detailed above, as officers of Cooper, each of these Defendants is responsible for the material misstatements and omissions made by Cooper.

243.     Lead Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct

88

and proximate result of the untrue statements and omissions in the Proxy and other solicitations described herein.

244.    This claim is brought within the applicable statute of limitations.

245.    By reason of the foregoing, these Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## XVI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiffs as class representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

89

DATED: October 15, 2014

/s/ Joel Friedlander
Joel Friedlander (Bar No. 3163)
Christopher M. Foulds (Bar No. 5169)
Benjamin P. Chapple (Bar No. 5871)
**FRIEDLANDER & GORRIS, P.A.**
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Plaintiffs' Liason Counsel*

Vincent R. Cappucci
Andrew J Entwistle
Robert N. Cappucci
Jordan A. Cortez
Evan T. Raciti
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor
New York, New York 10017
(212) 894-7200

Gerald H. Silk
James A. Harrod
Lauren McMillen Ormsbee
Evan Berkow
Laura Asserfea
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Lead Counsel for Lead Plaintiffs OFI Asset Management and Timber Hill LLC*

90