IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OFI RISK ARBITRAGES, *et al*,

    Plaintiffs;

v.

COOPER TIRE & RUBBER COMPANY, *et al*,

    Defendants.

Civil Action No. 14-68-RGA

MEMORANDUM OPINION

Joel Friedlander, Esq., Christopher M. Foulds, Esq., Benjamin P. Chapple, Esq., Friedlander & Gorris, P.A., Wilmington, DE; Andrew J. Entwistle, Esq. (argued), Vincent R. Cappucci, Esq., Robert N. Cappucci, Esq., Jonathan H. Beemer, Esq., Alexander F. Schlow, Esq., Entwistle & Cappucci LLP, New York, NY; Gerald H. Silk, Esq., James A. Harrod, Esq., Lauren McMillen Ormsbee, Esq., Bernstein Litowitz Berger & Grossmann LLP, New York, NY, attorneys for Plaintiffs.

Stephen C. Norman, Esq., John A. Sensing, Esq., Christopher N. Kelly, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Geoffrey J. Ritts, Esq. (argued), Adrienne Ferraro Mueller, Esq., James M. McWeeney II, Esq., Jones Day, Cleveland, OH; Marjorie P. Duffy, Esq., Jones Day, Columbus, OH, attorneys for Defendants.

July ___, 2015

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court is Defendants' motion to dismiss the amended complaint. (D.I. 53). The matter has been fully briefed. (D.I. 54, 56, 57). The Court heard oral argument on March 11, 2015. (D.I. 62 [hereinafter, "Tr."]).

On January 17, 2014, Plaintiffs OFI Risk Arbitrages, OFI Risk Arb Absolu, and Timber Hill LLC filed this securities class action against Cooper Tire and Rubber Company, Roy Armes, and Bradley Hughes. (D.I. 1). Mr. Armes was Cooper's CEO and Mr. Hughes was Cooper's CFO during the relevant period. (D.I. 54 at p. 2). Plaintiffs filed an amended complaint on October 15, 2014. (D.I. 51). The complaint alleges violations of §§ 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934. (D.I. 51 at 85-93).

For the reasons discussed below, the Court will grant Defendants' motion to dismiss.

## BACKGROUND

Cooper is a leading tire manufacturer with multiple international operations. (D.I. 54 at p. 3). One of Cooper's largest operations was Cooper Chengshen (Shandong) Tire Co., Ltd. ("CCT"), located in China. (D.I. 56 at 9). CCT was a joint venture between Cooper and the Chengshen Group, which was led by Chairman Che Hongzhi. (*Id.*).

On June 12, 2013, Cooper entered into an agreement to be acquired by Apollo Tyres Ltd. for $35 per share, a deal totaling $2.5 billion. (D.I. 54 at p. 4). After the merger was announced, CCT workers went on strike on June 21, 2013. (*Id.* at p. 6). CCT employees returned to work on June 28, but went on strike again on July 13, 2013. (*Id.*). The employees again returned to work on August 17, but denied Cooper access to the facility and stopped producing Cooper tires. (*Id.*). The merger announcement also resulted in the United Steelworkers union ("USW") filing two grievances alleging that the merger violated

1

successorship provisions in its collective bargaining agreements. (*Id.* at p. 8). Cooper and USW entered into an agreement scheduling expedited arbitration on July 8, 2013. (Tr. 66). USW filed official grievances on August 1, 2013. (D.I. 54 at p. 8). In September 2013, Apollo requested a price reduction, which Cooper refused. (D.I. 51 at 49-50).

Cooper shareholders approved the merger on September 30, 2013. (*Id.*). When Cooper began to suspect that Apollo was pulling back from the deal, it filed a lawsuit in the Delaware Chancery Court requesting specific performance. (*Id.*). On November 8, 2013, the Chancery Court denied the request for specific performance and held that Apollo did not breach the Merger Agreement. (D.I. 56 at 17). This lawsuit followed.

## LEGAL STANDARD

To state a claim for securities fraud under § 10(b), a plaintiff must plead: (1) a material misrepresentation (or omission) in connection with the purchase or sale of a security; (2) scienter, *i.e.*, a wrongful state of mind; (3) reliance; (4) economic loss; and (5) "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006). To survive a motion to dismiss, a plaintiff alleging securities fraud must satisfy Rule 8's requirement of factual allegations sufficient to "state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and the "heightened pleading requirement[s]" imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b). *In re Suprema Specialties*, 438 F.3d at 276.

The purpose of the PSLRA is "'to restrict abuses in securities class-action litigation.'" *Id.* at 276 n.8 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999)). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the

2

reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quotation omitted). The complaint must also allege, with particularity, facts giving rise to a "strong inference" that each defendant acted with scienter, that is, a "mental state embracing intent to deceive, manipulate, or defraud." 15 U.S.C. § 78u–4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotations omitted). In addition, the PSLRA "immunizes from liability any forward-looking statement" if it is "accompanied by meaningful cautionary language; or it is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).

## ANALYSIS

### A.    Section 10(b)

At the Court's request, Plaintiffs submitted a letter with the five most salient alleged misrepresentations and omissions, as well as the particularized allegations with respect to those statements demonstrating falsity and a strong inference of scienter. (D.I. 61). I will address these statements in turn.

1. <u>"[T]he Company or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property." (D.I. 51 ¶163)</u>

This statement is a warranty in the Merger Agreement attached to the June 12, 2013 merger announcement and repeated in the August 30, 2013 Proxy. (D.I. 61 at 2 n.2). Plaintiffs argue that the above statement is false because (1) Chengshan had denied Cooper access to the CCT facility at least once in the past, (2) Chengshan had "deep ties" to the Chinese government and closely controlled CCT, and (3) CCT and Cooper had separate financial systems, and Cooper could not control or access CCT's system. (*Id.* at 2).

3

Defendants note that the Merger Agreement's representations and warranties were required to be true as of only two points in time: (1) June 12, 2013, when the Merger Agreement was signed, and (2) at the closing of the deal, which never occurred. (Tr. 7-8). Defendants further note that the above statement refers to possession of real property, not internal controls generally. (*Id.* at 8). Defendants argue that there are no facts in the complaint alleging that neither Cooper nor CCT had possession of CCT's real property on June 12, 2013. (*Id.*).

The second and third reasons Plaintiffs offer to show falsity are unrelated to possession of real property and are therefore irrelevant. I do not think that the first allegation plausibly alleges falsity. Plaintiffs' basis for alleging that Cooper had been denied access to CCT at least once in the past is an unverified allegation in a pleading that Apollo filed in the Chancery Court lawsuit. (*Id.* at 9). In that complaint, Apollo alleged that someone at Cooper told someone at Apollo that Cooper had been denied access to CCT at some point of time in the past. (*Id.*).

In considering whether allegations by a confidential witness meet the particularity requirement of the PSLRA, courts must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (internal quotations and citation omitted). The confidential witness statement here lacks detail, the source is unknown, and there is no corroboration. I must therefore "discount [it] steeply." *Id.*

In addition, the complaint does not allege that Cooper lacked possession of or access to the CCT facilities on June 12, 2013. Rather, it alleges that Cooper "lost any access to CCT soon after the Merger was announced on June 12, 2013." (D.I. 56 at 18). I agree with Defendants

4

that the Merger Agreement's representations were only required to be true as of June 12, 2013 and the closing date, which never occurred. (*See* D.I. 57-1 at 164). There is therefore no allegation that the representation was false as of June 12, 2013.

Plaintiffs similarly fail to plead scienter. Plaintiffs argue that Messrs. "Armes and Hughes knew that Cooper had been barred access to the CCT facility 'at least' once prior to the June 12 announcement of the Merger, because Cooper executives told Apollo this after the Merger Agreement was signed." (D.I. 61 at 2). This allegation is unpersuasive for the same reasons discussed above—it is based on a confidential witness statement lacking detail and with no corroboration. In addition, it does not speak to what Messrs. Armes and Hughes knew as of June 12, 2013. Even if true, it shows only that an unknown Cooper executive knew, after the Merger Agreement was signed, that a lock-out had occurred.

2. The August 30, 2013 Proxy concealed that "Party C" was Chengshan and asserted that "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger." (D.I. 51 ¶¶174, 178).

This statement has two components, which I will address in turn. The Proxy included a background section, which described the negotiations leading up to the proposed merger. (D.I. 57-1 at 39-45). In that section, a consortium led by Chengshan and Mr. Che was described as "Party C." (D.I. 56 at 19). The Proxy stated that Party C had made three indications of interest in acquiring Cooper. (D.I. 57-1 at 39-45). Plaintiffs argue that failing to disclose that one of the rival bidders controlled CCT and desired to block the merger was materially misleading. (D.I. 56 at 19). Plaintiffs maintain that, having put Party C's role in the negotiations in play, Defendants had a duty to speak fully and truthfully. (*Id.* (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)).

5

With respect to scienter, Plaintiffs argue that Mr. Armes was aware that Mr. Che was interested in acquiring the company and had informed Apollo that Mr. Che "could disrupt [the Merger] or try to undermine it." (D.I. 61 at 4 n.6 (alteration in original)). He therefore knew that referring to the consortium as Party C omitted the material fact that Mr. Che was a rival bidder who did not wish to see the merger consummated. (*Id.*).

Defendants argue that identifying the consortium as Party C was not misleading because Party C never made an official bid, only indications of interest. (Tr. 19-20). The consortium was therefore not a "rival bidder." (*Id.*). Defendants argue that Plaintiffs' assertion that Party C should have been identified because it made a rival bid is therefore based on a faulty premise. (*Id.* at 20). With respect to scienter, Defendants argue that there is no allegation that Messrs. Armes or Hughes were involved in the decision about how to label the parties in the Proxy. (*Id.* at 22). Defendants maintain that the negotiations were private and confidentiality agreements were in place. (*Id.* at 21). In addition, Defendants note that all parties were identified with letters instead of names. (*Id.*).

I do not think that Plaintiffs' claim, that failing to identify Party C by name was false or misleading, is plausible. Though Mr. Che controlled CCT, there was never a formal bid and the consortium cannot be considered a "rival bidder." There is also not a strong inference of scienter. The process was a private and confidential one, so identifying the parties with pseudonyms seems to be more likely a result of a reasonable concern for confidentiality than a desire to mislead.

Plaintiffs also argue that it was misleading to state that the strike and plant shutdown were not expected to have an effect on the merger. (D.I. 56 at 23). Plaintiffs argue that Apollo's managing director warned Mr. Armes that "completion of the Cooper-Apollo

6

transaction may be in jeopardy" because Cooper was unable to provide certain financial information since it could not access CCT. (D.I. 61 at 4; Tr. 71). Plaintiffs therefore maintain that the strike could prevent the merger. (Tr. 71-72).

Plaintiffs argue that Messrs. Armes and Hughes knew the statement was false, because Mr. Armes's notes from a July 10, 2013 meeting with Mr. Che indicated that the strike could "significantly impact [Cooper's] business." (D.I. 61 at 4). In addition, Messrs. Armes and Hughes were informed in late August that, as a result of the strike, Cooper could not access the CCT financial information required to close the merger. (*Id.* at 4-5). Plaintiffs contend that the statement is not protected by the PSLRA safe harbor because (1) Defendants knew it was false when made and (2) the cautionary statements were boilerplate. (D.I. 56 at 21-22).

Defendants argue that the statement was not false because the agreement contained a material adverse effects clause, which provided that a strike was not a basis on which Apollo could walk away from the deal. (*Id.* at 26). Defendants argue that Plaintiffs cannot show scienter because the complaint admits that Cooper genuinely believed the material adverse effects clause would prevent the strike from blocking the merger. (D.I. 57 at 11). In addition, Defendants argue that the statement is protected by the PSLRA safe harbor because it is forward-looking and accompanied by cautionary language. (*Id.* at 18-19).

The statement that Cooper believed the strike would not slow down the merger appears to be a genuinely held belief. The complaint acknowledges that Cooper believed the material adverse effects clause would prevent a strike from stopping the merger. There are therefore no particularized facts supporting falsity.

Even if this were not so, the statement is protected by the PSLRA safe harbor. There is no question that it is a forward-looking statement. Plaintiffs argue that the accompanying

7

cautionary statements were boilerplate, but the type of boilerplate statements forbidden by the safe harbor are "significantly more general than these, such as warning readers that an 'investment has risks.'" *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009) (quoting *Avaya*, 564 F.3d at 256). The cautionary statements in the Proxy are specific. For example, it warns that "[w]e cannot assure you that any of our expectations, estimates or projections will be achieved." (D.I. 57-1 at 25). In particular, the Proxy cautions that "the impact of labor problems, including labor disruptions at the Company or at one or more of its large customers or suppliers," could cause "events to differ materially from those expressed" in the Proxy. (*Id.*).

3. The August 9, 2013 Form 10-Q stated that Cooper "maintain[ed] disclosure controls and procedures designed to ensure that information required to be disclosed" in SEC filings was disclosed and represented that "[t]here have been no other changes in the Company's internal controls over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting." (D.I. 51 ¶171).

Plaintiffs argue that this statement is false because (1) there was a shutdown on June 21, 2013 that prevented Cooper from accessing the CCT facility and financial records, (2) CCT and Cooper had separate financial and data control systems, and (3) a February 28, 2014 SEC filing stated that Cooper's "disclosure controls and procedures were not effective." (D.I. 61 at 5-6). Plaintiff further argues that the complaint shows a strong inference of scienter because (1) Mr. Armes knew that Mr. Che was behind the shutdown, (2) it was "widely known" that Mr. Che and Chengshan controlled access to CCT's financial data, and (3) Messrs. Armes and Hughes had detailed knowledge about the internal controls because CCT was a "core" aspect of Cooper's business. (*Id.* at 6).

Defendants note that the statement is directed to financial reporting during the quarter ending June 30, 2013. (Tr. 11). While there was a shutdown from June 21, 2013 to June 28,

8

2013, the complaint does not allege that the shutdown had any effect on access to financial data for the second quarter. (*Id.* at 12). Defendants argue that Plaintiffs' third point as to falsity, that Cooper later lost access to CCT financial data in the third quarter, is impermissible fraud by hindsight. (*Id.*). Defendants maintain that there is no allegation that any financial data for the second quarter—or any time previously—was inaccurate. (*Id.* at 11-12, 14). With respect to scienter, Defendants argue that none of Plaintiffs' allegations speak to whether Cooper had access to financial data for the second quarter.

I agree that there are no particularized allegations that Cooper lacked internal control over financial reporting for the second quarter of 2013. Difficulties in accessing data in a subsequent quarter do not indicate that the internal controls during the second quarter were inadequate. In addition, that Cooper and CCT had separate computer systems does not indicate that internal control was lacking during the second quarter. Cooper had no difficulty accessing financial data in the past. Internal controls do not require that all financial information for every subsidiary be on a central computer.

I also do not think that Plaintiffs have pled allegations showing a strong inference of scienter. That Defendants knew how the computer systems worked and that Mr. Che controlled them does not demonstrate that they knew they would not be able to access data. The system had worked in the past. The most likely inference from that is that they believed the system would continue to work. In addition, knowledge of the labor strike is not relevant because it did not affect access to financial data for the second quarter.

4. <u>The Merger Agreement stated that there were no "pending, or to the Knowledge of the Company, threatened . . . labor strike or lock-out or any material dispute, walk-out, work stoppages or slow-down involving the Company or any of its Subsidiaries." (D.I. 51 ¶166).</u>

9

Plaintiffs argue that this statement is false because, in April 2013, Cooper and Apollo discussed the possibility of USW filing a grievance in response to the merger announcement. (D.I. 61 at 7). Plaintiffs note that USW and Cooper executed an agreement setting forth a schedule for expedited arbitration of the grievances on July 8, 2013. (Tr. 66). Plaintiffs maintain that, because Defendants prepared for USW to file a grievance, combined with the fact that one was filed shortly after the announcement, it was false to say they had no knowledge of a threatened dispute. (Tr. 67). Plaintiffs argue that Defendants knew the statement was false because they prepared for the possibility of USW filing a grievance. (D.I. 61 at 8).

Defendants note that, as with the first statement, this representation was only required to be true on June 12, 2013. (Tr. 29). Defendants argue that there are no allegations of any threatened dispute as of June 12, 2013. (*Id.*). For the same reasons, Defendants argue that Plaintiffs cannot show an inference of scienter.

Plaintiffs have not shown either falsity or scienter. Preparing for responses to a major announcement does not mean that Defendants knew which responses would occur. Sophisticated parties naturally plan in advance for any number of reactions to a major transaction. It does not follow that they expect, let alone know, that every such response will occur. Relying on a later-filed grievance is an attempt to prove fraud by hindsight. The Third Circuit has "long rejected attempts to plead fraud by hindsight." *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004). "To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

5.  The August 30, 2013 Proxy contained false financial projections. (D.I. 51 ¶96).

10

Plaintiffs argue that the August 30, 2013 Proxy contained materially false financial projections. (D.I. 61 at 8). Plaintiffs maintain that the "projections were objectively false because they were materially greater than the financial projections used internally and presented by Cooper to Apollo just weeks earlier." (D.I. 56 at 24). Plaintiffs argue that Defendants failed to update the projections included in the August 30, 2013 Proxy even though they had updated, significantly lower projections. (D.I. 61 at 8). With respect to scienter, Plaintiffs maintain that Messrs. Armes and Hughes testified at the Chancery trial that they were aware of the updated projections. (*Id.* at 9).

Plaintiffs argue that the projections are not protected by the PSLRA safe harbor because they were false when made; by the time of the August 30, 2013 Proxy, Messrs. Armes and Hughes knew of the lower projections, which were sent to Apollo on August 9, 2013. (D.I. 56 at 24-25).

Defendants respond that Delaware law requires disclosure of the projections provided to bankers and potential bidders. (D.I. 57 at 13). The projections that bankers relied upon must be included in a proxy statement for transparency in evaluating the fairness opinion, not as current, accurate projections. (Tr. 32-33). Defendants argue that the Proxy made clear that the projections were "included in this proxy statement only because the information was provided to the Apollo parties . . . ." (D.I. 57-1 at 55). Defendants maintain that Plaintiffs did not allege falsity, because there is no allegation that the projections included were not the projections disclosed during negotiations. (Tr. 34). Cooper did not hold the projections out as accurate in the Proxy, so the fact that later projections differed does not make it false that the projections included were those showed to Apollo. (*Id.* at 34-35). With respect to scienter, Defendants

11

argue that the strongest inference that can be drawn from the inclusion of these projections is that they were required by Delaware law. (D.I. 57 at 13).

In addition, Defendants argue that the PSLRA safe harbor applies. (D.I. 54 at p. 21). The Proxy stated, "these financial projections constitute forward-looking statements." (D.I. 57-1 at 55). Defendants note that the projections were surrounded with ample cautionary statements, and the Proxy was clear that they were outdated and not to be relied on as accurate. (D.I. 57 at 13-14).

The Proxy states,

> [W]e provided the Apollo Parties and certain other potential purchasers that signed confidentiality agreements selected, non-public financial projections prepared by our senior management. We also provided such projections to BofA Merrill Lynch. . . . [T]he portions of these financial projections set forth below are included in this proxy statement only because this information was provided to the Apollo Parties, certain other potential purchasers and Cooper Tire's financial advisor on a confidential basis in connection with a potential transaction involving Cooper Tire. . . . You should not regard the inclusion of these projections in this proxy statement as an indication that Cooper Tire, the Apollo Parties or any of their respective affiliates, advisors or other representatives considered or consider the projections to be necessarily predictive of actual future events, and you should not rely on the projections as such. . . . None of Cooper Tire, the Apollo Parties or any of their respective affiliates, advisors or other representatives has made or makes any representations regarding the ultimate performance of Cooper Tire compared to the information contained in the projections. . . . We do not intend to update these outdated financial projections or to make other projections public in the future.

(D.I. 57-1 at 55-56).

I agree that the safe harbor applies. The Proxy explicitly says that the projections are forward-looking statements, and they are surrounded by cautionary language. Even if that were not the case, I do not think Plaintiffs have alleged falsity or scienter. The projections were included in the Proxy because they were provided to bidders and bankers, as required by Delaware law. *See In re Netsmart Technologies, Inc. Shareholders Litig.*, 924 A.2d 171, 203-04

12

(Del. Ch. 2007) ("[W]hen a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed."). The Proxy makes perfectly clear that that is the sole reason they are included. Plaintiffs have not alleged that the projections were not provided to the bankers and bidders. There is no falsity. In addition, the strongest inference to be drawn from including the statements is that Defendants were following Delaware law, not attempting to mislead or defraud.

6.      Omissions

In addition to the statements addressed above, Plaintiffs allege that Defendants made several fraudulent omissions. (D.I. 56 at 19-20). Plaintiffs argue that Cooper had a duty to disclose that Mr. Che and Chengshan "wanted to acquire Cooper, had made an unsuccessful competing bid for the Company, and were orchestrating the strike to block the Merger." (*Id.* at 19). Plaintiffs allege that omitting that information made statements in a June 12, 2013 press release and several SEC filings false and misleading because those documents highlighted the importance of Cooper's Chinese operations to the merger. (D.I. 51 at 67-68). In addition, Plaintiffs argue that Defendants had a duty to disclose that Apollo requested a price reduction. (*Id.* at 20).

Defendants argue that an alleged omission is not actionable unless it renders an affirmative statement misleading. (D.I. 57 at 23). Defendants maintain that, having disclosed the CCT strike, there was no obligation to disclose everything about it, such as speculation about Mr. Che's motives. (*Id.* at 23-24). Defendants further argue that Plaintiffs have not identified an affirmative statement that failing to disclose Apollo's price reduction request would make misleading. (*Id.* at 24).

13

"Liability may exist under Rule 10b–5 for misleading or untrue statements, but not for statements that are simply incomplete." *Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007). Defendants had no obligation to disclose Mr. Che's personal motivations or his role in the strike. As discussed above, he did not make a competing bid. In addition, I do not see how the omissions Plaintiffs identify make statements about the importance of China to the merger false or misleading. The omission with respect to the price reduction request is not tied to any affirmative statement, and is therefore not actionable.

**B.    Section 14(a)**

Section 14(a) of the Securities Exchange Act of 1934 provides,

> It shall be unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit . . . any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 78l of the Act.

15 U.S.C. § 78n(a)(1). To state a claim under § 14(a), a plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *California Pub. Employees' Ret. Sys.*, 394 F.3d at 144. For the reasons discussed above, Plaintiff has failed to allege that the Proxy contained a material misrepresentation or omission. Thus, the § 14(a) claim will be dismissed.

**C.    Section 20(a)**

Section 20(a) "establishes a derivative cause of action in which liability is premised on an independent violation of the federal securities laws." *City of Roseville Employees' Ret. Sys. v.*

14

*Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 427 (D. Del. 2009) (internal quotation marks omitted)).

It provides,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (1988). Where there is no underlying securities violation, there can be no liability under § 20(a). *See Shapiro*, 964 F.2d at 279. Because Plaintiffs' § 10(b) count is dismissed, there can be no derivative liability. Thus, the § 20(a) claim will be dismissed.

## CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss is granted. An appropriate order will be entered.